UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO: 1:23-cv-24771

ERNESTO LALOR, an individual, JOSEFINA
RUIZ LUQUE, an individual, MARTIN
MELHEM, an individual, GUSTAVO ARCHAIN,
an individual, IGNACIO ARCHAIN, an
individual, and GUILLERMO DE JULIO, an
individual,

    Plaintiffs,

      v.

MATIAS COSTANTINI, an individual;
JUAN CRUZ TALIA BROWN, an individual;
JONATHAN CULLEY, an individual;
ALBERTO SAN MIGUEL, an individual;
CAPITAL FORCE LLC, a Delaware limited
liability company; CAPITAL FORCE F1 LLC, a
Delaware limited liability company; and
VEHICLE SOLUTIONS CF LLC, a Florida
limited liability company,

    Defendants.

_____/

## COMPLAINT

The above-captioned Plaintiffs file this Complaint, and sue the above-captioned

Defendants in this matter, and in support thereof, state as follows:

### I. THE PARTIES

1.    Plaintiffs Ernesto Lalor ("Lalor") and Josefina Ruiz Luque ("Luque"), husband and

wife, reside in the country of Argentina. Lalor and Luque (collectively referred to as the "Lalor

Family") invested in excess of $1,625,980.00 of their life savings in Capital Force LLC and Capital

Force F1 LLC Promissory Notes.

2.     Plaintiff Martin Melhem ("Melhem") is a citizen of the United States and Argentina and resides in the United States. Melhem invested in excess of $3,400,000.00 of his life savings with Capital Force LLC, Capital Force F1 LLC, and Vehicle Solutions CF LLC.

3.     Plaintiff Gustavo Archain ("G. Archain") is a citizen of Argentina and resides in the country of Argentina. G. Archain invested $50,000.00 of his life savings with Capital Force LLC.

4.     Plaintiff Ignacio Archain ("I. Archain") is a citizen of Argentina and resides in the country of Argentina. I. Archain invested $100,00.00 of his life savings with Capital Force LLC.

5.     Plaintiff Guillermo de Julio ("De Julio") is a citizen of Argentina and resides in the country of Argentina. De Julio invested $100,00.00 of his life savings with Capital Force F1 LLC.

6.     Defendant Capital Force LLC ("Capital Force") is a Delaware limited liability company with its principal place of business in Miami-Dade County, Florida. Capital Force is subject to personal jurisdiction in Florida because it operated, conducted, engaged in, or carried on a business or business venture in this state and/or committed a tortious act within this state and/or is engaged in substantial and not isolated activity within the State of Florida.

7.     Defendant Capital Force F1 LLC ("Capital Force F1") is a Delaware limited liability company with its principal place of business in Miami-Dade County, Florida. Capital Force F1 is subject to personal jurisdiction in Florida because it operated, conducted, engaged in, or carried on a business or business venture in this state and/or committed a tortious act within this state and/or is engaged in substantial and not isolated activity within the State of Florida.

8.     Defendant Vehicle Solutions CF LLC ("Vehicle Solutions CF") is a Florida limited liability company with its principal place of business in Miami-Dade County, Florida. Vehicle Solutions CF is subject to personal jurisdiction in Florida because it operated, conducted, engaged

in, or carried on a business or business venture in this state and/or committed a tortious act within this state and/or is engaged in substantial and not isolated activity within the State of Florida.[1]

9.      Defendant Matias Costantini ("Costantini") resides in Miami-Dade County, Florida, and is otherwise *sui juris*. Costantini is the founding partner/member, manager and current President of the Capital Force Entities, including Vehicle Solutions CF, Capital Force and Capital Force F1. As President and founding partner/member Costantini is the highest-ranking officer, exercises significant control over the Company operations. From its inception in or around late 2017 through the present, Costantini was Capital Force Entities' ultimate decision-maker about policy and strategy, which includes making business and legal decisions. Additionally, Costantini is a licensed securities agent and investment advisor and has worked in such capacity for Merrill Lynch starting in 1998, thereafter at UBS Financial Services and lastly at Insigneo Securities until late 2018. Costantini on his LinkedIn profile lists himself as the President of the Capital Force Group of companies, a Wharton School of Business graduate and previous First Vice President with UBS Financial Services.

10.     Defendant Juan Cruz Talia Brown ("Talia-Brown") resides in Miami-Dade County, Florida, and is otherwise *sui juris*. According to Capital Force's web page, Talia-Brown is the founding partner and current Vice-President of the Capital Force Entities including Vehicle Solutions CF, Capital Force and Capital Force F1. Talia-Brown's responsibilities cover a broad area of Capital Force's corporate structure, financial operations, liaisons with investors, oversees the day-to-day operations and exercises significant control over Capital Force Entities' operations.

---

[1] Capital Force, Capital Force F1 and Vehicle Solutions CF are collectively known as (the "Capital Force Entities" or "Company").

Moreover, Talia-Brown had signatory authority and control of Capital Force Entities bank accounts.

11.     Defendant Jonathan Culley ("Culley") resides in Miami-Dade County, Florida, and is otherwise *sui juris*. Culley is one of the founding partners and chief financial officer of the Capital Force Entities including Vehicle Solutions CF, Capital Force and Capital Force F1. Culley's responsibilities cover supervision and control over a broad area of Capital Force's corporate structure, financial operations, financial planning and record keeping, liaisons with investors, preparing financial reports for investors' review, signatory authority for Capital Force Entities' bank accounts and exercises significant control over the Capital Force Entities' operations.[2] Moreover, in such capacity as the chief financial officer, Culley approved in excess of 1,200 outbound wire transfer from Capital Force Entities' bank accounts.

12.     Defendant Alberto San Miguel a/k/a Alberto H. San Miguel ("San Miguel") resides in Miami-Dade County, Florida, and is otherwise *sui juris*. San Miguel through his company SCP Finance LLC, is a 30% Member of Vehicle Solutions CF. San Miguel is also one of Vehicle Solutions CF's Managers, and in such capacity had authority to manage, control and otherwise operate Vehicle Solutions CF's business and affairs. San Miguel's responsibilities cover a broad area of Vehicle Solutions corporate structure, financial operations, liaisons with investors, directing the acquisition of automobile loans and exercises significant control over Company operations.

## II. JURISDICTION

---

[2] Defendants Costantini, Brown and Culley are collectively known as (the "Individual Defendants")

13.     This Complaint asserts claims under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

14.     The Court has personal jurisdiction over Defendants Costantini, Talia-Brown, Culley, and San Miguel because they are residents of the Southern District of Florida. The Court also has personal jurisdiction over each Defendant under Florida's long-arm statute because they have all conducted continuous and systematic business in the State of Florida and are therefore subject to general jurisdiction pursuant to Florida's Long-Arm Statute §48.193.

15.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because Defendants can be found or transact business in this District. Also, Defendants Capital Force, Capital Force F1 and Vehicle Solutions CF maintain their headquarters in Miami, Florida, which is situated in this District. Venue is also proper because many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in this District.

16.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the United States mails and interstate telephone communications.

### III. INTRODUCTION

17.     Plaintiffs Ernesto Lalor, Josefina Ruiz Luque, Guillermo de Julio, Ignacio Archain, Gustavo Archain, and Guillermo de Julio (the "Plaintiffs") are six of over 150 victims of a fraudulent scheme masterminded by a web of individuals, who enticed victims with baseless promises of a high-return, safe and fully collateralized investment opportunity in the form of an

unregistered fraudulent securities offering. This Ponzi-like scheme was orchestrated by Defendants Costantini, Talia-Brown, and Culley (collectively the "Individual Defendants") individually and through the unlawful use of business entities controlled by them, from 2017 through the date of insolvency and filing of Assignments for the Benefit of Creditors on October 24, 2022 (the "ABC").

18.     Defendants' fraudulent schemes also involved other individuals and entities which assisted Defendants, including Vehicle Solutions Corp., Capital Force Management LLC, Costamat Corp, Yacare Corp, Totan Corp, Vehicle Solutions USA LLC, Capital Force F5 LLC, attorney Jennifer Snyder and her law firm Snyder International Law Group P.A. (the "Relevant Entities and Individuals").

19.     Defendants used investor funds for business operations, employee payroll, sales agent commissions, personal expenses, and real estate ventures for the benefit of Costantini, Talia-Brown and Culley. Moreover, Defendants also used investor funds to make Ponzi-like repayments to earlier investors.

20.     From early 2017 and until October 2022, Defendants' fraudulent scheme operates behind multiple veils of secrecy built of the Defendants' lies to conceal among other things:

> (1) the true nature of Capital Force Entities' loan practices and that Plaintiffs' investments were not secured by car loans, which Defendants represented secured in excess of 125% of the amount invested by Plaintiffs;

> (2) the fact that contrary to Individual Defendants' representations, investor funds were being used for purposes other than purchasing car loans from Vehicle Solutions Corp, including payment of Capital Force Entities' business expenses, and pay Individual Defendants millions of dollars;

(3) the fact that contrary to Individual Defendants' representations, investor funds were not used to purchase car loans, but instead used in large part repay other investors, and to capitalize an unsecured loan to Vehicle Solutions Corp;

(4) that fact that car loans belonging to investors, including Plaintiffs, were unknowingly sold or pledged to third parties such as Agora Data Inc. and Primalend Capital Partners;

(5) Capital Force Entities' true track record of experience in the car loan business and the default rates of the loans;

(6) that Capital Force Entities were was not "extremely profitable" as represented by Individual Defendants and did not have substantial financial reserves to cover any potential financial deficiencies;

(7) the investing in Capital Force Entities' car loans were not safe and secure;

(8) the fact that Defendants paid unlicensed brokers a commission to identify and solicit investors to invest in Capital Force Entities' car loans;

(9) the fact that Capital Force Entities did not have a car loan underwriting policy and much less a "strict underwriting policy";

(10) that by early 2021 Capital Force Entities were undercollateralized by approximately 70%, which was not discovered by Plaintiffs until after filing for insolvency via the ABC proceedings in October of 2022;

(11) the fact that a substantial percentage of Plaintiffs' investment was being used to fund Individual Defendants' personal expenses and to fund unrelated business ventures and investments for Individual Defendants' sole and exclusive benefit; and

(12) the fact that investors including Plaintiffs at no time had a security interest in a designated and segregated portfolio of car loans.

21.     These lies, and the scheme the Defendants employed to perpetuate them in the unregistered securities offerings, form the basis of this action. Each Defendant plays a critical and substantial role in the fraudulent scheme to misrepresent and conceal the truth.

22.     From at least 2017 and through October of 2022, the Defendants preyed primarily on unsuspecting investors and raised over $50,000,000.00 through an unregistered fraudulent securities offering, providing investors with promissory notes and other security documents to fund its business of buying and servicing subprime and non-prime automobile retail installment loans/contracts (in the form of Retail Installment Sales Contracts ("RISC") or ("Car Loans) and obtaining titles to the automobiles and the related and attendant documents and obligations.

23.     The Defendants further perpetuated their fraudulent scheme and solicited investors, using an interconnected web of affiliated entities operating as limited liability companies formed in Florida, Texas and Delaware, corporations controlled by Individual Defendants, all of which operated from Defendants' principal offices in Miami-Dade County Florida.

24.     In marketing presentations, email correspondence, and when speaking with investors and Plaintiffs, the Individual Defendants would commonly refer to Capital Force Entities as "Capital Force Group." A diligent search does not find Capital Force Group to be a legally formed entity. The interconnected web of affiliated entities included:

- Vehicle Solutions CF, LLC ("Vehicle Solutions CF");
- Vehicle Solutions Corp. ("VSC");
- Capital Force F1, LLC ("Capital Force F1");
- Capital Force, LLC ("Capital Force");
- Vehicle Solutions Finance LLC ("VSF");
- Vehicle Solutions USA, LLC ("VS USA");
- VSC Auto Finance LLC ("VSC Finance");

- Capital Force Management, LLC; and
- Capital Force F5, LLC ("Capital Force F5") - (collectively the "Affiliated Companies" or "Capital Force Companies").

25.     As set forth herein, Individual Defendants Costantini, Talia-Brown, and Culley in their own self-interests and on behalf of Defendants Capital Force F1, Capital Force and Vehicle Solutions CF, from as early as January 2017 through October 2022, made numerous untrue statements of material fact and omitted to state other material facts to investors and Plaintiffs, which had those facts been disclosed, would have revealed the fraud being committed by Defendants.

26.     Costantini, Talia-Brown, and Culley, in their own self-interest and on behalf of Capital Force F1, Capital Force, and Vehicle Solutions CF, tricked investors, including Plaintiffs into believing that their investment would be used exclusively to fund Car Loans and lied by representing that their money was safe and secure.

27.     As a result of Individual Defendants' artful ability to conceal the truth, Plaintiffs did not discover that their investments were not collateralized by Car Loans until the filing of Capital Force Entities filing of their respect petitions of Assignments for the Benefit of Creditors in October 24, 2022 (the "ABC Filing").

28.      Subsequent to the ABC Filing, Plaintiffs have discovered that Individual Defendants through the Capital Force Entities, pooled Plaintiffs' money along with monies from other investors, spent the funds as they saw fit for purposes other than purchasing/financing Car Loans. A snapshot of Defendants' expenditures of Plaintiffs' funds include:

- Approximately $2,000,000.00 in favor of Individual Defendants to invest in real estate development projects, including the Ritz Carlton Residences in Pompano

Beach, bulk purchase of condominium units at Brickell City Center, and Optimus Ride LLC, an autonomous vehicle technology start-up.

- Millions of dollars in wire transfers and checks from Capital Force Entities characterized as "Loan Redemption(s)" "Management Fee(s)" "Net Profit(s)" or with no explanation whatsoever, to business entities, such as Costamat Corp, Yacare Corp and Totan Corp, Capital Force Management, LLC, all of which are owned by Individual Defendants.

- $164,168.00 from Capital Force F1 to Capital Force F2, LLC, which is owned by Defendant Costantini, Talia-Brown and Culley. In addition to $911,000.00 from Capital Force F1 to Vehicle Solutions Corp to purchase Car Loans for both Capital Force F1 and Individual Defendants' company Capital Force F2, LLC.

- Millions of dollars (over 300 wire transfers) from Capital Force Entities to Capital Force F2, LLC, and Capital Force F5, LLC, both of which are entities owned and controlled by Costantini, Talia-Brown and Culley.

- Approximately $500,000.00 in office rent and parking at the Four Seasons Office Building.

- Diversion of funds using Capital Force Entity Debit Card for personal expenses and luxury item: $1,862.40 Mandolin Aegean Bistro, travel expenses to Santiago, Chile, lunches at Casa Tua, Amazon Market Place, $5,617.50 Apple Store, Miami Beach Restaurant $581.66, IKEA $1,323.56, $4,972.00 Bars, Restaurants and Hotels Zurich, Switzerland, $2,918.95 Miami Beach Night Club, $1,777.39 Sea Memories St. Barth/Caribbean, Poliform Furniture and Restoration Hardware

$19,389.00, Zuma Restaurant and East Restaurant Miami $2,258.00, Work of Art Gallery $3,973.83

29.     Plaintiffs have discovered subsequent to the ABC Filing, that Individual Defendants knew that Capital Force Entities never had sufficient collateral in Car Loans to secure the investments, and investors' ability to receive the promised returns and repayment of principal was dependent on Capital Force Entities' ability to continue to raise new investor money and convince existing investors including Plaintiffs, to extend the term of their investment agreements.

30.     Capital Force Entities along served as a conduit for the unauthorized receipt and distribution of investor and Plaintiffs' funds, to make Ponzi-like distributions to investors and Plaintiffs, where the investments made by newer investors were used to pay off Capital Force Entities' earlier investors, along with investors in other companies used by Individual Defendants.[3]

31.     At all times relevant to these allegations, Defendants Costantini, Talia-Brown and Culley, in their own self-interests and on behalf of Defendants Capital Force Entities, concealed material facts regarding the Capital Force Group's precarious financial situation in order to convince existing investors (including Plaintiffs) to renew their existing investments, thus deferring Capital Force Entities from needing to repay investors and Plaintiffs their principal investments. This scheme was devised and implemented by Individual Defendants individually and in their capacities as Capital Force Entities' controlling persons, to keep the Ponzi scheme afloat for over four years and until which time that the fraud was no longer sustainable.

32.     Investors who were interested in participating in the investment scheme, including Plaintiffs, were instructed by Individual Defendants Costantini, Talia-Brown and Culley to wire

---

[3] There is in excess of $6,000,000.00 (141 wire transfers commencing on 12/3/18 through 12/8/21) wired from Vehicle Solutions CF to a separate entity Capital Force F5 LLC.

investment funds to Snyder International Law Group, P.A. 's trust account. Snyder Law International Law Group P.A. is a, Florida based law firm., managed by Jennifer Snyder a Florida attorney. (Jennifer Snyder and Snyder Law International Law Group P.A. collectively "Snyder Law").

33.     Costantini, Talia-Brown and Culley would use Snyder Law to receive investors' funds in its Florida Bar regulated trust account, and to make distributions to VSC, Capital Force, Capital Force F1 and Vehicle Solutions CF.

34.     To initiate an investment, Costantini, Talia-Brown, and Culley would provide investors including Plaintiffs, with Snyder Law's bank account information, address, and telephone number to process funding the investment. Thereafter, Costantini Talia-Brown, and Culley would provide investors' name and contact information to Snyder Law and instruct Snyder Law to prepare legal documents in the form of promissory notes, security agreements, special power of attorney and pledge agreements (collectively the "Notes").

35.     In certain instances, investors were provided with pledge agreements from either Capital Force, Capital Force F1 or Vehicle Solutions CF, wherein that entity would pledge its membership interest (the "Pledged Equity") in favor of the investors as security for its obligation to repay.[4]

36.     The Pledged Equity was to be held by Snyder Law as "Escrow Agent" duly endorsed in blank and in form transferable for delivery to each respective investor.

37.     Snyder Law invoiced the Capital Force Entities for preparing the Notes (legal documents in the form of promissory notes, security agreements, pledge agreements) and was

---

[4] The Pledge Agreements represented that the Pledged Equity would at all times be equal to the amount of the investment.

compensated from a Capital Force Entities' bank account using pooled funds from investors' monies.

38.     As part of the scheme, Defendants used Snyder Law's Trust account as a conduit for receipt of investor Plaintiffs' funds and to mask how investor funds were disbursed. Investor funds were at times wrongfully disbursed to entities (other than the borrowing entity) within Capital Force Entities group and/or to VSC, further to instructions provided to Snyder Law by Individual Defendants Costantini, Talia-Brown or Culley.

39.     Further to Capital Force Group's marketing material which was provided to Plaintiffs prior to their respective investment, Snyder Law was required to wire investor funds to VSC for the purchase of the notes and car titles, and a particular company within the Capital Force Entities group would receive car titles as collateral corresponding to Plaintiffs' investment. Thereafter the note and car title would be pledged to each investor/Plaintiff. Capital Force Group's marketing material provided a Loan Methodology contained in the following graphic:



40. Throughout the course of dealings with investors and Plaintiffs, Costantini, Culley, and Talia-Brown emphasized Snyder Law's participation to legitimatize the investment transaction.

41. Costantini, Talia-Brown and Culley also represented to each investor/Plaintiff, that Snyder Law had a fiduciary duty as an escrow agent and attorney, to only disburse investment funds as provided for in the loan documents. In addition, Snyder Law was responsible for verifying the loan documents (i.e., Notes and security agreements) and assured that all conditions precedent had occurred and/or been satisfied before disbursing investors' funds.

42. In one of its marketing presentations delivered to each Plaintiff, Capital Force Entities and Individual Defendants assured investors and Plaintiffs that Snyder Law's legal "advice" further supported their representations that investors would obtain the "car titles" as security. See the following graphic:



43. Notwithstanding the use of numerous affiliated business entities, the Individual Defendants routinely used the general moniker "Capital Force Group" when soliciting funds from investors. Investors were led to believe that companies such as Vehicle Solutions CF, Capital Force and Capital Force F1, were companies managed, owned or operated by and through "Capital Force" without disclosing whether or not "Capital Force" was a separate and/or distinguishable legal entity.

**Relationship between Capital Force Entities and Vehicle Solutions Corp**

44.     Investors including Plaintiffs were further told, and presented with written material, including information in Capital Force Group's LinkedIn page, that VSC had a business arrangement with Capital Force Entities, wherein VSC would originate car loans by purchasing loan portfolios from other lenders and car dealerships wishing to offload car loans – and provide Capital Force Entities with the opportunity to purchase select car loans at a reduced cost, or what is known in the industry at a discount rate.[5]

45.     Investors were assured by Capital Force Group, that each VSC Car Loan would undergo an audit by the Capital Force Entities, using a strict verification of loan quality criteria and underwriting standards ("Verification of Loan Quality") prior to being purchased. In other words, Capital Force Group would have first pick to only purchase VSC car loans which were the best performing car loans at the best price.

46.     Investors trusted Capital Force Group's independent selection and underwriting standards to assure that Car Loans originated by VSC were performing and of high credit quality, before being purchased by Capital Force Group with use of investors' funds.

47.     Based on Costantini, Talia-Brown and Culley's representations, investors were led to believe that Capital Force Group's Verification of Loan Quality would provide investors with transparency and accountability in the loan origination process – and assure that VSC was not offloading non-conforming, high risk car loans.

48.     In truth and unbeknownst to investors, Capital Force Group and Defendants Costantini, Talia-Cruz and Culley were double dipping and financially benefiting by sharing in VSC's profit as the originating entity – in addition to the profit generated from the interest rate

---

[5] Discount Rate: The discount at which car loans are purchased is expressed as a percentage below the face value of the loans. For example, if a car loan portfolio has a face value of

spread between the interest rate paid to investors and the interest rate charged to car loan borrowers.

49. From at least January 2017 through October 2022, Costantini, San Miguel, Talia-Brown and Culley made key misrepresentations and omissions to investors, promising investors a high-return, low-risk investment, which was further included in written promotional material that their investment (*e.g.,* the promissory notes) were "125% asset backed" and falsely touted that the notes were an extremely secure investment capable of generating reliable investment returns of 12% per annum. Costantini, San Miguel, Talia-Brown and Culley directly participated with preparing the written promotional material (the "Promotional Material"). Attached hereto as (Exhibit "A"). Costantini, San Miguel, Talia-Brown and Culley having the ultimate authority over the statements, including its content and whether and how to communicate it.

50. Moreover, Costantini, Talia-Brown, Culley, and San-Miguel falsely represented that they would use investors' money solely to fund Capital Force, which would in turn obtain Car Loans from Vehicle Solutions Corp ("VSC") portfolio of recently originated Car Loans.[6] (the "Promotional Material") Attached hereto as (Exhibit "A").

Capital Force Group's marketing material contained the following graphic/chart showing the operational flow of investor funds (the "International Fund Operation Flow"):

---

[6] Vehicle Solutions Corp is owned and operated by Alberto San Miguel.



51.     Plaintiffs and other investors have now learned that the notes were never endorsed in favor of investors as depicted in Capital Force Group's operational flowchart.

52.     The promotional material also falsely represented that Capital Force Group had a strict loan selection purchase process, with strict underwriting criteria, which examines the condition of each automobile, borrower's financials, and would throughout the life of each Car Loan monitor its performance to assure that the investors collateral would never hold a non-performing Car Loan.

53.     The promotional material falsely assured investors that Capital Force Group would conduct audits of VSC's operation and underwriting process and obtain custody of the current notes and title for each automobile as collateral to secure the investors' investment.

54.     As part of the scheme, the Bad Actors further touted that in addition to Capital Force Group's profitability and capital reserves, they were able to offer investors added security by providing a "double guarantee" by having Capital Group hold both the note and physical title to each automobile.

55.     Capital Force's website further elaborated "Capital Force has a lien on every title, complete access to a monitoring system, and GPS's of every vehicles [sic] held as collateral. Any loan within recourse is more than 60 days past due would be replaced for a brand-new loan that is current on its payment."

56.     Costantini, Talia-Brown and Culley represented to investors in meetings that Capital Force's Car Loan business was extremely profitable and expanding, claiming to one investor that Capital Force had a $50 million Car Loan portfolio with a default rate of less than 55, which they represented was due to their meticulous due diligence and monitoring policy. In reality, the actual default rate was actually close to 30%.

57.     Because investor returns were purportedly generated by the interest borrowers pay on the Car Loans make, the success and profitability of the investment turns on Capital Force Groups Verification of Loan Quality to minimize the financial risk of having borrowers' default on the loans.

58.     As Costantini explained to the Lalor Plaintiffs, this is one of the most important considerations when deciding whether to invest in Capital Force Group.

59.     Costantini and Brown also represented to investors that their principal and interest payments were safe, guaranteed, and protected by the profit Capital Force Group generated from high interest rates (in excess of 20%) Capital Force Group charged Car Loan borrowers.[7]

60.     The truth was far different. In reality, the Company used substantial investor funds for purposes other than to purchase and finance the Car Loans, including paying the Company's operating expenses, investor repayments, distributions to Costantini, Brown and Culley, and other

---

[7] Costantini and Talia-Brown represented that Capital Force Group had in excess of 3 million in profit in 2018 after payment of its operating expenses and payment to its investors.

unrelated high-risk business ventures and funding Costantini's vice, vanity and lavish lifestyle, such as luxury vacations to St. Barth, Geneva, Switzerland, ski trips to Vail, Colorado, high end boats and exotic luxury cars.[8]

61.    Because investor funds were the sole source of Capital Force's money, the Company necessarily had to use investor funds to pay the Company's operating expenses.

### i.    The Scheme Unravels.

62.    The scheme unraveled during the month of June 2020, when the Capital Force team (Costantini, Talia-Brown and Culley), advised investors that as a result of COVID-19 (the "Pandemic"), Capital Force Group was now subject to "an unexpected and unprecedented global financial effect, had a deep impact on the automotive financing industry as a whole." (the "June Letter") *See* Capital Force Letter June 29, 2020 (Exhibit "B").

63.    The June Letter stated that repayment of the Notes would need to be reduced to 6% interest, as a proactive measure to preserve and safeguard the investors' capital – which in turn would allow the Company to generate positive returns of approximately 8%. Further, investors were falsely assured that the Pandemic had not stopped the Company from continuing to have positive and stable returns.

64.    Again, the truth was far different. By July 2020, the proceeds Capital Force Group generated from the Car Loans were not sufficient to cover the principal and interest payments due to investors on the Notes.

### ii. The Chilean Fund Investment and Diversion of Loan Collateral.

---

[8] On or around May 2021, Capital Force, LLC funded the purchase of an equity interest in a partnership between Shahab Karmely's KAR Properties and Edgardo Defortuna'a Fortune International Group, in a securities offering to raise $21,000,000.00 and acquire 81 units at Reach and Rise condominiums at Brickell City Centre in Miami.

65.     Notwithstanding its attempt to attribute its financial woes on the Pandemic which affected the U.S. during the early months of 2020, Capital Force was, as of early February 2019, already facing severe financial hardship because of its inability to deliver the returns promised to investors without a steady stream of funds from new investors. Notwithstanding its financial predicament, Capital Force continued to solicit and raise funds from other investors in a failed attempt to cover shortfalls.

66.     In or around July 2018, Costantini, Talia-Brown and Culley, with the assistance of their company attorney Jennifer Snyder, formed Capital Force F5, LLC, a Delaware limited liability company ("Capital Force F5"). Capital Force F5 was formed as a clean slate to solicit and launch a new Car Loan investment opportunity with a Chilean mutual fund.

67.     Costantini, Talia-Brown and Culley were at the forefront of Capital Force F5, and at all times relevant to these allegations managed and controlled Capital Force F5's business operations.

68.     The relationship with the Chilean mutual fund commenced sometime in early 2018. From 2018 and through 2019, Capital Force F5, LLC, obtained in excess of $15 million from LarrainVial Asset Management ("LarrainVial") a Chilean mutual fund, and its affiliated sister company LatinAmerica, Activa SpA ("Activa"), to fund its business in the acquisition and servicing of prime, sub-prime, and non-prime automobile retail installment loan/contracts. Accordingly, LarrainVial formed Fondo De Inversion Privado Activa Deuda Automotriz USD, a Chilean Fund as the investment entity (the "Chilean Fund").

69.     The Chilean Funds secured their investment funds with Capital Force F5's assets and receivables, by filing a State of Florida Uniform Commercial Code Financing Statement Form

filed on November 28, 2018, in the Florida Secured Transaction Registry. *See* UCC Financing Statement (Exhibit "C").

70.     On or about February 2019, Capital Force F5 negotiated with the Chilean Fund to provide a second round of funding. As a condition precedent to funding, the Chilean Fund required additional security, collateral and personal guarantees from Costantini and Talia-Brown.

71.     Costantini and Talia-Brown instructed attorney Jennifer Snyder to pledge additional collateral in favor of the Chilean Fund in the form of a security interest, to those same Car Loans previously pledged by Vehicle Solutions CF to investors prior to the February 2019 Chilean Fund transaction. *See* Florida Uniform Commercial Code Financing Statement Form filed by Snyder Law on February 5, 2019, in the Florida Secured Transaction Registry, identifying Vehicle Solutions CF as the Debtor and the Chilean Fund as the Secured Party - UCC Financing Statement (Exhibit "D").

72.      Capital Force, Costantini, and Talia-Brown did not disclose to those investors of Vehicle Solutions CF that the collateral (Car Loans) securing their Notes was later pledged to secure the Chilean Fund's investment. As a result, the collateral securing the Notes was further diluted to the detriment of the existing Vehicle Solutions CF investors.

73.     Following in the trajectory of Capital Force's demise, on or about January 2020, Capital Force F5 inevitably fell upon financial difficulties resulting in the default of its payment and loan-to-value ratio obligations with the Chilean Fund.

> **iii.   Capital Force F5 Is Unable to Pay the Chilean Fund Vehicle Solutions; CF Pledges Investor Car Loans to the Chilean Fund to Cover Capital Force F5 Loan Default.**

74.     Consequently, the Chilean Fund declared a default and threatened to initiate collection proceedings against Capital Force Group, Capital Force F5, Vehicle Solutions Corp, Vehicle Solutions CF, Costantini and Talia-Brown.

75.     With an imminent $15 million lawsuit, Costantini and Talia-Brown scrambled to negotiate with the Chilean Fund to avert a lawsuit against Capital Force F5, Vehicle Solutions Corp, Vehicle Solutions CF, and more importantly, against Costantini and Talia-Brown personally.

76.     Further to settlement negotiations between Costantini, Talia-Brown and the Chilean Fund's Automotive Credit Manager, Gabriela Nallar, along with Costantini and Talia-Brown, agreed to provide the Chilean Fund with additional collateral to comply with Capital Force F5's loan-to-value ratio; more specifically, an additional pledge of 749 Car Loans from Vehicle Solutions CF and VSC worth in excess of $8 Million (the "749 Car Loans") (Florida Secured Transaction Registry dated July 10, 2020 – Exhibit "E").[9] At the time of obtaining the additional pledge of 749 Car Loans, the Chilean Fund had knowledge that the 749 Car Loans had been previously pledged in favor of prior investors.

77.     Most, if not all, the 749 Car Loans pledged to the Chilean Fund on June 10, 2020, were within the portfolio of Car Loans previously pledged to investors as collateral for their investment. This caused investors' collateral to be further diluted, from an already undercollateralized investment.

78.     Adding insult to grave injury, Costantini, Talia-Brown and Culley's June Letter to investors kept the investors in the dark by not disclosing that 749 Car Loans securing loans from

---

[9] Capital Force F5 had assured the Chilean Fund that its funds were guaranteed by Car Loans having a loan-to-value ratio in excess of 125% of its outstanding loan principal.

Vehicle Solutions CF, had been re-pledged and a security interest had been perfected to the Chilean

Fund. Instead, Costantini, Talia-Brown and Culley's June Letter to investors, stated:

> "But not everything is bad news. Despite the hardship, during these past two months, the proper strategic decisions were put into action aiming at stabilizing the situation, allowing the business to generate positive returns of an average of 8%. We trust to be going in the right direction for overcoming this recession."

79.     Once again, the truth was far different. In reality, the Bad Actors had transferred $8

Million in Car Loans from Vehicle Solutions CF to guarantee performance of the subsequent

transaction between Capital Force F5 and the Chilean Fund.

### IV.     PLAINTIFF ERNESTO LALOR AND JOSEFINA RUIZ LUQUE – SPECIFIC FACTUAL ALLEGATIONS.

80.     On or around February 2019, Ernesto Tomas Lalor ("Lalor") and Josefina Maria

Ruiz Luque ("Luque") spoke to Costantini in person in Wellington, Florida after a mutual friend,

Nicholas Tedin ("Tedin") introduced the two. During their conversation, as well as through

conversations with Lalor and Luque's friend Nicholas Tedin, Costantini provided a detailed

explanation about the investment opportunity, stating that his company was lending money to

working people who rarely default because working people need their car to go to work and

survive. Costantini stated that the investment was extremely safe because the last thing that an

American working-class person wants is to lose their car. Costantini further elaborated that the

investment was secured and guaranteed because, The Lalor Family would have the collateral to

every car loan that was being purchased with his investment funds – and that the value of the Car

Loans would at all times exceed his investment at a ratio of 125%. Costantini also represented that

if a specific car loan were to be sold from The Lalor Family's list of Car Loans, it would be

immediately replaced with a car loan of equal or greater value.

81.     During that same conversation, and through conversations with Tedin, Costantini provided the following assurances:

    a.  Capital Force had a longstanding track record of being extremely profitable and maintained ample reserves in the extremely unlikely event of any shortfalls;

    b.  The Lalor Family's investment would be used exclusively to purchase Car Loans, which would be acquired by Capital Force and thereafter pledged in favor of The Lalor Family as collateral for The Lalor Family's investment;

    c.  Capital Force had a strict underwriting policy and effective risk management, and would thoroughly examine the status of each Car Loan and the buyer's creditworthiness prior to purchasing a Car Loan;

    d.  That Capital Force management had over 20 years of experience in the auto finance industry;

    e.  That each car financed through the Car Loan would have a GPS installed and was at all times monitored by Capital Force to ensure prompt recovery in the event of a default;

    f.  That the cars securing the Car Loans had a wholesale market value 30% in excess of loan amount of each Car Loan; and,

    g.  The Lalor Family's Car Loans would be maintained in a segregated portfolio in favor of The Lalor Family identifying each Car Loan and the specific car being financed.

82.     At the time of making the aforementioned material statements of fact (set forth in paragraphs 80-81), Costantini knew from his position as Capital Force's founder and managing member, that his statements were false and misleading.

83.    Moreover, the aforementioned representations were material in nature, as The Lalor Family would not have gone through with the investment transaction with Capital Force but for Costantini's misrepresentations and material omissions regarding the intended use of The Lalor Family's funds.

84.    From Costantini's first conversation with The Lalor Family, Costantini knew that The Lalor Family were not sophisticated investors and consequently did not have an understanding of financial markets, especially with respect to Car Loans and the risks associated with Capital Force's investment opportunity.

85.    The securities/investments offered to The Lalor Family by Costantini were not registered with the Florida Office of Financial Regulation or the Securities Exchange Commission.

86.    As stated, The Lalor Family first spoke with Costantini in February of 2019 in Wellington, Florida.  (the "February 2019 Meeting").

87.    During the February 2019 meeting, as well as through Costantini's conversations with Tedin, Costantini discussed and showed The Lalor Family the Company's website, its financial and operational flowcharts, Car Loan monitoring systems, and the Promotional Material.

88.    Costantini repeatedly assured The Lalor Family that this was a great opportunity and that their investment would be safe, secure and guaranteed. Much like the script delivered to other investors, Costantini further touted Capital Force's profitability and capital reserves. He reassured The Lalor Family that they were able to offer investors added security by having Capital Force hold both the note and physical title to each automobile subject to the Car Loan.

89.    At this same meeting, and in conversations with Tedin, Costantini spent considerable time going through the International Fund Operation Flow graphic/chart, and the

terms of the promissory note, security agreement and special power of attorney in favor of The Lalor Family. Costantini summarized the investment transaction as follows:

a.  The Lalor Family shall wire the investment funds to Snyder Law to be held in the law firm's Florida Bar supervised trust account;

b.  Upon receipt of The Lalor Family's funds, Snyder Law would prepare the documents, which included a promissory note, security agreement and special power of attorney, which was then executed by Capital Force and The Lalor Family and delivered to Snyder Law at its offices in Aventura, Florida;

c.  Upon receipt of The Lalor Family's funds and the executed promissory note, security agreement and special power of attorney, Snyder Law would verify that all conditions specified in these investment agreements were satisfied and/or performed. Upon Snyder Law's verification that everything was in order, Snyder Law would wire the funds to Capital Force, which would then allegedly use the totality of these funds to purchase Car Loans;

d.  VSC would provide the servicing with each individual Car Loan borrower – that is, collecting regular payments from the borrower.  Notwithstanding VSC's role of servicing the Car Loans – Capital Force assured The Lalor Family that title to each Car Loan purchased with The Lalor Family's funds would have The Lalor Family as the holder of title to the collateral (i.e., the car) as a senior lienholder.

e.  The investment structure detailed by Costantini, and further supported by the Promotional Material prepared by Costantini, Talia-Brown and Culley – provided The Lalor Family with an identifiable and collectible security interest to designated

Car Loans – which The Lalor Family would possess and could liquidate in the event of a Capital Force default.

90.     Unbeknownst to The Lalor Family, Capital Force's business model operated much differently. Capital Force did not use The Lalor Family/investor funds to purchase Car Loans from VSC. Instead, The Lalor Family's monies were used to fund an undisclosed Revolving Line of Credit, first dated May 1, 2017, between Capital Force as Lender and VSC as Borrower at an interest rate of 18%.

91.     During the course of communications between November 2018 and February 2019, Costantini assured The Lalor Family, both personally and through Tedin, that they would be a secured creditor, by having a security interest in specific Car Loans, in which the value of the Car Loans would at all times exceed 125% of the invested funds. Moreover, Costantini assured The Lalor Family that Capital Force was extremely conservative, since the 125% ratio Car Loan to investment was actually higher, because the collateral (the value of each automobile) never exceeded 80% of the value of the Car Loan.

### i.     The Lalor Family Meet with Costantini in Miami.

92.     During the February 2019 meeting, and in meetings and conversations with Tedin, Costantini showed The Lalor Family the Company's website, its financial and operational flowcharts, Car Loan monitoring systems, and repeatedly assured The Lalor Family that investing with Capital Force was safe, secured, and guaranteed. Much like Costantini's previous presentations to other investors, Costantini highlighted Capital Force's profitability, which he claimed exceeded $3 million after operational expenses and capital reserves. Costantini also assured The Lalor Family that they were able to offer investors added security by having Capital Force hold both the note and physical title to each automobile subject to the Car Loan.

93.     These same assurances were also provided to The Lalor Family via Capital Force's Promotional Material – material which was prepared under the direction and control of Defendants Talia-Brown and Culley.

94.     Costantini further sought to entice The Lalor Family by stating that his father Rodolfo Costantini and his uncle Eduardo Costantini had also invested a substantial sum of money with Capital Force. This was significant because Eduardo Costantini is among seven Argentines listed on "Forbes Rich List of Billionaires" and therefore supported Costantini's reassurances that Capital Force was well capitalized.

95.     To reassure The Lalor Family of the investment's legitimacy, Costantini represented that two renowned Miami-based law firms, including the prestigious firm Snyder International Law Group, had vetted the investment to provide guarantees and transparency. *See* https://www.linkedin.com/company/capital-force/about/ (last visited March 1, 2023).

96.     Costantini knew that these statements were false. In fact, the investors' funds, including The Lalor Family's investment, were used to partially offset Capital Force's operating expenses (including a $1,000,000.00 annual salary to Costantini, and approximately $350,000.00 to Talia-Brown and $350,000.00 to Culley). The balance was used to provide VSC with a revolving line of credit (i.e., a loan) and not for the acquisition of Car Loans.

**ii. Car Loans Were Never Segregated for the Benefit of The Lalor Family's Investment.**

97.     At no time material to these allegations was The Lalor Family told that the collateral securing The Lalor Family's investment would be commingled with other investors' collateral and by companies other than Capital Force. To the contrary, The Lalor Family were specifically told by Costantini that The Lalor Family's collateral (the Car Loans) were segregated, and each Car

Loan individually accounted for in Capital Force's ledgers and in ledgers maintained and audited by Snyder Law.

98.    The Lalor Family received copies of the investment documents which included a Security Agreement ("Security Agreement"), Special Power of Attorney ("Power of Attorney") and Secured Fixed Interest Only Promissory Note ("Promissory Note"), (collectively the "Investment Agreements"). The Investment Agreements were prepared by Jennifer Snyder, Esq., managing and founding partner at Snyder International Law Group P.A., further to instructions and the participation of loan terms provided by Capital Force's managers, Individual Defendants Costantini, Talia-Brown and Culley.

99.    Contained within the language and terms of the Investment Agreement were additional representations, which, along with Costantini's presentations during the February 2019 Meeting, were relied upon by The Lalor Family in their decision to invest and thereafter keep its investment in. More specifically, the Security Agreement contains the following provision:

- "A.  Debtor is in the business of purchasing subprime auto car loans, which are secured by the borrower's automobile. The security interest granted to the Secured Party [in this case The Lalor Family] in the Collateral shall be the pledge of the security of Debtor's loans [referring to Capital Force] to said subprime borrowers, which are the title to the automobiles wherein the lender on the title is the Debtor and that Debtor is the lawful owner of such Collateral and has good right to pledge, sell, assign, transfer and create a security interest in the same."

- "D.  The Collateral will not be disposed of by the Debtor unless replaced by Collateral of equal value. Secured Party acknowledges the nature of subprime auto loans is such that the loans that make up the Collateral may be repaid and therefore, the Collateral may often be replaced by loans of equal value."

100.    Costantini provided The Lalor Family with an explanation on the benefit of being a secured creditor (which he referred to as a Secured Party). Costantini referred to the language contained in the previously provided Security Agreement, which stated:

- "C.  The Collateral shall continue to be free from any **superior** and prior pledges, liens, encumbrances and security interests in the same, and the Debtor [referring to Capital Force] will warrant and, at the **Secured Party's** request, defend the same from all claims and demands of all persons whatsoever."

101.    At the time of The Lalor Family's execution of the Investment Documents, Defendant Capital Force and Individual Defendants Costantini, Talia-Brown and Culley, knew that the statements contained in the Security Agreement (see paragraphs 99-100) were untrue.

102.    Costantini's assurances that the investments were safe were further bolstered by quoting American author, equities analyst, and Bloomberg columnist Barry Rithotz, who said, "Because our autos are such a lifeline to our financial lives, people will pay their monthly loan bill over almost any other bill. Prolonged court delays are rare. In many cases, the repo man is virtual technology that can remotely render the car useless." [This statement was also contained in written promotional material provided to The Lalor Family during conversations beginning in late 2019 and through 2020]. Costantini went on to say that Capital Force has that kind of virtual technology, along with GAP insurance if the automobile is damaged – along with GPS on all its vehicles.

**iii.    Capital Force Had Poor Controls and Severely Inadequate Risk Management/Underwriting Procedures – in Stark Contrast to Costantini's Representations that It Was a Mature, Risk-Free Company with a Seasoned Management Team.**

103.    The marketing material provided to The Lalor Family during the February 2019 Meeting and through Tedin further emphasized, "...there is an effective risk management under a strict VSC and CF (referring to Capital Force) underwriting policy."

104.    In the same marketing material prepared by Individual Defendants Costantini, Talia-Brown and Culley, Capital Force further emphasizes having a management team with more than 20 years of experience in auto financing.

105.    The Lalor Family has now come to know, that contrary to Costantini's representations, Capital Force did not audit nor underwrite the Car Loans, nor did it have a mechanism to assure that the Car Loans being allegedly purchased by Capital Force complied with Capital Force's underwriting requirement.

106.    From its inception, Capital Force had poor controls and fundamentally deficient risk management/underwriting procedures. Assets and liabilities of all forms were generally treated as interchangeable, and there were insufficient distinctions between the assignment of debts and credits to Capital Force, and its affiliated companies, Capital Force F1, Vehicle Solutions CF, Defendant San Miguel's company VSC and principals Costantini, Brown and Culley. This reality was a sharp contrast to Costantini's representations made to The Lalor Family and to other investors – a mature company that managed funds and risk in a conservative, risk free, and rigorous manner.

107.    The Lalor Family has now come to discover that Capital Force's management team, which consisted of Costantini, Talia-Brown and Culley, did not have 20 years of experience in auto financing. In fact, at the time The Lalor Family made his investments, Costantini, Brown and Culley (the management team) each had less than two years in the auto financing business – with most of that time spent being "rainmakers" (i.e., soliciting investors) and very little time actually conducting auto financing transactions.

108.    Capital Force's management team did not have the training experience and know-how to implement and administrate the strict risk management and underwriting procedures which Costantini, Talia-Brown and Culley represented to be an integral component of mitigating investment risk. Costantini, Talia-Brown and Culley knew that Capital Force's management team

did not have the requisite experience and much less 20 years of experience in the auto financing industry.

109.    Costantini's representations that Capital Force was profitable and that the Car Loans securing The Lalor Family's investment were safe, secured and guaranteed, were false.  In reality, the proceeds that Capital Force generated from its Car Loans were woefully insufficient to cover principal and interest payments to investors. Capital Force's profitability was further compromised by having to pay Costantini's $1,000,000.00 salary, and reimbursement of business, entertainment, and international travel expenses unrelated to Capital Force's business.

110.    Because Individual Defendants Costantini, Talia-Brown and Culley were at the highest level of corporate governance, supervised all aspects of Capital Force's operations, made financial decisions and projections and had access to the accounting and were the architects of the fraudulent Promotional Material delivered to The Lalor Family, Individual Defendants knew or were extremely reckless in not knowing that Capital Force was not profitable and that the Car Loans were not safe, secured and guaranteed.

111.    At the time of making their investments, The Lalor Family were not aware, and neither Costantini, nor anyone at Capital Force, disclosed that Capital Force pooled all investor funds together in its bank accounts, and that once The Lalor Family gave their money to Capital Force, it lost all control over how Capital Force used his funds.

112.    The Lalor Family were completely dependent on Capital Force to make a successful Car Loan to achieve his returns. The Lalor Family did not have any say in the Car Loan portfolio, who Capital Force loaned money to, which Car Loans it purchased, or Capital Force's collection efforts. The success of The Lalor Family's investment therefore was inextricably tied to the success of Capital Force's Car Loan business and other efforts by the Individual Defendants and Defendant

Capital Force to generate revenue. The Lalor Family provided the funds and received returns – Capital Force managed and controlled the business and finance operations purportedly used to generate those returns.

113.    Costantini further assured The Lalor Family that Snyder International Law Group would provide its professional services with preparing the requisite loan agreements necessary to secure his investment. The Lalor Family relied on Costantini's representations when agreeing to deposit his investment funds into Snyder Law's escrow account.

114.    These false and misleading misstatements and omissions of material information altered the total mix of information that The Lalor Family found relevant in determining whether to invest nearly their entire life's savings in the Capital Force Group investment through The Lalor Family.

115.    But for these false and misleading misstatements and material omissions, The Lalor Family's decision to invest in Capital Force would have been different.

116.    Defendant Costantini knew at the time of the 2019 meeting with The Lalor Family, from his position as Capital Force's founder and managing member, or recklessly disregarded the fact, that his statements were false and misleading and omitted material information because:

  a.  Capital Force did not have a strict underwriting policy or effective risk management, nor did it thoroughly examine the car status and buyer background related to credit and income (as represented in the written promotional material presented to The Lalor Family prior to The Lalor Family's investment);

  b.  Capital Force was not profitable and was making payments to investors by selling the Car Loans and consequently diluting The Lalor Family's collateral;

c.  Few, if any, automobiles securing the Car Loans had a GPS installed to monitor the collateral at all times;

d.  That many of the Car Loans exceeded the fair market value of automobiles securing each Car Loan;

e.  That the value of the Car Loans securing The Lalor Family's investment was less than 70% (and not 125%) of its investment to Car Loan ratio. In other words, The Lalor Family's investment was undercollateralized by 30% from the time of making its investment and at one point in late 2021 was under collateralized by more than 70%.

f.  That The Lalor Family were never a Secured Party and that there was never an identifiable certificate of title and/or Car Loans securing its investment – to the contrary, all the Car Loans were pooled together, commingled, and dispersed among Capital Force, and other affiliated companies such as Vehicle Solutions CF, Capital Force F1 and VSC. The Lalor Family were shocked when he discovered from reviewing Capital Force's Petition For Assignment For The Benefit Of Creditors (filed on October 24, 2022) that The Lalor Family were not a Secured Party, but instead an unsecured creditor;

g.  That The Lalor Family's investment was not used exclusively to purchase Car Loans, but was instead used in part to pay Capital Force's operating expenses, Car Loan payments to other pre-existing investors, and distributions to Costantini, Talia-Brown and Culley;

h.  That Capital Force's management team (which consisted of Costantini, Talia-Brown and Culley) did not have 20 years of experience in the auto finance industry;

117.    Capital Force and Individual Defendants had a common interest in making misleading misstatements and concealing these facts. Had The Lalor Family known of these material misleading misstatements and material omissions, The Lalor Family would not have deposited its funds into Snyder International Law Group's trust account, Defendants' fraud would not have succeeded, and neither Capital Force nor any of the Defendants would have stood to profit as handsomely as they expected. Defendants Costantini, Talia-Brown, and Culley, by and through Capital Force therefore worked together to perpetuate and conceal a fraud, all the while inciting it with critical reports of success, profitability, cutting edge risk controls, and dressing of legitimacy and security.

     **iv.**     **The Lalor Family Executes the Investment Documents.**

118.    On or about January 28, 2019, Lalor and Luque wired $400,000.00 to Snyder Law's Trust Account.

119.    On January 31, 2019, Lalor and Luque executed a Promissory Note and Security Agreement for $400,000.00 to Capital Force F1 LLC. Attached hereto as (Exhibit "F").

120.    On or about December 11, 2019, Lalor and Luque wired $776,000.00 to Snyder Law's Trust Account.

121.    On December 12, 2019 Lalor and Luque executed a Promissory Note and Security Agreement for $776,000.00 to Capital Force F1 LLC.  Attached hereto as (Exhibit "G").

122.    On or about March 13, 2020 Lalor and Luque wired $449,980.00 to Snyder Law's Trust Account.

123.    On or about March 13, 2020 The Lalor Family executed a Promissory Note and Security Agreement for $449,980.00 to Capital Force LLC. Attached hereto as (Exhibit "H").

**v.      The Lies Continue - Capital Force Falsely Assures The Lalor Family the COVID-19 Pandemic Will Not and Has Not Affected Capital Force's Financial Condition.**

124.    On January 9, 2020, WHO announces mysterious Coronavirus-Related pneumonia in Wuhan, China.

125.    On February 3, 2020, the U.S. declares public health emergency.

126.    On February 25, 2020, the U.S. Centers for Disease Control and Prevention ("CDC") says that COVID-19 is heading toward pandemic status.

127.    On March 13, 2020, the United States declares the novel coronavirus a national emergency.

128.    On or about late June or early July of 2020, The Lalor Family received the June Letter advising The Lalor Family and other investors that as a result of COVID-19, Capital Force was now subject to "an unexpected and unprecedented global financial effect, had a deep impact on the automotive financing industry as a whole."  Attached hereto as (Exhibit "I").

129.    The June Letter also stated that repayment of the Notes would need to be reduced to 6% interest, as a proactive measure to preserve and safeguard the investors' capital – which in turn would allow the Company to generate positive returns of approximately 8%. Further, investors were falsely assured that the Pandemic has not stopped the Company from continuing to have positive and stable returns.

130.    Costantini and Culley knew or should have known that their representations concerning Capital Force's financial well-being were false.

**vi.     Costantini Makes False Reassurances to The Lalor Family Regarding Its Investment.**

131.    In the first quarter of 2021, Lalor spoke to Costantini on the phone asking for the return of The Lalor Family's investment.

132.     During this 2021 conversation, Costantini replied that the company had 70% of assets intact. He then stated that the remaining 30% would be paid back from a new parallel company that Costantini was creating, in which The Lalor Family would have some ownership.

133.     No such company was effectuated. The Lalor Family did not receive any ownership of any company, and did not receive any assets, monies, or return on its investment following these conversations by Costantini.

134.     At the time Costantini made these statements to The Lalor Family, Costantini knew these statements to be false. Costantini knew long before that Capital Force did not have 70% of assets intact.

**vii.     Petitions for Assignment Assignments for the Benefit of Creditors filed by Capital Force.**

135.     On October 24, 2022, petitions for Assignments for the Benefit of Creditors were filed on behalf of Capital Force (the "ABC Petitions").[10]

136.     The ABC Petitions have unfoiled the true extent of Defendants' fraudulent scheme, *inter alia*, that Capital Force (and the other entities of Capital Force Group) were, during The Lalor Family's Investment Period, critically undercapitalized, undercollateralized, fraught with non-performing Car Loans, many of which resulted in worthless repossessed automobiles, and that The Lalor Family were never a secured party.

More specifically:

- Capital Force F1's ABC Petition confirms the following as of October 2022.

---

[10] In re: Capital Force F1 LLC  Miami-Dade County Circuit Court. Case No. 2022-020390-CA-01 (43); In re: Capital Force LLC Miami-Dade County Circuit Court. Case No. 2022-020389-CA-01 (43) and, In re: Vehicle Solutions CF LLC Miami-Dade County Circuit Court. Case No. 2022-020388-CA-01 (43)

a.   Current amount outstanding to sixty-two (62) investors - $16,206,317.65;

b.   Total estimated liquidation value of automobile loans/titles - $1,000,000.00;

c.    Car Loans Securitized and Pledged to Agora Data and collected by Westlake Financial – Principal Balance $2,909,000. Residual Loan balance - $800,000.00;

d.   Available Cash and Bank Accounts - $23,105.28;

e.   Other than the $1,000,000.00 in repossessed automobiles, there is no evidence of a Car Loan portfolio, and much less, a designated portfolio of Car Loans in securing The Lalor Family's investment.

• Capital Force's ABC Petition confirms the following as of October 2022.

a.   Current amount outstanding to forty (40) investors - $9,060,296.42;

b.   Total estimated liquidation value of automobile loans/titles - None;

c.   Car Loans Securitized and Pledged - None;

d.   Available Cash and Bank Accounts - $8,481.83;

e.   Multiple (apparently unsecured) loans to Vehicle Solutions Corporation (Alberto San Miguel and Jessica Malvecino's Company) - $9,252,283.05.

f.    There is no evidence of a Car Loan portfolio, and much less, a designated portfolio of Car Loans in securing The Lalor Family's investment.

137.    The Lalor Family had no knowledge of the scheme perpetrated by Defendants until the ABCs were filed. Prior to the filing of the ABCs, The Lalor Family and the investors believed themselves to be secured creditors, with their investments secured by lien rights in certain vehicles. It was not until the ABCs were filed that they discovered the Defendants scheme and came to know that they in fact were unsecured creditors, without lien rights to any of the vehicles.

**V. PLAINTIFF MARTIN MELHEM – SPECIFIC FACTUAL ALLEGATIONS.**

138.    On or around January 2017, Martin Melhem spoke to Costantini via telephone after a mutual friend introduced the two. During this telephone conversation, Costantini provided a detailed explanation about the investment opportunity, stating that his company was lending money to working people who rarely default because working people need their car to go to work and survive. Costantini stated that the investment was extremely safe because the last thing that an American working-class person wants is to lose their car. Costantini further elaborated that the investment was secured and guaranteed because Melhem, would have the collateral to every car loan that was being purchased with his investment funds – and that the value of the Car Loans would at all times exceed his investment at a ratio of 125%. Costantini also represented that if a specific car loan were to be sold from Melhem's list of Car Loans, it would be immediately replaced with a car loan of equal or greater value.

139.    During that same telephone conversation, Costantini provided the following assurances:

   a.   Capital Force had a longstanding track record of being extremely profitable and maintained ample reserves in the extremely unlikely event of any shortfalls;

   b.   Melhem's investment would be used exclusively to purchase Car Loans, which would be acquired by Capital Force and thereafter pledged in favor of Melhem as collateral for Melhem's investment;

   c.   Capital Force had a strict underwriting policy and effective risk management, and would thoroughly examine the status of each Car Loan and the buyer's creditworthiness prior to purchasing a Car Loan;

   d.   That Capital Force management had over 20 years of experience in the auto finance industry;

e.   That each car financed through the Car Loan would have a GPS installed and was at all times monitored by Capital Force to ensure prompt recovery in the event of a default;

f.   That the cars securing the Car Loans had a wholesale market value 30% in excess of loan amount of each Car Loan; and,

g.   Melhem's Car Loans would be maintained in a segregated portfolio in favor of Melhem identifying each Car Loan and the specific car being financed.

140.   At the time of making the aforementioned material statements of fact (set forth in paragraphs 138-139), Costantini knew from his position as Capital Force's founder and managing member, that his statements were false and misleading.

141.   Moreover, the aforementioned representations were material in nature, as Melhem would not have gone through with the investment transaction with Capital Force but for Costantini's misrepresentations and material omissions regarding the intended use of Melhem's funds.

142.   From Costantini's first telephone conversation with Melhem, Costantini knew that Ini was not a sophisticated investor and consequently did not have an understanding of financial markets, especially with respect to Car Loans and the risks associated with Capital Force's investment opportunity.

143.   The securities/investments offered to Melhem by Costantini were not registered with the Florida Office of Financial Regulation or the Securities Exchange Commission.

144.   On or about February 1st, 2017, Costantini invited Melhem to meet for a Capital Force investor presentation at his opulent Miami office at the Offices at the Four Seasons Tower

located at 1441 Brickell Avenue, Miami, Florida (the "February 2017 Meeting"). San Miguel was also present at this meeting with Costantini and Melhem.

145.    At this meeting, Costantini reiterated the representations previously made, and also showed Melhem the Company's website, its financial and operational flowcharts, Car Loan monitoring systems, and the Promotional Material.

146.    Costantini repeatedly assured Melhem that this was a great opportunity and that his investment would be safe, secure, and guaranteed. Much like the script delivered to other investors, Costantini further touted Capital Force's profitability and capital reserves. He reassured Melhem that they were able to offer investors added security by having Capital Force hold both the note and physical title to each automobile subject to the Car Loan.

147.    At this same meeting, Costantini spent considerable time going through the International Fund Operation Flow graphic/chart, and the terms of the promissory note, security agreement and special power of attorney in favor of Melhem.[11] Costantini summarized the investment transaction as follows:

   a.    Melhem/investor shall wire the investment funds to Snyder Law to be held in the law firm's Florida Bar supervised trust account;

   b.    Upon receipt of Melhem's funds, Snyder Law would prepare the documents, which included a promissory note, security agreement and special power of attorney, which was then executed by Capital Force and Melhem and delivered to Snyder Law at its offices in Aventura, Florida;

---

[11] Costantini outlined the terms and conditions related to collateral (i.e., Car Loans) which would be provided by Capital Force to Melhem to secure Capital Force's payment obligations – which served as a guarantee or assurance that Melhem would be repaid in the event of a default by Capital Force.

c.  Upon receipt of Melhem's funds and the executed promissory note, security agreement and special power of attorney, Snyder Law would verify that all conditions specified in these investment agreements were satisfied and/or performed. Upon Snyder Law's verification that everything was in order, Snyder Law would wire the funds to Capital Force, which would then allegedly use the totality of these funds to purchase Car Loans;

d.  VSC would provide the servicing with each individual Car Loan borrower – that is, collecting regular payments from the borrower.  Notwithstanding VSC's role of servicing the Car Loans – Capital Force assured Melhem that title to each Car Loan purchased with Melhem's funds would have Melhem as the holder of title to the collateral (i.e., the car) as a senior lienholder.

e.  The investment structure detailed by Costantini, and further supported by the Promotional Material prepared by Costantini, Talia-Brown and Culley – provided Melhem with an identifiable and collectible security interest to designated Car Loans – which Melhem would possess and could liquidate in the event of a Capital Force default.

148.  Unbeknownst to Melhem, Capital Force's business model operated much differently. Capital Force did not use Melhem/investor funds to purchase Car Loans from VSC. Instead, Melhem's monies were used to fund an undisclosed Revolving Line of Credit, first dated May 1, 2017, between Capital Force as Lender and VSC as Borrower at an interest rate of 18%.

149.  During the course of communications throughout January 2017 and September 2022, Costantini assured Melhem that he would be a secured creditor, by having a security interest in specific Car Loans, in which the value of the Car Loans would at all times exceed 125% of the

invested funds. Moreover, Costantini assured Melhem that Capital Force was extremely conservative, since the 125% ratio Car Loan to investment was actually higher, because the collateral (the value of each automobile) never exceeded 80% of the value of the Car Loan.

150.    Between 2018 and 2019 alone, Melhem invested $400,000.00 with Capital Force F1.

### i.    Melhem Meets with Costantini in Miami.

151.    At the February 2017 meeting, Melhem and San Miguel met with Costantini in Capital Force's office located at the Four Seasons office building on Brickell Avenue, Miami, Florida (the "February 2017 Meeting"). During that meeting, Costantini showed Melhem the Company's website, its financial and operational flowcharts, Car Loan monitoring systems, and repeatedly assured Melhem that investing with Capital Force was safe, secured, and guaranteed. Much like Costantini's previous presentations to other investors, Costantini highlighted Capital Force's profitability, which he claimed exceeded $3 million after operational expenses and capital reserves. Costantini also assured Ini that they were able to offer investors added security by having Capital Force hold both the note and physical title to each automobile subject to the Car Loan.

152.    These same assurances were also provided to Melhem via Capital Force's Promotional Material – material which was prepared under the direction and control of Defendants Talia-Brown and Culley.

153.    Costantini further sought to entice Melhem by stating that his father Rodolfo Costantini and his uncle Eduardo Costantini had also invested a substantial sum of money with Capital Force. This was significant because Eduardo Costantini is among seven Argentines listed on "Forbes Rich List of Billionaires" and therefore supported Costantini's reassurances that Capital Force was well capitalized.

154.    To reassure Melhem of the investment's legitimacy, Costantini represented that two renowned Miami-based law firms, including the prestigious firm Snyder International Law Group, had vetted the investment to provide guarantees and transparency. *See* https://www.linkedin.com/company/capital-force/about/ (last visited March 1, 2023).

155.    Costantini knew that these statements were false. In fact, the investors' funds, including Melhem's investment, were used to partially offset Capital Force's operating expenses (including a $1,000,000.00 annual salary to Costantini, and approximately $350,000.00 to Talia-Brown and $350,000.00 to Culley). The balance was used to provide VSC with a revolving line of credit (i.e., a loan) and not for the acquisition of Car Loans.

**ii. Car Loans Were Never Segregated for the Benefit of Melhem's Investment.**

156.    At no time material to these allegations was Melhem told that the collateral securing Melhem's investment would be commingled with other investors' collateral and by companies other than Capital Force. To the contrary, Melhem was specifically told by Costantini that Melhem's collateral (the Car Loans) was segregated, and each Car Loan individually accounted for in Capital Force's ledgers and in ledgers maintained and audited by Snyder Law.

157.    Melhem received copies of the investment documents which included a Security Agreement ("Security Agreement"), Special Power of Attorney ("Power of Attorney") and Secured Fixed Interest Only Promissory Note ("Promissory Note"), (collectively the "Investment Agreements"). The Investment Agreements were prepared by Jennifer Snyder, Esq., managing and founding partner at Snyder International Law Group P.A., further to instructions and the participation of loan terms provided by Capital Force's managers, Individual Defendants Costantini, Talia-Brown and Culley.

158.    Contained within the language and terms of the Investment Agreement were additional representations, which, along with Costantini's presentations during the January 2020 Meeting, were relied upon by Melhem in its decision to invest and thereafter keep its investment in. More specifically, the Security Agreement contains the following provision:

- "A.  Debtor is in the business of purchasing subprime auto car loans, which are secured by the borrower's automobile. The security interest granted to the Secured Party [in this case Melhem] in the Collateral shall be the pledge of the security of Debtor's loans [referring to Capital Force] to said subprime borrowers, which are the title to the automobiles wherein the lender on the title is the Debtor and that Debtor is the lawful owner of such Collateral and has good right to pledge, sell, assign, transfer and create a security interest in the same."

- "D.  The Collateral will not be disposed of by the Debtor unless replaced by Collateral of equal value. Secured Party acknowledges the nature of subprime auto loans is such that the loans that make up the Collateral may be repaid and therefore, the Collateral may often be replaced by loans of equal value."

159.    Costantini provided Melhem  with an explanation on the benefit of being a secured creditor (which he referred to as a Secured Party). Costantini referred to the language contained in the previously provided Security Agreement, which stated:

- "C.  The Collateral shall continue to be free from any **superior** and prior pledges, liens, encumbrances and security interests in the same, and the Debtor [referring to Capital Force] will warrant and, at the **Secured Party's** request, defend the same from all claims and demands of all persons whatsoever."

160.    At the time of Melhem's execution of the Investment Documents, Defendant Capital Force and Individual Defendants Costantini, Talia-Brown and Culley, knew that the statements contained in the Security Agreement (see paragraphs 158-159) were untrue.

161.    Costantini's assurances that the investments were safe were further bolstered by quoting American author, equities analyst, and Bloomberg columnist Barry Rithotz, who said, "Because our autos are such a lifeline to our financial lives, people will pay their monthly loan bill over almost any other bill. Prolonged court delays are rare. In many cases, the repo man is virtual

technology that can remotely render the car useless." [This statement was also contained in written promotional material provided to Melhem during conversations beginning in late 2019 and through 2020]. Costantini went on to say that Capital Force has that kind of virtual technology, along with GAP insurance if the automobile is damaged – along with GPS on all its vehicles.

### iv. Capital Force Had Poor Controls and Severely Inadequate Risk Management/Underwriting Procedures – in Stark Contrast to Costantini's Representations that It Was a Mature, Risk-Free Company with a Seasoned Management Team.

162.    The marketing material provided to Melhem during the February 2017 meeting further emphasized, "...there is an effective risk management under a strict VSC and CF (referring to Capital Force) underwriting policy."

163.    In the same marketing material prepared by Individual Defendants Costantini, Talia-Brown and Culley, Capital Force further emphasizes having a management team with more than 20 years of experience in auto financing.

164.    Melhem has now come to know, that contrary to Costantini's representations, Capital Force did not audit nor underwrite the Car Loans, nor did it have a mechanism to assure that the Car Loans being allegedly purchased by Capital Force complied with Capital Force's underwriting requirement.

165.    From its inception, Capital Force had poor controls and fundamentally deficient risk management/underwriting procedures. Assets and liabilities of all forms were generally treated as interchangeable, and there were insufficient distinctions between the assignment of debts and credits to Capital Force, and its affiliated companies, Capital Force F1, Vehicle Solutions CF, Defendant San Miguel's company VSC and principals Costantini, Brown and Culley. This reality was a sharp contrast to Costantini's representations made to Melhem and to other investors – a mature company that managed funds and risk in a conservative, risk free, and rigorous manner.

166.    Melhem has now come to discover that Capital Force's management team, which consisted of Costantini, Talia-Brown and Culley, did not have 20 years of experience in auto financing. In fact, at the time Melhem made his first investment on May 16, 2017, Costantini, Brown and Culley (the management team) each had less than two years in the auto financing business – with most of that time spent being "rainmakers" (i.e., soliciting investors) and very little time actually conducting auto financing transactions.

167.    Capital Force's management team did not have the training experience and know-how to implement and administrate the strict risk management and underwriting procedures which Costantini, Talia-Brown and Culley represented to be an integral component of mitigating investment risk. Costantini, Talia-Brown and Culley knew that Capital Force's management team did not have the requisite experience and much less 20 years of experience in the auto financing industry.

168.    Costantini's representations that Capital Force was profitable and that the Car Loans securing Melhem's investment were safe, secured and guaranteed, were false.  In reality, the proceeds that Capital Force generated from its Car Loans were woefully insufficient to cover principal and interest payments to investors. Capital Force's profitability was further compromised by having to pay Costantini's $1,000,000.00 salary, and reimbursement of business, entertainment, and international travel expenses unrelated to Capital Force's business.

169.    Because Individual Defendants Costantini, Talia-Brown and Culley were at the highest level of corporate governance, supervised all aspects of Capital Force's operations, made financial decisions and projections and had access to the accounting and were the architects of the fraudulent Promotional Material delivered to Melhem, Individual Defendants knew or were

extremely reckless in not knowing that Capital Force was not profitable and that the Car Loans were not safe, secured and guaranteed.

170.    At the time of making his investments, Melhem was not aware, and neither Costantini, nor anyone at Capital Force, disclosed that Capital Force pooled all investor funds together in its bank accounts, and that once Melhem gave its money to Capital Force, it lost all control over how Capital Force used his funds.

171.    Melhem was completely dependent on Capital Force to make a successful Car Loan to achieve his returns. Melhem did not have any say in the Car Loan portfolio, who Capital Force loaned money to, which Car Loans it purchased, or Capital Force's collection efforts. The success of Melhem's investment therefore was inextricably tied to the success of Capital Force's Car Loan business and other efforts by the Individual Defendants and Defendant Capital Force to generate revenue. Melhem provided the funds and received returns – Capital Force managed and controlled the business and finance operations purportedly used to generate those returns.

172.    Costantini further assured Melhem that Snyder International Law Group would provide its professional services with preparing the requisite loan agreements necessary to secure his investment. Melhem relied on Costantini's representations when agreeing to deposit his investment funds into Snyder Law's escrow account.

173.    These false and misleading misstatements and omissions of material information altered the total mix of information that Melhem found relevant in determining whether to invest his life's savings in the Capital Force Group investment through Melhem.

174.    But for these false and misleading misstatements and material omissions, Melhem's decision to invest in Capital Force would have been different.

175.    Defendant Costantini knew at the time of the 2020 meeting with Melhem, from his position as Capital Force's founder and managing member, or recklessly disregarded the fact, that his statements were false and misleading and omitted material information because:

a.  Capital Force did not have a strict underwriting policy or effective risk management, nor did it thoroughly examine the car status and buyer background related to credit and income (as represented in the written promotional material presented to Melhem prior to Melhem's investment);

b.  Capital Force was not profitable and was making payments to investors by selling the Car Loans and consequently diluting Melhem's collateral;

c.  Few, if any, automobiles securing the Car Loans had a GPS installed to monitor the collateral at all times;

d.  That many of the Car Loans exceeded the fair market value of automobiles securing each Car Loan;

e.  That the value of the Car Loans securing Melhem's investment was less than 70% (and not 125%) of its investment to Car Loan ratio. In other words, Melhem's investment was undercollateralized by 30% from the time of making its investment and at one point in late 2021 was under collateralized by more than 70%.

f.  That Melhem was never a Secured Party and that there was never an identifiable certificate of title and/or Car Loans securing its investment – to the contrary, all the Car Loans were pooled together, commingled, and dispersed among Capital Force, and other affiliated companies such as Vehicle Solutions CF, Capital Force F1 and VSC. Melhem was shocked when he discovered from reviewing Capital Force's

Petition For Assignment For The Benefit Of Creditors (filed on October 24, 2022) that Melhem was not a Secured Party, but instead an unsecured creditor;

g. That Melhem's investment was not used exclusively to purchase Car Loans, but was instead used in part to pay Capital Force's operating expenses, Car Loan payments to other pre-existing investors, and distributions to Costantini, Talia-Brown and Culley;

h. That Capital Force's management team (which consisted of Costantini, Talia-Brown and Culley) did not have 20 years of experience in the auto finance industry;

176. Capital Force and Individual Defendants had a common interest in making misleading misstatements and concealing these facts. Had Melhem known of these material misleading misstatements and material omissions, Melhem would not have deposited its funds into Snyder International Law Group's trust account, Defendants' fraud would not have succeeded, and neither Capital Force nor any of the Defendants would have stood to profit as handsomely as they expected. Defendants Costantini, Talia-Brown, and Culley, by and through Capital Force therefore worked together to perpetuate and conceal a fraud, all the while inciting it with critical reports of success, profitability, cutting edge risk controls, and dressing of legitimacy and security.

**v.    Melhem Executes the Investment Documents.**

177.    On May 16, 2017, Melhem wired the sum of $300,000.00 to Snyder's Trust Account.

178.    On May 17, 2017, Talia-Brown, as Capital Force's Manager, executed the Promissory Note and Pledge Agreement for $300,000.00 in favor of Melhem – which was thereafter executed by Melhem (the "First Investment"). Attached hereto as (Exhibit "J").

179.    On May 17, 2017, Snyder Law wired the sum of $300,000.00 to Vehicle Solutions Corp.

180.    On August 16, 2018, Talia-Brown, as Capital Force F1's Manager, executed the Promissory Note and Security Agreement for $600,000.00 in favor of Melhem, which was subsequently executed by Melhem (the "Second Investment"). Attached hereto as (Exhibit "K").

181.    On August 16, 2018, Melhem wired the sum of $600,000.00 to Snyder's Trust Account. On August 17, 2018, Snyder Law wired the sum of $600,000.00 to Capital Force F1.

182.    On October 31, 2018, Talia-Brown, as Capital Force F1's Manager, executed the Promissory Note and Security Agreement for $500,000.00 in favor of Melhem, which was subsequently executed by Melhem (the "Third Investment"). Attached hereto as (Exhibit "L").

183.    On October 31, 2018, Melhem wired the sum of $500,000.00 to Snyder's Trust Account. On the same day, Snyder Law wired this sum to Capital Force F1.

184.    On November 27, 2018, Melhem wired the sum of $250,000.00 to Snyder's Trust Account, and on December 12, 2018, Melhem wired the sum of $250,000.00 to Snyder's Trust Account, totaling a combined $500,000.00.

185.    On December 17, 2018, Talia-Brown as Capital Force F1's Manager executed the Promissory Note and Security Agreement for $500,000.00 in favor of Melhem, which was subsequently executed by Melhem (the "Fourth Investment"). Attached hereto as (Exhibit "M"). However, the Promissory Note and Security Agreement were not between Melhem and Capital Force F1, but Melhem and Vehicle Solutions CF LLC.

186.    On December 18, 2018, Snyder Law wired the sum of $500,000.00 to Vehicle Solutions CF LLC.

187.    On March 1, 2019, Talia-Brown as Capital Force F1's Manager executed the Promissory Note and Security Agreement for $500,000.00 in favor of Melhem, which was subsequently executed by Melhem (the "Fifth Investment"). Attached hereto as (Exhibit "N").

188.    On March 1, 2019, Melhem wired the sum of $500,000.00 to Snyder Law's Trust Account. On March 14, 2019, Snyder Law wired the sum of $500,000.00 to Capital Force F1 LLC.

189.    On May 6, 2019, Melhem wired the sum of $400,000.00 to Snyder Law's Trust Account.

190.    On May 21, 2019, Talia-Brown as Capital Force F1's Manager executed the Promissory Note for $400,000.00 in favor of Melhem, which was subsequently executed by Melhem (the "Sixth Investment"). Attached hereto as (Exhibit "O").

191.    On May 21, 2019, Snyder Law wired the sum of $400,000.00 to Capital Force F1 LLC.

**vi.    The Lies Continue - Capital Force Falsely Assures Melhem the COVID-19 Pandemic Will Not and Has Not Affected Capital Force's Financial Condition.**

192.    On January 9, 2020, WHO announces mysterious Coronavirus-Related pneumonia in Wuhan, China.

193.    On February 3, 2020, the U.S. declares public health emergency.

194.    On February 25, 2020, the U.S. Centers for Disease Control and Prevention ("CDC") says that COVID-19 is heading toward pandemic status.

195.    On March 13, 2020, the United States declares the novel coronavirus a national emergency.

196.    On or about late June or early July of 2020, Melhem received the June Letter advising Melhem and other investors that as a result of COVID-19, Capital Force was now subject

to "an unexpected and unprecedented global financial effect, had a deep impact on the automotive financing industry as a whole." Attached hereto as (Exhibit "I").

197.    The June Letter also stated that repayment of the Notes would need to be reduced to 6% interest, as a proactive measure to preserve and safeguard the investors' capital – which in turn would allow the Company to generate positive returns of approximately 8%. Further, investors were falsely assured that the Pandemic has not stopped the Company from continuing to have positive and stable returns.

198.    Costantini and Culley knew or should have known that their representations concerning Capital Force's financial well-being were false.

**vii.    Costantini Makes False Reassurances to Melhem Regarding Its Investment.**

199.    In March 2022, Melhem spoke to Costantini on the phone asking for the return of Melhem's investment.

200.    In May 2022, Melhem again had a telephone conversation with Costantini, demanding the return of Melhem's investment.

201.    During this May 2022 conversation, Costantini replied that the company had 70% of assets intact. He then stated that the remaining 30% would be paid back from a new parallel company that Costantini was creating, in which Melhem would have some ownership.

202.    No such company was effectuated. Melhem did not receive any ownership of any company, and did not receive any assets, monies, or return on its investment following these conversations by Costantini.

203.    At the time Costantini made these statements to Melhem, Costantini knew these statements to be false. Costantini knew long before March 2022 that Capital Force did not have 70% of assets intact.

viii.    **Petitions for Assignment Assignments for the Benefit of Creditors filed by Capital Force F1.**

204.    On October 24, 2022, petitions for Assignments for the Benefit of Creditors were filed on behalf of Capital Force (the "ABC Petitions").[12]

205.    The ABC Petitions have unfoiled the true extent of Defendants' fraudulent scheme, *inter alia*, that Capital Force (and the other entities of Capital Force Group) were, during Melhem's Investment Period, critically undercapitalized, undercollateralized, fraught with non-performing Car Loans, many of which resulted in worthless repossessed automobiles, and that Melhem was never a secured party.

More specifically:

- Capital Force F1's ABC Petition confirms the following as of October 2022.

a.   Current amount outstanding to sixty-two (62) investors - $16,206,317.65;

b.   Total estimated liquidation value of automobile loans/titles - $1,000,000.00;

c.   Car Loans Securitized and Pledged to Agora Data and collected by Westlake Financial – Principal Balance $2,909,000. Residual Loan balance - $800,000.00;

d.   Available Cash and Bank Accounts - $23,105.28;

e.   Other than the $1,000,000.00 in repossessed automobiles, there is no evidence of a Car Loan portfolio, and much less, a designated portfolio of Car Loans in securing Melhem's investment.

- Capital Force's ABC Petition confirms the following as of October 2022.

---

[12] In re: Capital Force F1 LLC  Miami-Dade County Circuit Court. Case No. 2022-020390-CA-01 (43); In re: Capital Force LLC Miami-Dade County Circuit Court. Case No. 2022-020389-CA-01 (43) and, In re: Vehicle Solutions CF LLC Miami-Dade County Circuit Court. Case No. 2022-020388-CA-01 (43)

a.  Current amount outstanding to forty (40) investors - $9,060,296.42;

b.  Total estimated liquidation value of automobile loans/titles - None;

c.  Car Loans Securitized and Pledged - None;

d.  Available Cash and Bank Accounts - $8,481.83;

e.  Multiple (apparently unsecured) loans to Vehicle Solutions Corporation (Alberto San Miguel and Jessica Malvecino's Company) - $9,252,283.05.

f.  There is no evidence of a Car Loan portfolio, and much less, a designated portfolio of Car Loans in securing Melhem's investment.

206.  Melhem had no knowledge of the scheme perpetrated by Defendants until the ABCs were filed. Prior to the filing of the ABCs, Melhem and the investors believed themselves to be secured creditors, with their investments secured by lien rights in certain vehicles. It was not until the ABCs were filed that he discovered the Defendants scheme and came to know that they in fact were unsecured creditors, without lien rights to any of the vehicles.

**VI. PLAINTIFF GUSTAVO ARCHAIN – SPECIFIC FACTUAL ALLEGATIONS.**

207.  On or around December 2019, Gustavo Archain ("G. Archain") spoke to Costantini via telephone after a mutual friend introduced the two. During this telephone conversation, Costantini provided a detailed explanation about the investment opportunity, stating that his company was lending money to working people who rarely default because working people need their car to go to work and survive. Costantini stated that the investment was extremely safe because the last thing that an American working-class person wants is to lose their car. Costantini further elaborated that the investment was secured and guaranteed because G. Archain, would have the collateral to every car loan that was being purchased with his investment funds – and that the value of the Car Loans would at all times exceed his investment at a ratio of 125%. Costantini also

represented that if a specific car loan were to be sold from G. Archain's list of Car Loans, it would be immediately replaced with a car loan of equal or greater value.

208.    During that same telephone conversation, Costantini provided the following assurances:

  a.  Capital Force had a longstanding track record of being extremely profitable and maintained ample reserves in the extremely unlikely event of any shortfalls;

  b.  G. Archain's investment would be used exclusively to purchase Car Loans, which would be acquired by Capital Force and thereafter pledged in favor of G. Archain as collateral for G. Archain's investment;

  c.  Capital Force had a strict underwriting policy and effective risk management, and would thoroughly examine the status of each Car Loan and the buyer's creditworthiness prior to purchasing a Car Loan;

  d.  That Capital Force management had over 20 years of experience in the auto finance industry;

  e.  That each car financed through the Car Loan would have a GPS installed and was at all times monitored by Capital Force to ensure prompt recovery in the event of a default;

  f.  That the cars securing the Car Loans had a wholesale market value 30% in excess of loan amount of each Car Loan; and,

  g.  G. Archain's Car Loans would be maintained in a segregated portfolio in favor of G. Archain identifying each Car Loan and the specific car being financed.

209.     At the time of making the aforementioned material statements of fact (set forth in paragraphs 207-208), Costantini knew from his position as Capital Force's founder and managing member, that his statements were false and misleading.

210.     Moreover, the aforementioned representations were material in nature, as G. Archain would not have gone through with the investment transaction with Capital Force but for Costantini's misrepresentations and material omissions regarding the intended use of G. Archain's funds.

211.     From Costantini's first telephone conversation with Ini, Costantini knew that G. Archain was not a sophisticated investor and consequently did not have an understanding of financial markets, especially with respect to Car Loans and the risks associated with Capital Force's investment opportunity.

212.     The securities/investments offered to G. Archain by Costantini were not registered with the Florida Office of Financial Regulation or the Securities Exchange Commission.

213.     On or about January 2020, Costantini invited G. Archain to meet for a Capital Force investor presentation at his opulent Miami office at the Offices at the Four Seasons Tower located at 1441 Brickell Avenue, Miami, Florida (the "January 2020 Meeting").

214.     At this meeting, Costantini reiterated the representations previously made, and also showed G. Archain the Company's website, its financial and operational flowcharts, Car Loan monitoring systems, and the Promotional Material.

215.     Costantini repeatedly assured G. Archain that this was a great opportunity and that his investment would be safe, secure, and guaranteed. Much like the script delivered to other investors, Costantini further touted Capital Force's profitability and capital reserves. He reassured

G. Archain that they were able to offer investors added security by having Capital Force hold both the note and physical title to each automobile subject to the Car Loan.

216.    At this same meeting, Costantini spent considerable time going through the International Fund Operation Flow graphic/chart, and the terms of the promissory note, security agreement and special power of attorney in favor of G. Archain.[13] Costantini summarized the investment transaction as follows:

   a.   G. Archain/investor shall wire the investment funds to Snyder Law to be held in the law firm's Florida Bar supervised trust account;

   b.   Upon receipt of G. Archain's funds, Snyder Law would prepare the documents, which included a promissory note, security agreement and special power of attorney, which was then executed by Capital Force and G. Archain and delivered to Snyder Law at its offices in Aventura, Florida;

   c.   Upon receipt of G. Archain's funds and the executed promissory note, security agreement and special power of attorney, Snyder Law would verify that all conditions specified in these investment agreements were satisfied and/or performed. Upon Snyder Law's verification that everything was in order, Snyder Law would wire the funds to Capital Force, which would then allegedly use the totality of these funds to purchase Car Loans;

   d.   VSC would provide the servicing with each individual Car Loan borrower – that is, collecting regular payments from the borrower.  Notwithstanding VSC's role of

---

[13] Costantini outlined the terms and conditions related to collateral (i.e., Car Loans) which would be provided by Capital Force to Archain to secure Capital Force's payment obligations – which served as a guarantee or assurance that Archain would be repaid in the event of a default by Capital Force.

servicing the Car Loans – Capital Force assured G. Archain that title to each Car Loan purchased with G. Archain's funds would have G. Archain as the holder of title to the collateral (i.e., the car) as a senior lienholder.

e.  The investment structure detailed by Costantini, and further supported by the Promotional Material prepared by Costantini, Talia-Brown and Culley – provided G. Archain with an identifiable and collectible security interest to designated Car Loans – which G. Archain would possess and could liquidate in the event of a Capital Force default.

217.  Unbeknownst to G. Archain, Capital Force's business model operated much differently. Capital Force did not use G. Archain/investor funds to purchase Car Loans from VSC. Instead, G. Archain's monies were used to fund an undisclosed Revolving Line of Credit, first dated May 1, 2017, between Capital Force as Lender and VSC as Borrower at an interest rate of 18%.

218.  During the course of communications throughout December 2019 and January 2020, Costantini assured G. Archain that he would be a secured creditor, by having a security interest in specific Car Loans, in which the value of the Car Loans would at all times exceed 125% of the invested funds. Moreover, Costantini assured G. Archain that Capital Force was extremely conservative, since the 125% ratio Car Loan to investment was actually higher, because the collateral (the value of each automobile) never exceeded 80% of the value of the Car Loan.

219.  In 2020, G. Archain invested $50,000.00 with Capital Force F1.

### i.  G. Archain Meets with Costantini in Miami.

220.  At the January 2020 meeting, G. Archain met with Costantini in Capital Force's office located at the Four Seasons office building on Brickell Avenue, Miami, Florida (the

"January 2020 Meeting"). During that meeting, Costantini showed G. Archain the Company's website, its financial and operational flowcharts, Car Loan monitoring systems, and repeatedly assured G. Archain that investing with Capital Force was safe, secured, and guaranteed. Much like Costantini's previous presentations to other investors, Costantini highlighted Capital Force's profitability, which he claimed exceeded $3 million after operational expenses and capital reserves. Costantini also assured Ini that they were able to offer investors added security by having Capital Force hold both the note and physical title to each automobile subject to the Car Loan.

221.   These same assurances were also provided to G. Archain via Capital Force's Promotional Material – material which was prepared under the direction and control of Defendants Talia-Brown and Culley.

222.   Costantini further sought to entice G. Archain by stating that his father Rodolfo Costantini and his uncle Eduardo Costantini had also invested a substantial sum of money with Capital Force. This was significant because Eduardo Costantini is among seven Argentines listed on "Forbes Rich List of Billionaires" and therefore supported Costantini's reassurances that Capital Force was well capitalized.

223.   To reassure G. Archain of the investment's legitimacy, Costantini represented that two renowned Miami-based law firms, including the prestigious firm Snyder International Law Group, had vetted the investment to provide guarantees and transparency. *See* https://www.linkedin.com/company/capital-force/about/ (last visited March 1, 2023).

224.   Costantini knew that these statements were false. In fact, the investors' funds, including G. Archain's investment, were used to partially offset Capital Force's operating expenses (including a $1,000,000.00 annual salary to Costantini, and approximately $350,000.00

to Talia-Brown and $350,000.00 to Culley). The balance was used to provide VSC with a revolving line of credit (i.e., a loan) and not for the acquisition of Car Loans.

### iii. Car Loans Were Never Segregated for the Benefit of G. Archain's Investment.

225.    At no time material to these allegations was G. Archain told that the collateral securing G. Archain's investment would be commingled with other investors' collateral and by companies other than Capital Force. To the contrary, G. Archain was specifically told by Costantini that G. Archain's collateral (the Car Loans) were segregated, and each Car Loan individually accounted for in Capital Force's ledgers and in ledgers maintained and audited by Snyder Law.

226.    G. Archain received copies of the investment documents which included a Security Agreement ("Security Agreement"), Special Power of Attorney ("Power of Attorney") and Secured Fixed Interest Only Promissory Note ("Promissory Note"), (collectively the "Investment Agreements"). The Investment Agreements were prepared by Jennifer Snyder, Esq., managing and founding partner at Snyder International Law Group P.A., further to instructions and the participation of loan terms provided by Capital Force's managers, Individual Defendants Costantini, Talia-Brown and Culley.

227.    Contained within the language and terms of the Investment Agreement were additional representations, which, along with Costantini's presentations during the January 2020 Meeting, were relied upon by G. Archain in its decision to invest and thereafter keep its investment in. More specifically, the Security Agreement contains the following provision:

- "A.  Debtor is in the business of purchasing subprime auto car loans, which are secured by the borrower's automobile. The security interest granted to the Secured Party [in this case G. Archain] in the Collateral shall be the pledge of the security of Debtor's loans [referring to Capital Force] to said subprime borrowers, which

are the title to the automobiles wherein the lender on the title is the Debtor and that Debtor is the lawful owner of such Collateral and has good right to pledge, sell, assign, transfer and create a security interest in the same."

- "D.   The Collateral will not be disposed of by the Debtor unless replaced by Collateral of equal value. Secured Party acknowledges the nature of subprime auto loans is such that the loans that make up the Collateral may be repaid and therefore, the Collateral may often be replaced by loans of equal value."

228.    Costantini provided G. Archain with an explanation on the benefit of being a secured creditor (which he referred to as a Secured Party). Costantini referred to the language contained in the previously provided Security Agreement, which stated:

- "C.  The Collateral shall continue to be free from any **superior** and prior pledges, liens, encumbrances and security interests in the same, and the Debtor [referring to Capital Force] will warrant and, at the **Secured Party's** request, defend the same from all claims and demands of all persons whatsoever."

229.    At the time of G. Archain's execution of the Investment Documents, Defendant Capital Force and Individual Defendants Costantini, Talia-Brown and Culley, knew that the statements contained in the Security Agreement (See paragraphs 227-228) were untrue.

230.    Costantini's assurances that the investments were safe were further bolstered by quoting American author, equities analyst, and Bloomberg columnist Barry Rithotz, who said, "Because our autos are such a lifeline to our financial lives, people will pay their monthly loan bill over almost any other bill. Prolonged court delays are rare. In many cases, the repo man is virtual technology that can remotely render the car useless." [This statement was also contained in written promotional material provided to G. Archain during conversations beginning in late 2019 and through 2020]. Costantini went on to say that Capital Force has that kind of virtual technology, along with GAP insurance if the automobile is damaged – along with GPS on all its vehicles.

iv.   **Capital Force Had Poor Controls and Severely Inadequate Risk Management/Underwriting Procedures – in Stark Contrast to Costantini's**

**Representations that It Was a Mature, Risk-Free Company with a Seasoned Management Team.**

231.    The marketing material provided to G. Archain during the January 2020 meeting further emphasized, "...there is an effective risk management under a strict VSC and CF (referring to Capital Force) underwriting policy."

232.    In the same marketing material prepared by Individual Defendants Costantini, Talia-Brown and Culley, Capital Force further emphasizes having a management team with more than 20 years of experience in auto financing.

233.    G. Archain has now come to know, that contrary to Costantini's representations, Capital Force did not audit nor underwrite the Car Loans, nor did it have a mechanism to assure that the Car Loans being allegedly purchased by Capital Force complied with Capital Force's underwriting requirement.

234.    From its inception, Capital Force had poor controls and fundamentally deficient risk management/underwriting procedures. Assets and liabilities of all forms were generally treated as interchangeable, and there were insufficient distinctions between the assignment of debts and credits to Capital Force, and its affiliated companies, Capital Force F1, Vehicle Solutions CF, Defendant San Miguel's company VSC and principals Costantini, Brown and Culley. This reality was a sharp contrast to Costantini's representations made to G. Archain and to other investors – a mature company that managed funds and risk in a conservative, risk free, and rigorous manner.

235.    G. Archain has now come to discover that Capital Force's management team, which consisted of Costantini, Talia-Brown and Culley, did not have 20 years of experience in auto financing. In fact, at the time G. Archain made its investment on January 23, 2020, Costantini, Brown and Culley (the management team) each had less than two years in the auto financing

business – with most of that time spent being "rainmakers" (i.e., soliciting investors) and very little time actually conducting auto financing transactions.

236.    Capital Force's management team did not have the training experience and know-how to implement and administrate the strict risk management and underwriting procedures which Costantini, Talia-Brown and Culley represented to be an integral component of mitigating investment risk. Costantini, Talia-Brown and Culley knew that Capital Force's management team did not have the requisite experience and much less 20 years of experience in the auto financing industry.

237.    Costantini's representations that Capital Force was profitable and that the Car Loans securing G. Archain's investment were safe, secured and guaranteed, were false.  In reality, the proceeds that Capital Force generated from its Car Loans were woefully insufficient to cover principal and interest payments to investors. Capital Force's profitability was further compromised by having to pay Costantini's $1,000,000.00 salary, and reimbursement of business, entertainment, and international travel expenses unrelated to Capital Force's business.

238.    Because Individual Defendants Costantini, Talia-Brown and Culley were at the highest level of corporate governance, supervised all aspects of Capital Force's operations, made financial decisions and projections and had access to the accounting and were the architects of the fraudulent Promotional Material delivered to G. Archain, Individual Defendants knew or were extremely reckless in not knowing that Capital Force was not profitable and that the Car Loans were not safe, secured and guaranteed.

239.    At the time of making his investments, G. Archain was not aware, and neither Costantini, nor anyone at Capital Force, disclosed that Capital Force pooled all investor funds

together in its bank accounts, and that once G. Archain gave its money to Capital Force, it lost all control over how Capital Force used his funds.

240.    G. Archain was completely dependent on Capital Force to make a successful Car Loan to achieve his returns. G. Archain did not have any say in the Car Loan portfolio, who Capital Force loaned money to, which Car Loans it purchased, or Capital Force's collection efforts. The success of G. Archain's investment therefore was inextricably tied to the success of Capital Force's Car Loan business and other efforts by the Individual Defendants and Defendant Capital Force to generate revenue. G. Archain provided the funds and received returns – Capital Force managed and controlled the business and finance operations purportedly used to generate those returns.

241.    Costantini further assured G. Archain that Snyder International Law Group would provide its professional services with preparing the requisite loan agreements necessary to secure his investment. G. Archain relied on Costantini's representations when agreeing to deposit his investment funds into Snyder Law's escrow account.

242.    These false and misleading misstatements and omissions of material information altered the total mix of information that G. Archain found relevant in determining whether to invest his life's savings in the Capital Force Group investment through G. Archain.

243.    But for these false and misleading misstatements and material omissions, G. Archain's decision to invest in Capital Force would have been different.

244.    Defendant Costantini knew at the time of the 2020 meeting with G. Archain, from his position as Capital Force's founder and managing member, or recklessly disregarded the fact, that his statements were false and misleading and omitted material information because:

> a.    Capital Force did not have a strict underwriting policy or effective risk management, nor did it thoroughly examine the car status and buyer background

related to credit and income (as represented in the written promotional material presented to G. Archain prior to G. Archain's investment);

b.  Capital Force was not profitable and was making payments to investors by selling the Car Loans and consequently diluting G. Archain's collateral;

c.  Few, if any, automobiles securing the Car Loans had a GPS installed to monitor the collateral at all times;

d.  That many of the Car Loans exceeded the fair market value of automobiles securing each Car Loan;

e.  That the value of the Car Loans securing G. Archain's investment was less than 70% (and not 125%) of its investment to Car Loan ratio. In other words, G. Archain's investment was undercollateralized by 30% from the time of making its investment and at one point in late 2021 was under collateralized by more than 70%.

f.  That G. Archain was never a Secured Party and that there was never an identifiable certificate of title and/or Car Loans securing its investment – to the contrary, all the Car Loans were pooled together, commingled, and dispersed among Capital Force, and other affiliated companies such as Vehicle Solutions CF, Capital Force F1 and VSC. G. Archain was shocked when he discovered from reviewing Capital Force's Petition For Assignment For The Benefit Of Creditors (filed on October 24, 2022) that G. Archain was not a Secured Party, but instead an unsecured creditor;

g.  That G. Archain's investment was not used exclusively to purchase Car Loans, but was instead used in part to pay Capital Force's operating expenses, Car Loan

payments to other pre-existing investors, and distributions to Costantini, Talia-Brown and Culley;

  h. That Capital Force's management team (which consisted of Costantini, Talia-Brown and Culley) did not have 20 years of experience in the auto finance industry;

  245. Capital Force and Individual Defendants had a common interest in making misleading misstatements and concealing these facts. Had G. Archain known of these material misleading misstatements and material omissions, G. Archain would not have deposited its funds into Snyder International Law Group's trust account, Defendants' fraud would not have succeeded, and neither Capital Force nor any of the Defendants would have stood to profit as handsomely as they expected. Defendants Costantini, Talia-Brown, and Culley, by and through Capital Force therefore worked together to perpetuate and conceal a fraud, all the while inciting it with critical reports of success, profitability, cutting edge risk controls, and dressing of legitimacy and security.

  **v. G. Archain Executes the Investment Documents.**

  246. In January 2020, G. Archain executed the Promissory Note and Security Agreement to Capital Force LLC for $50,000.00 (the "First Investment"). Attached hereto as (Exhibit "P").

  247. On February 3, 2020, G. Archain wired the sum of $50,000.00 to Snyder's Trust Account.

  **vi. The Lies Continue - Capital Force Falsely Assures G. Archain the COVID-19 Pandemic Will Not and Has Not Affected Capital Force's Financial Condition.**

  248. On January 9, 2020, WHO announces mysterious Coronavirus-Related pneumonia in Wuhan, China.

  249. On February 3, 2020, the U.S. declares public health emergency.

250. On February 25, 2020, the U.S. Centers for Disease Control and Prevention ("CDC") says that COVID-19 is heading toward pandemic status.

251. On March 13, 2020, the United States declares the novel coronavirus a national emergency.

252. On or about late June or early July of 2020, G. Archain received the June Letter advising G. Archain and other investors that as a result of COVID-19, Capital Force was now subject to "an unexpected and unprecedented global financial effect, had a deep impact on the automotive financing industry as a whole." Attached hereto as (Exhibit "I").

253. The June Letter also stated that repayment of the Notes would need to be reduced to 6% interest, as a proactive measure to preserve and safeguard the investors' capital – which in turn would allow the Company to generate positive returns of approximately 8%. Further, investors were falsely assured that the Pandemic has not stopped the Company from continuing to have positive and stable returns.

254. Costantini and Culley knew or should have known that their representations concerning Capital Force's financial well-being were false.

**vii.  Costantini Makes False Reassurances to G. Archain Regarding Its Investment.**

255. In March 2022, G. Archain spoke to Costantini on the phone asking for the return of G. Archain's investment.

256. In May 2022, G. Archain again had a telephone conversation with Costantini, demanding the return of G. Archain's investment.

257. During this May 2022 conversation, Costantini replied that the company had 70% of assets intact. He then stated that the remaining 30% would be paid back from a new parallel company that Costantini was creating, in which G. Archain would have some ownership.

258.    No such company was effectuated. G. Archain did not receive any ownership of any company, and did not receive any assets, monies, or return on its investment following these conversations by Costantini.

259.    At the time Costantini made these statements to G. Archain, Costantini knew these statements to be false. Costantini knew long before March 2022 that Capital Force did not have 70% of assets intact.

**viii.    Petitions for Assignment Assignments for the Benefit of Creditors filed by Capital Force.**

260.    On October 24, 2022, petitions for Assignments for the Benefit of Creditors were filed on behalf of Capital Force (the "ABC Petitions").[14]

261.    The ABC Petitions have unfoiled the true extent of Defendants' fraudulent scheme, *inter alia*, that Capital Force (and the other entities of Capital Force Group) were, during G. Archain's Investment Period, critically undercapitalized, undercollateralized, fraught with non-performing Car Loans, many of which resulted in worthless repossessed automobiles, and that G. Archain was never a secured party.

More specifically:

Capital Force's ABC Petition confirms the following as of October 2022.

a.    Current amount outstanding to forty (40) investors - $9,060,296.42;

b.    Total estimated liquidation value of automobile loans/titles - None;

c.    Car Loans Securitized and Pledged - None;

---

[14] In re: Capital Force F1 LLC  Miami-Dade County Circuit Court. Case No. 2022-020390-CA-01 (43); In re: Capital Force LLC Miami-Dade County Circuit Court. Case No. 2022-020389-CA-01 (43) and, In re: Vehicle Solutions CF LLC Miami-Dade County Circuit Court. Case No. 2022-020388-CA-01 (43)

d.  Available Cash and Bank Accounts - $8,481.83;

e.  Multiple (apparently unsecured) loans to Vehicle Solutions Corporation (Alberto San Miguel and Jessica Malvecino's Company) - $9,252,283.05.

f.  There is no evidence of a Car Loan portfolio, and much less, a designated portfolio of Car Loans in securing G. Archain's investment.

262.    G. Archain had no knowledge of the scheme perpetrated by Defendants until the ABCs were filed. Prior to the filing of the ABCs, G. Archain and the investors believed themselves to be secured creditors, with their investments secured by lien rights in certain vehicles. It was not until the ABCs were filed that he discovered the Defendants scheme and came to know that they in fact were unsecured creditors, without lien rights to any of the vehicles.

## VII. PLAINTIFF IGNACIO ARCHAIN – SPECIFIC FACTUAL ALLEGATIONS.

263.    On or around January of 2020, Ignacio Archain ("I. Archain") spoke to Costantini via telephone after I. Archain's family member, Adrian Simonetti, introduced the two. During this telephone conversation, Costantini provided a detailed explanation about the investment opportunity, stating that his company was lending money to working people who rarely default because working people need their car to go to work and survive. Costantini stated that the investment was extremely safe because the last thing that an American working-class person wants is to lose their car. Costantini further elaborated that the investment was secured and guaranteed because, I. Archain would have the collateral to every car loan that was being purchased with his investment funds – and that the value of the Car Loans would at all times exceed his investment at a ratio of 125%. Costantini also represented that if a specific car loan were to be sold from I. Archain's list of Car Loans, it would be immediately replaced with a car loan of equal or greater value.

264.     During that same telephone conversation, Costantini provided the following assurances:

    a.   Capital Force had a longstanding track record of being extremely profitable and maintained ample reserves in the extremely unlikely event of any shortfalls;

    b.   I. Archain's investment would be used exclusively to purchase Car Loans, which would be acquired by Capital Force and thereafter pledged in favor of I. Archain as collateral for I. Archain's investment;

    c.   Capital Force had a strict underwriting policy and effective risk management, and would thoroughly examine the status of each Car Loan and the buyer's creditworthiness prior to purchasing a Car Loan;

    d.   That Capital Force management had over 20 years of experience in the auto finance industry;

    e.   That each car financed through the Car Loan would have a GPS installed and was at all times monitored by Capital Force to ensure prompt recovery in the event of a default;

    f.   That the cars securing the Car Loans had a wholesale market value 30% in excess of loan amount of each Car Loan; and,

    g.   I. Archain's Car Loans would be maintained in a segregated portfolio in favor of I. Archain identifying each Car Loan and the specific car being financed.

265.     At the time of making the aforementioned material statements of fact (set forth in paragraphs 263-264), Costantini knew from his position as Capital Force's founder and managing member, that his statements were false and misleading.

266.    Moreover, the aforementioned representations were material in nature, as I. Archain would not have gone through with the investment transaction with Capital Force but for Costantini's misrepresentations and material omissions regarding the intended use of I. Archain's funds.

267.    From Costantini's first telephone conversation with I. Archain, Costantini knew that I. Archain was not a sophisticated investor and consequently did not have an understanding of financial markets, especially with respect to Car Loans and the risks associated with Capital Force's investment opportunity.

268.    The securities/investments offered to I. Archain by Costantini were not registered with the Florida Office of Financial Regulation or the Securities Exchange Commission.

269.    On or about the end of January 2020, Costantini and I. Archain participated in a Zoom Videoconference call, in which they discussed the structure and business operations of Capital Force, as well as regarding I. Archain's potential investment  (the "I. Archain Conference Call").

270.    During the I. Archain Conference Calls Costantini reiterated the representations previously made, and also showed I. Archain the Company's website, its financial and operational flowcharts, Car Loan monitoring systems, and the Promotional Material.

271.    Costantini repeatedly assured I. Archain that this was a great opportunity and that his investment would be safe, secure and guaranteed. Much like the script delivered to other investors, Costantini further touted Capital Force's profitability and capital reserves. He reassured I. Archain that they were able to offer investors added security by having Capital Force hold both the note and physical title to each automobile subject to the Car Loan.

272.     During the I. Archain Conference Call Costantini spent considerable time going through the International Fund Operation Flow graphic/chart, and the terms of the promissory note, security agreement and special power of attorney in favor of I. Archain. Costantini summarized the investment transaction as follows:

a.  I. Archain shall wire the investment funds to Snyder Law to be held in the law firm's Florida Bar supervised trust account;

b.  Upon receipt of I. Archain's funds, Snyder Law would prepare the documents, which included a promissory note, security agreement and special power of attorney, which was then executed by Capital Force and I. Archain and delivered to Snyder Law at its offices in Aventura, Florida;

c.  Upon receipt of I. Archain's funds and the executed promissory note, security agreement and special power of attorney, Snyder Law would verify that all conditions specified in these investment agreements were satisfied and/or performed. Upon Snyder Law's verification that everything was in order, Snyder Law would wire the funds to Capital Force, which would then allegedly use the totality of these funds to purchase Car Loans;

d.  VSC would provide the servicing with each individual Car Loan borrower – that is, collecting regular payments from the borrower.  Notwithstanding VSC's role of servicing the Car Loans – Capital Force assured I. Archain that title to each Car Loan purchased with I. Archain's funds would have I. Archain as the holder of title to the collateral (i.e., the car) as a senior lienholder.

e.  The investment structure detailed by Costantini, and further supported by the Promotional Material prepared by Costantini, Talia-Brown and Culley – provided

I. Archain with an identifiable and collectible security interest to designated Car Loans – which I. Archain would possess and could liquidate in the event of a Capital Force default.

273.    Unbeknownst to I. Archain, Capital Force's business model operated much differently. Capital Force did not use I. Archain/investor funds to purchase Car Loans from VSC. Instead, I. Archain's monies were used to fund an undisclosed Revolving Line of Credit, first dated May 1, 2017, between Capital Force as Lender and VSC as Borrower at an interest rate of 18%.

274.    During the course of communications throughout early 2020, Costantini assured I. Archain that he would be a secured creditor, by having a security interest in specific Car Loans, in which the value of the Car Loans would at all times exceed 125% of the invested funds. Moreover, Costantini assured I. Archain that Capital Force was extremely conservative, since the 125% ratio Car Loan to investment was actually higher, because the collateral (the value of each automobile) never exceeded 80% of the value of the Car Loan.

275.    On or about January 31, 2020, I. Archain invested $100,000.00 with Capital Force LLC.

### i.    I. Archain Meets with Costantini in Miami.

276.    As stated, during the I. Archain Conference Call, I. Archain spoke at length with Costantini.  During that meeting, Costantini showed I. Archain the Company's website, its financial and operational flowcharts, Car Loan monitoring systems, and repeatedly assured I. Archain that investing with Capital Force was safe, secured, and guaranteed. Much like Costantini's previous presentations to other investors, Costantini highlighted Capital Force's profitability, which he claimed exceeded $3 million after operational expenses and capital reserves. Costantini also assured I. Archain that they were able to offer investors added security

by having Capital Force hold both the note and physical title to each automobile subject to the Car Loan.

277.     These same assurances were also provided to I. Archain via Capital Force's Promotional Material – material which was prepared under the direction and control of Defendants Talia-Brown and Culley.

278.     Costantini further sought to entice I. Archain by stating that his father Rodolfo Costantini and his uncle Eduardo Costantini had also invested a substantial sum of money with Capital Force. This was significant because Eduardo Costantini is among seven Argentines listed on "Forbes Rich List of Billionaires" and therefore supported Costantini's reassurances that Capital Force was well capitalized.

279.     To reassure I. Archain of the investment's legitimacy, Costantini represented that two renowned Miami-based law firms, including the prestigious firm Snyder International Law Group, had vetted the investment to provide guarantees and transparency. *See* https://www.linkedin.com/company/capital-force/about/ (last visited March 1, 2023).

280.     Costantini knew that these statements were false. In fact, the investors' funds, including I. Archain's investment, were used to partially offset Capital Force's operating expenses (including a $1,000,000.00 annual salary to Costantini, and approximately $350,000.00 to Talia-Brown and $350,000.00 to Culley). The balance was used to provide VSC with a revolving line of credit (i.e., a loan) and not for the acquisition of Car Loans.

**ii. Car Loans Were Never Segregated for the Benefit of I. Archain's Investment.**

281.     At no time material to these allegations was I. Archain told that the collateral securing I. Archain's investment would be commingled with other investors' collateral and by companies other than Capital Force. To the contrary, I. Archain was specifically told by Costantini

that I. Archain's collateral (the Car Loans) were segregated, and each Car Loan individually accounted for in Capital Force's ledgers and in ledgers maintained and audited by Snyder Law.

282.    I. Archain received copies of the investment documents which included a Security Agreement ("Security Agreement"), Special Power of Attorney ("Power of Attorney") and Secured Fixed Interest Only Promissory Note ("Promissory Note"), (collectively the "Investment Agreements"). The Investment Agreements were prepared by Jennifer Snyder, Esq., managing and founding partner at Snyder International Law Group P.A., further to instructions and the participation of loan terms provided by Capital Force's managers, Individual Defendants Costantini, Talia-Brown and Culley.

283.    Contained within the language and terms of the Investment Agreement were additional representations, which, along with Costantini's presentations during the I. Archain Conference Call, were relied upon by I. Archain in its decision to invest and thereafter keep its investment in. More specifically, the Security Agreement contains the following provision:

- "A.  Debtor is in the business of purchasing subprime auto car loans, which are secured by the borrower's automobile. The security interest granted to the Secured Party [in this case I. Archain] in the Collateral shall be the pledge of the security of Debtor's loans [referring to Capital Force] to said subprime borrowers, which are the title to the automobiles wherein the lender on the title is the Debtor and that Debtor is the lawful owner of such Collateral and has good right to pledge, sell, assign, transfer and create a security interest in the same."

- "D.  The Collateral will not be disposed of by the Debtor unless replaced by Collateral of equal value. Secured Party acknowledges the nature of subprime auto loans is such that the loans that make up the Collateral may be repaid and therefore, the Collateral may often be replaced by loans of equal value."

284.    Costantini provided I. Archain with an explanation on the benefit of being a secured creditor (which he referred to as a Secured Party). Costantini referred to the language contained in the previously provided Security Agreement, which stated:

- "C.  The Collateral shall continue to be free from any **superior** and prior pledges, liens, encumbrances and security interests in the same, and the Debtor [referring to Capital Force] will warrant and, at the **Secured Party's** request, defend the same from all claims and demands of all persons whatsoever."

285.    At the time of I. Archain's execution of the Investment Documents, Defendant Capital Force and Individual Defendants Costantini, Talia-Brown and Culley, knew that the statements contained in the Security Agreement (See paragraphs 283-284) were untrue.

286.    Costantini's assurances that the investments were safe were further bolstered by quoting American author, equities analyst, and Bloomberg columnist Barry Rithotz, who said, "Because our autos are such a lifeline to our financial lives, people will pay their monthly loan bill over almost any other bill. Prolonged court delays are rare. In many cases, the repo man is virtual technology that can remotely render the car useless." [This statement was also contained in written promotional material provided to I. Archain during conversations beginning in late 2019 and through 2020]. Costantini went on to say that Capital Force has that kind of virtual technology, along with GAP insurance if the automobile is damaged – along with GPS on all its vehicles.

**iii.    Capital Force Had Poor Controls and Severely Inadequate Risk Management/Underwriting Procedures – in Stark Contrast to Costantini's Representations that It Was a Mature, Risk-Free Company with a Seasoned Management Team.**

287.    The marketing material provided to I. Archain during the I. Archain Conference Call further emphasized, "...there is an effective risk management under a strict VSC and CF (referring to Capital Force) underwriting policy."

288.    In the same marketing material prepared by Individual Defendants Costantini, Talia-Brown and Culley, Capital Force further emphasizes having a management team with more than 20 years of experience in auto financing.

289.    I. Archain has now come to know, that contrary to Costantini's representations, Capital Force did not audit nor underwrite the Car Loans, nor did it have a mechanism to assure that the Car Loans being allegedly purchased by Capital Force complied with Capital Force's underwriting requirement.

290.    From its inception, Capital Force had poor controls and fundamentally deficient risk management/underwriting procedures. Assets and liabilities of all forms were generally treated as interchangeable, and there were insufficient distinctions between the assignment of debts and credits to Capital Force, and its affiliated companies, Capital Force F1, Vehicle Solutions CF, Defendant San Miguel's company VSC and principals Costantini, Brown and Culley. This reality was a sharp contrast to Costantini's representations made to I. Archain and to other investors – a mature company that managed funds and risk in a conservative, risk free, and rigorous manner.

291.    I. Archain has now come to discover that Capital Force's management team, which consisted of Costantini, Talia-Brown and Culley, did not have 20 years of experience in auto financing. In fact, at the time I. Archain made his investments, Costantini, Brown and Culley (the management team) each had less than two years in the auto financing business – with most of that time spent being "rainmakers" (i.e., soliciting investors) and very little time actually conducting auto financing transactions.

292.    Capital Force's management team did not have the training experience and know-how to implement and administrate the strict risk management and underwriting procedures which Costantini, Talia-Brown and Culley represented to be an integral component of mitigating investment risk. Costantini, Talia-Brown and Culley knew that Capital Force's management team did not have the requisite experience and much less 20 years of experience in the auto financing industry.

293.    Costantini's representations that Capital Force was profitable and that the Car Loans securing I. Archain's investment were safe, secured and guaranteed, were false.  In reality, the proceeds that Capital Force generated from its Car Loans were woefully insufficient to cover principal and interest payments to investors. Capital Force's profitability was further compromised by having to pay Costantini's $1,000,000.00 salary, and reimbursement of business, entertainment, and international travel expenses unrelated to Capital Force's business.

294.    Because Individual Defendants Costantini, Talia-Brown and Culley were at the highest level of corporate governance, supervised all aspects of Capital Force's operations, made financial decisions and projections and had access to the accounting and were the architects of the fraudulent Promotional Material delivered to I. Archain, Individual Defendants knew or were extremely reckless in not knowing that Capital Force was not profitable and that the Car Loans were not safe, secured and guaranteed.

295.    At the time of making his investments, I. Archain was not aware, and neither Costantini, nor anyone at Capital Force, disclosed that Capital Force pooled all investor funds together in its bank accounts, and that once I. Archain gave its money to Capital Force, it lost all control over how Capital Force used his funds.

296.    I. Archain was completely dependent on Capital Force to make a successful Car Loan to achieve his returns. I. Archain did not have any say in the Car Loan portfolio, who Capital Force loaned money to, which Car Loans it purchased, or Capital Force's collection efforts. The success of I. Archain's investment therefore was inextricably tied to the success of Capital Force's Car Loan business and other efforts by the Individual Defendants and Defendant Capital Force to generate revenue. I. Archain provided the funds and received returns – Capital Force managed and controlled the business and finance operations purportedly used to generate those returns.

297.     Costantini further assured I. Archain that Snyder International Law Group would provide its professional services with preparing the requisite loan agreements necessary to secure his investment. I. Archain relied on Costantini's representations when agreeing to deposit his investment funds into Snyder Law's escrow account.

298.     These false and misleading misstatements and omissions of material information altered the total mix of information that I. Archain found relevant in determining whether to invest his life's savings in the Capital Force Group investment through I. Archain.

299.     But for these false and misleading misstatements and material omissions, I. Archain's decision to invest in Capital Force would have been different.

300.     Defendant Costantini knew at the time of the 2020 meeting with I. Archain, from his position as Capital Force's founder and managing member, or recklessly disregarded the fact, that his statements were false and misleading and omitted material information because:

    a.  Capital Force did not have a strict underwriting policy or effective risk management, nor did it thoroughly examine the car status and buyer background related to credit and income (as represented in the written promotional material presented to I. Archain prior to I. Archain's investment);

    b.  Capital Force was not profitable and was making payments to investors by selling the Car Loans and consequently diluting I. Archain's collateral;

    c.  Few, if any, automobiles securing the Car Loans had a GPS installed to monitor the collateral at all times;

    d.  That many of the Car Loans exceeded the fair market value of automobiles securing each Car Loan;

e.   That the value of the Car Loans securing I. Archain's investment was less than 70% (and not 125%) of its investment to Car Loan ratio. In other words, I. Archain's investment was undercollateralized by 30% from the time of making its investment and at one point in late 2021 was under collateralized by more than 70%.

f.   That I. Archain was never a Secured Party and that there was never an identifiable certificate of title and/or Car Loans securing its investment – to the contrary, all the Car Loans were pooled together, commingled, and dispersed among Capital Force, and other affiliated companies such as Vehicle Solutions CF, Capital Force F1 and VSC. I. Archain was shocked when he discovered from reviewing Capital Force's Petition For Assignment For The Benefit Of Creditors (filed on October 24, 2022) that I. Archain was not a Secured Party, but instead an unsecured creditor;

g.   That I. Archain's investment was not used exclusively to purchase Car Loans, but was instead used in part to pay Capital Force's operating expenses, Car Loan payments to other pre-existing investors, and distributions to Costantini, Talia-Brown and Culley;

h.   That Capital Force's management team (which consisted of Costantini, Talia-Brown and Culley) did not have 20 years of experience in the auto finance industry;

301.   Capital Force and Individual Defendants had a common interest in making misleading misstatements and concealing these facts. Had I. Archain known of these material misleading misstatements and material omissions, I. Archain would not have deposited its funds into Snyder International Law Group's trust account, Defendants' fraud would not have succeeded, and neither Capital Force nor any of the Defendants would have stood to profit as handsomely as they expected. Defendants Costantini, Talia-Brown, and Culley, by and through Capital Force

therefore worked together to perpetuate and conceal a fraud, all the while inciting it with critical reports of success, profitability, cutting edge risk controls, and dressing of legitimacy and security.

    **iv.**    **I. Archain Executes the Investment Documents.**

302.    On or about January 31, 2020, I. Archain wired $100,000.00 to Snyder Law's Trust Account.

303.    On or about January 31, 2020, I. Archain executed the Promissory Note and Security Agreement to Capital Force, LLC for $100,000.00. Attached hereto as (Exhibit "Q").

    **v.**    **The Lies Continue - Capital Force Falsely Assures I. Archain the COVID-19 Pandemic Will Not and Has Not Affected Capital Force's Financial Condition.**

304.    On January 9, 2020, WHO announces mysterious Coronavirus-Related pneumonia in Wuhan, China.

305.    On February 3, 2020, the U.S. declares public health emergency.

306.    On February 25, 2020, the U.S. Centers for Disease Control and Prevention ("CDC") says that COVID-19 is heading toward pandemic status.

307.    On March 13, 2020, the United States declares the novel coronavirus a national emergency.

308.    On or about late June or early July of 2020, I. Archain received the June Letter advising I. Archain and other investors that as a result of COVID-19, Capital Force was now subject to "an unexpected and unprecedented global financial effect, had a deep impact on the automotive financing industry as a whole." Attached hereto as (Exhibit "I").

309.    The June Letter also stated that repayment of the Notes would need to be reduced to 6% interest, as a proactive measure to preserve and safeguard the investors' capital – which in turn would allow the Company to generate positive returns of approximately 8%. Further, investors

were falsely assured that the Pandemic has not stopped the Company from continuing to have positive and stable returns.

310.    Costantini and Culley knew or should have known that their representations concerning Capital Force's financial well-being were false.

**vi.    Costantini Makes False Reassurances to I. Archain Regarding Its Investment.**

311.    On or about February 15, 2022, I. Archain spoke to Costantini on the phone asking for the return of his investment.

312.    During this February 2022 conversation, Costantini replied that the company had 70% of assets intact. He then stated that the remaining 30% would be paid back from a new parallel company that Costantini was creating, in which I. Archain would have some ownership.

313.    No such company was effectuated. I. Archain did not receive any ownership of any company, and did not receive any assets, monies, or return on its investment following these conversations by Costantini.

314.    At the time Costantini made these statements to I. Archain, Costantini knew these statements to be false. Costantini knew long before February 2022 that Capital Force did not have 70% of assets intact.

**vii.    Petitions for Assignment Assignments for the Benefit of Creditors filed by Capital Force.**

315.    On October 24, 2022, petitions for Assignments for the Benefit of Creditors were filed on behalf of Capital Force (the "ABC Petitions").[15]

---

[15] In re: <u>Capital Force F1 LLC</u>  Miami-Dade County Circuit Court. Case No. 2022-020390-CA-01 (43); In re: <u>Capital Force LLC</u> Miami-Dade County Circuit Court. Case No. 2022-020389-CA-01 (43) and, In re: <u>Vehicle Solutions CF LLC</u> Miami-Dade County Circuit Court. Case No. 2022-020388-CA-01 (43)

316.     The ABC Petitions have unfoiled the true extent of Defendants' fraudulent scheme, *inter alia*, that Capital Force (and the other entities of Capital Force Group) were, during I. Archain's Investment Period, critically undercapitalized, undercollateralized, fraught with non-performing Car Loans, many of which resulted in worthless repossessed automobiles, and that I. Archain was never a secured party.

More specifically:

Capital Force's ABC Petition confirms the following as of October 2022.

a.   Current amount outstanding to forty (40) investors - $9,060,296.42;

b.   Total estimated liquidation value of automobile loans/titles - None;

c.   Car Loans Securitized and Pledged - None;

d.   Available Cash and Bank Accounts - $8,481.83;

e.   Multiple (apparently unsecured) loans to Vehicle Solutions Corporation (Alberto San Miguel and Jessica Malvecino's Company) - $9,252,283.05.

f.   There is no evidence of a Car Loan portfolio, and much less, a designated portfolio of Car Loans in securing I. Archain's investment.

317.     I. Archain had no knowledge of the scheme perpetrated by Defendants until the ABCs were filed. Prior to the filing of the ABCs, I. Archain and the Investors believed themselves to be secured creditors, with their investments secured by lien rights in certain vehicles. It was not until the ABCs were filed that they discovered the Defendants scheme and came to know that they in fact were unsecured creditors, without lien rights to any of the vehicles.

**VIII. PLAINTIFF DE JULIO – SPECIFIC FACTUAL ALLEGATIONS.**

318.     On or around late 2019, Guillermo De Julio ("De Julio") spoke to Talia Brown via telephone. De Julio and Talia Brown were acquaintances who had known each other since at least

2009 through a mutual acquaintance.  During this telephone conversation, Talia Brown provided a detailed explanation about the investment opportunity, stating that his company was lending money to working people who rarely default because working people need their car to go to work and survive. Talia Brown stated that the investment was extremely safe because the last thing that an American working-class person wants is to lose their car. Talia Brown further elaborated that the investment was secured and guaranteed because, De Julio would have the collateral to every car loan that was being purchased with his investment funds – and that the value of the Car Loans would at all times exceed his investment at a ratio of 125%. Talia Brown also represented that if a specific car loan were to be sold from De Julio's list of Car Loans, it would be immediately replaced with a car loan of equal or greater value.

319.    During that same telephone conversation, Talia Brown provided the following assurances:

a.  Capital Force had a longstanding track record of being extremely profitable and maintained ample reserves in the extremely unlikely event of any shortfalls;

b.  De Julio's investment would be used exclusively to purchase Car Loans, which would be acquired by Capital Force and thereafter pledged in favor of De Julio as collateral for De Julio's investment;

c.  Capital Force had a strict underwriting policy and effective risk management, and would thoroughly examine the status of each Car Loan and the buyer's creditworthiness prior to purchasing a Car Loan;

d.  That Capital Force management had over 20 years of experience in the auto finance industry;

e.  That each car financed through the Car Loan would have a GPS installed and was at all times monitored by Capital Force to ensure prompt recovery in the event of a default;

f.  That the cars securing the Car Loans had a wholesale market value 30% in excess of loan amount of each Car Loan; and,

g.  De Julio's Car Loans would be maintained in a segregated portfolio in favor of De Julio identifying each Car Loan and the specific car being financed.

320.   At the time of making the aforementioned material statements of fact (set forth in paragraphs 318-319), Talia Brown knew from his position as Capital Force's manager, that his statements were false and misleading.

321.   Moreover, the aforementioned representations were material in nature, as De Julio would not have gone through with the investment transaction with Capital Force but for Talia Brown's misrepresentations and material omissions regarding the intended use of De Julio's funds.

322.   From Talia Brown's first telephone conversation with De Julio, Talia Brown  knew that De Julio was not a sophisticated investor and consequently did not have an understanding of financial markets, especially with respect to Car Loans and the risks associated with Capital Force's investment opportunity.

323.   The securities/investments offered to De Julio by Talia Brown were not registered with the Florida Office of Financial Regulation or the Securities Exchange Commission.

324.   On or about late 2019, (and on several occasions thereafter) Talia Brown invited De Julio to meet for a Capital Force investor presentation at his opulent Miami office at the Offices at the Four Seasons Tower located at 1441 Brickell Avenue, Miami, Florida (the "Late 2019 Meeting").

325.     At this meeting, Talia Brown reiterated the representations previously made, and also showed De Julio the Company's website, its financial and operational flowcharts, Car Loan monitoring systems, and the Promotional Material.

326.     Talia Brown repeatedly assured De Julio that this was a great opportunity and that his investment would be safe, secure and guaranteed. Much like the script delivered to other investors, Talia Brown further touted Capital Force's profitability and capital reserves. He reassured De Julio that they were able to offer investors added security by having Capital Force hold both the note and physical title to each automobile subject to the Car Loan.

327.     At this same meeting, Talia Brown spent considerable time going through the International Fund Operation Flow graphic/chart, and the terms of the promissory note, security agreement and special power of attorney in favor of De Julio.[16] Talia Brown summarized the investment transaction as follows:

   a.   De Julio shall wire the investment funds to Snyder Law to be held in the law firm's Florida Bar supervised trust account;

   b.   Upon receipt of De Julio's funds, Snyder Law would prepare the documents, which included a promissory note, security agreement and special power of attorney, which was then executed by Capital Force and De Julio and delivered to Snyder Law at its offices in Aventura, Florida;

   c.   Upon receipt of De Julio's funds and the executed promissory note, security agreement and special power of attorney, Snyder Law would verify that all

---

[16] Costantini outlined the terms and conditions related to collateral (i.e., Car Loans) which would be provided by Capital Force to De Julio to secure Capital Force's payment obligations – which served as a guarantee or assurance that De Julio would be repaid in the event of a default by Capital Force.

conditions specified in these investment agreements were satisfied and/or performed. Upon Snyder Law's verification that everything was in order, Snyder Law would wire the funds to Capital Force, which would then allegedly use the totality of these funds to purchase Car Loans;

d.   VSC would provide the servicing with each individual Car Loan borrower – that is, collecting regular payments from the borrower.  Notwithstanding VSC's role of servicing the Car Loans – Capital Force assured De Julio that title to each Car Loan purchased with De Julio's funds would have De Julio as the holder of title to the collateral (i.e., the car) as a senior lienholder.

e.   The investment structure detailed by Talia Brown, and further supported by the Promotional Material prepared by Costantini and Culley – provided De Julio with an identifiable and collectible security interest to designated Car Loans – which De Julio would possess and could liquidate in the event of a Capital Force default.

328.   Unbeknownst to De Julio, Capital Force's business model operated much differently. Capital Force did not use De Julio/investor funds to purchase Car Loans from VSC. Instead, De Julio's monies were used to fund an undisclosed Revolving Line of Credit, first dated May 1, 2017, between Capital Force as Lender and VSC as Borrower at an interest rate of 18%.

329.   During the course of communications throughout late 2019 and through 2021, Talia Brown assured De Julio that he would be a secured creditor, by having a security interest in specific Car Loans, in which the value of the Car Loans would at all times exceed 125% of the invested funds. Moreover, Talia Brown assured De Julio that Capital Force was extremely conservative, since the 125% ratio Car Loan to investment was actually higher, because the collateral (the value of each automobile) never exceeded 80% of the value of the Car Loan.

330.     On or about November 29, 2019 De Julio invested $100,000.00 with Capital Force F1 LLC.

> ### i.     De Julio Meets with Talia Brown in Miami.

331.     At the Late 2019 Meeting, De Julio met with Talia Brown in Capital Force's office located at the Four Seasons office building on Brickell Avenue, Miami, Florida (the "Late 2019 Meeting"). During that meeting, Talia Brown showed De Julio the Company's website, its financial and operational flowcharts, Car Loan monitoring systems, and repeatedly assured De Julio that investing with Capital Force was safe, secured, and guaranteed. Much like Talia Brown's previous presentations to other investors, Talia Brown highlighted Capital Force's profitability, which he claimed exceeded $3 million after operational expenses and capital reserves. Talia Brown also assured De Julio that they were able to offer investors added security by having Capital Force hold both the note and physical title to each automobile subject to the Car Loan.

332.     These same assurances were also provided to De Julio via Capital Force's Promotional Material – material which was prepared under the direction and control of Defendants Talia-Brown, Constantini and Culley.

333.     Talia Brown further sought to entice De Julio by stating that Costantini's father Rodolfo Costantini and his uncle Eduardo Costantini had also invested a substantial sum of money with Capital Force. This was significant because Eduardo Costantini is among seven Argentines listed on "Forbes Rich List of Billionaires" and therefore supported Talia Brown's reassurances that Capital Force was well capitalized.

334.     To reassure De Julio of the investment's legitimacy, Talia Brown represented that two renowned Miami-based law firms, including the prestigious firm Snyder International Law

Group, had vetted the investment to provide guarantees and transparency. *See* https://www.linkedin.com/company/capital-force/about/ (last visited March 1, 2023).

335.    Talia Brown knew that these statements were false. In fact, the investors' funds, including De Julio's investment, were used to partially offset Capital Force's operating expenses (including a $1,000,000.00 annual salary to Costantini, and approximately $350,000.00 to Talia-Brown and $350,000.00 to Culley). The balance was used to provide VSC with a revolving line of credit (i.e., a loan) and not for the acquisition of Car Loans.

### ii. De Julio's Investment Funds Are Misappropriated and Sent to Vehicle Solutions Corp.

336.    On or about November 29, 2019, De Julio wired $100,000.00 to Snyder Law's Trust Account.

337.    On December 2, 2019 De Julio executed a Promissory Note and Security Agreement for $100,000.00 to Capital Force F1 LLC.

338.    At some point in time, De Julio spoke with Talia Brown, and thereafter with Culley, and was told that Snyder Law was in receipt of De Julio's funds and had disbursed the funds to Capital Force LLC or Capital Force F1 LLC. Talia Brown and Culley further confirmed that Snyder Law was now in possession and safeguarding Car Loans pledged to De Julio.

339.    Talia Brown and Culley's statements to De Julio were false.

### iii. Car Loans Were Never Segregated for the Benefit of De Julio's Investment.

340.    At no time material to these allegations was De Julio told that the collateral securing De Julio's investment would be commingled with other investors' collateral and by companies other than Capital Force. To the contrary, De Julio was specifically told by Talia Brown that De Julio's collateral (the Car Loans) was segregated, and each Car Loan individually accounted for in Capital Force's ledgers and in ledgers maintained and audited by Snyder Law.

341.    De Julio received copies of the investment documents which included a Security Agreement ("Security Agreement"), Special Power of Attorney ("Power of Attorney") and Secured Fixed Interest Only Promissory Note ("Promissory Note"), (collectively the "Investment Agreements"). The Investment Agreements were prepared by Jennifer Snyder, Esq., managing and founding partner at Snyder International Law Group P.A., further to instructions and the participation of loan terms provided by Capital Force's managers, Individual Defendants Costantini, Talia-Brown and Culley.

342.    Contained within the language and terms of the Investment Agreement were additional representations, which, along with Talia Brown's presentations during the Late 2019 Meeting, were relied upon by De Julio in its decision to invest and thereafter keep its investment in. More specifically, the Security Agreement contains the following provision:

- "A. Debtor is in the business of purchasing subprime auto car loans, which are secured by the borrower's automobile. The security interest granted to the Secured Party [in this case De Julio] in the Collateral shall be the pledge of the security of Debtor's loans [referring to Capital Force] to said subprime borrowers, which are the title to the automobiles wherein the lender on the title is the Debtor and that Debtor is the lawful owner of such Collateral and has good right to pledge, sell, assign, transfer and create a security interest in the same."

- "D. The Collateral will not be disposed of by the Debtor unless replaced by Collateral of equal value. Secured Party acknowledges the nature of subprime auto loans is such that the loans that make up the Collateral may be repaid and therefore, the Collateral may often be replaced by loans of equal value."

343.    Talia Brown provided De Julio with an explanation on the benefit of being a secured creditor (which he referred to as a Secured Party). Talia Brown referred to the language contained in the previously provided Security Agreement, which stated:

- "C. The Collateral shall continue to be free from any **superior** and prior pledges, liens, encumbrances and security interests in the same, and the Debtor [referring to Capital Force] will warrant and, at the **Secured Party's** request, defend the same from all claims and demands of all persons whatsoever."

344.     At the time of De Julio's execution of the Investment Documents, Defendant Capital Force and Individual Defendants Costantini, Talia-Brown and Culley, knew that the statements contained in the Security Agreement (see paragraphs 342-343) were untrue.

345.     Talia Brown's assurances that the investments were safe were further bolstered by quoting American author, equities analyst, and Bloomberg columnist Barry Rithotz, who said, "Because our autos are such a lifeline to our financial lives, people will pay their monthly loan bill over almost any other bill. Prolonged court delays are rare. In many cases, the repo man is virtual technology that can remotely render the car useless." [This statement was also contained in written promotional material provided to De Julio during conversations beginning in late 2019 and through 2020]. Talia Brown went on to say that Capital Force has that kind of virtual technology, along with GAP insurance if the automobile is damaged – along with GPS on all its vehicles.

**iv.    Capital Force Had Poor Controls and Severely Inadequate Risk Management/Underwriting Procedures – in Stark Contrast to Talia Brown's Representations that It Was a Mature, Risk-Free Company with a Seasoned Management Team.**

346.     The marketing material provided to De Julio during the Late 2019 Meeting further emphasized, "...there is an effective risk management under a strict VSC and CF (referring to Capital Force) underwriting policy."

347.     In the same marketing material prepared by Individual Defendants Costantini, Talia-Brown and Culley, Capital Force further emphasizes having a management team with more than 20 years of experience in auto financing.

348.     De Julio has now come to know, that contrary to Talia Brown's representations, Capital Force did not audit nor underwrite the Car Loans, nor did it have a mechanism to assure

that the Car Loans being allegedly purchased by Capital Force complied with Capital Force's underwriting requirement.

349.     From its inception, Capital Force had poor controls and fundamentally deficient risk management/underwriting procedures. Assets and liabilities of all forms were generally treated as interchangeable, and there were insufficient distinctions between the assignment of debts and credits to Capital Force, and its affiliated companies, Capital Force F1, Vehicle Solutions CF, Defendant San Miguel's company VSC and principals Costantini, Brown and Culley. This reality was a sharp contrast to Talia Brown's representations made to De Julio and to other investors – a mature company that managed funds and risk in a conservative, risk free, and rigorous manner.

350.     De Julio has now come to discover that Capital Force's management team, which consisted of Costantini, Talia-Brown and Culley, did not have 20 years of experience in auto financing. In fact, at the time De Julio made his investments, Costantini, Brown and Culley (the management team) each had less than two years in the auto financing business – with most of that time spent being "rainmakers" (i.e., soliciting investors) and very little time actually conducting auto financing transactions.

351.     Capital Force's management team did not have the training experience and know-how to implement and administrate the strict risk management and underwriting procedures which Costantini, Talia-Brown and Culley represented to be an integral component of mitigating investment risk. Costantini, Talia-Brown and Culley knew that Capital Force's management team did not have the requisite experience and much less 20 years of experience in the auto financing industry.

352.     Talia Brown's representations that Capital Force was profitable and that the Car Loans securing De Julio's investment were safe, secured and guaranteed, were false.  In reality,

the proceeds that Capital Force generated from its Car Loans were woefully insufficient to cover principal and interest payments to investors. Capital Force's profitability was further compromised by having to pay Costantini's $1,000,000.00 salary, and reimbursement of business, entertainment, and international travel expenses unrelated to Capital Force's business.

353.    Because Individual Defendants Costantini, Talia-Brown and Culley were at the highest level of corporate governance, supervised all aspects of Capital Force's operations, made financial decisions and projections and had access to the accounting and were the architects of the fraudulent Promotional Material delivered to De Julio, Individual Defendants knew or were extremely reckless in not knowing that Capital Force was not profitable and that the Car Loans were not safe, secured and guaranteed.

354.    At the time of making his investments, De Julio was not aware, and neither Costantini, nor anyone at Capital Force, disclosed that Capital Force pooled all investor funds together in its bank accounts, and that once De Julio gave its money to Capital Force, it lost all control over how Capital Force used his funds.

355.    De Julio was completely dependent on Capital Force to make a successful Car Loan to achieve his returns. De Julio did not have any say in the Car Loan portfolio, who Capital Force loaned money to, which Car Loans it purchased, or Capital Force's collection efforts. The success of De Julio's investment therefore was inextricably tied to the success of Capital Force's Car Loan business and other efforts by the Individual Defendants and Defendant Capital Force to generate revenue. De Julio provided the funds and received returns – Capital Force managed and controlled the business and finance operations purportedly used to generate those returns.

356.    Talia Brown further assured De Julio that Snyder International Law Group would provide its professional services with preparing the requisite loan agreements necessary to secure

his investment. De Julio relied on Talia Brown's representations when agreeing to deposit his investment funds into Snyder Law's escrow account.

357. These false and misleading misstatements and omissions of material information altered the total mix of information that De Julio found relevant in determining whether to invest a substantial portion of his life's savings in the Capital Force Group investment through De Julio.

358. But for these false and misleading misstatements and material omissions, De Julio's decision to invest in Capital Force would have been different.

359. Defendant Talia Brown knew at the time of the 2017 meeting with De Julio, from his position as Capital Force's manager, or recklessly disregarded the fact, that his statements were false and misleading and omitted material information because:

   a. Capital Force did not have a strict underwriting policy or effective risk management, nor did it thoroughly examine the car status and buyer background related to credit and income (as represented in the written promotional material presented to De Julio prior to De Julio's investment);

   b. Capital Force was not profitable and was making payments to investors by selling the Car Loans and consequently diluting De Julio's collateral;

   c. Few, if any, automobiles securing the Car Loans had a GPS installed to monitor the collateral at all times;

   d. That many of the Car Loans exceeded the fair market value of automobiles securing each Car Loan;

   e. That the value of the Car Loans securing De Julio's investment was less than 70% (and not 125%) of its investment to Car Loan ratio. In other words, De Julio's

investment was undercollateralized by 30% from the time of making its investment and at one point in late 2021 was under collateralized by more than 70%.

    f.   That De Julio was never a Secured Party and that there was never an identifiable certificate of title and/or Car Loans securing its investment – to the contrary, all the Car Loans were pooled together, commingled, and dispersed among Capital Force, and other affiliated companies such as Vehicle Solutions CF, Capital Force F1 and VSC. De Julio was shocked when he discovered from reviewing Capital Force's Petition For Assignment For The Benefit Of Creditors (filed on October 24, 2022) that De Julio was not a Secured Party, but instead an unsecured creditor;

    g.   That De Julio's investment was not used exclusively to purchase Car Loans, but was instead used in part to pay Capital Force's operating expenses, Car Loan payments to other pre-existing investors, and distributions to Costantini, Talia-Brown and Culley;

    h.   That Capital Force's management team (which consisted of Costantini, Talia-Brown and Culley) did not have 20 years of experience in the auto finance industry;

360.   Capital Force and Individual Defendants had a common interest in making misleading misstatements and concealing these facts. Had De Julio known of these material misleading misstatements and material omissions, De Julio would not have deposited its funds into Snyder International Law Group's trust account, Defendants' fraud would not have succeeded, and neither Capital Force nor any of the Defendants would have stood to profit as handsomely as they expected. Defendants Costantini, Talia-Brown, and Culley, by and through Capital Force therefore worked together to perpetuate and conceal a fraud, all the while inciting it with critical reports of success, profitability, cutting edge risk controls, and dressing of legitimacy and security.

**v.      De Julio Executes the Investment Documents.**

361.    On or about November 29, 2019, De Julio wired $100,000.00 to Snyder Law's Trust Account.

362.    On December 2, 2019 De Julio executed a Promissory Note and Security Agreement for $100,000.00 to Capital Force F1 LLC. (Exhibit "R")

**vi.     The Lies Continue - Capital Force Falsely Assures De Julio the COVID-19 Pandemic Will Not and Has Not Affected Capital Force's Financial Condition.**

363.    On January 9, 2020, WHO announces mysterious Coronavirus-Related pneumonia in Wuhan, China.

364.    On February 3, 2020, the U.S. declares public health emergency.

365.    On February 25, 2020, the U.S. Centers for Disease Control and Prevention ("CDC") says that COVID-19 is heading toward pandemic status.

366.    On March 13, 2020, the United States declares the novel coronavirus a national emergency.

367.    On or about late June or early July of 2020, De Julio received the June Letter advising De Julio and other investors that as a result of COVID-19, Capital Force was now subject to "an unexpected and unprecedented global financial effect, had a deep impact on the automotive financing industry as a whole."  Attached hereto as (Exhibit "I").

368.    The June Letter also stated that repayment of the Notes would need to be reduced to 6% interest, as a proactive measure to preserve and safeguard the investors' capital – which in turn would allow the Company to generate positive returns of approximately 8%. Further, investors were falsely assured that the Pandemic has not stopped the Company from continuing to have positive and stable returns.

369.    Talia Brown and Culley knew or should have known that their representations concerning Capital Force's financial well-being were false.

**vii.    Talia Brown Makes False Reassurances to De Julio Regarding Its Investment.**

370.    In August 2021, De Julio, spoke to Talia Brown in person at the Capital Force Offices demanding a return of his investment.

371.    During this August 2021 conversation, Talia Brown replied that the company had 70% of assets intact. He then stated that the remaining 30% would be paid back from a new parallel company that Costantini was creating, in which De Julio would have some ownership.

372.    No such company was effectuated. De Julio did not receive any ownership of any company, and did not receive any assets, monies, or return on its investment following these conversations by Talia Brown.

373.    At the time Talia Brown made these statements to De Julio, Talia Brown knew these statements to be false. Talia Brown knew long before August 2021 that Capital Force did not have 70% of assets intact.

**viii.    Petitions for Assignment Assignments for the Benefit of Creditors filed by Capital Force F1, Capital Force, and Vehicle Solutions CF.**

374.    On October 24, 2022, petitions for Assignments for the Benefit of Creditors were filed on behalf of Capital Force F1, Capital Force, and Vehicle Solutions CF (the "ABC Petitions").[17]

---

[17] In re: <u>Capital Force F1 LLC</u>  Miami-Dade County Circuit Court. Case No. 2022-020390-CA-01 (43); In re: <u>Capital Force LLC</u> Miami-Dade County Circuit Court. Case No. 2022-020389-CA-01 (43) and, In re: <u>Vehicle Solutions CF LLC</u> Miami-Dade County Circuit Court. Case No. 2022-020388-CA-01 (43)

375.     The ABC Petitions have unfoiled the true extent of Defendants' fraudulent scheme, *inter alia*, that Vehicle Solutions CF, Capital Force F1 and Capital Force (the Capital Force Group) were, during De Julio's Investment Period, critically undercapitalized, undercollateralized, fraught with non-performing Car Loans, many of which resulted in worthless repossessed automobiles, and that De Julio was never a secured party.[18]

More specifically:

- Capital Force F1's ABC Petition confirms the following as of October 2022.

  a.  Current amount outstanding to sixty-two (62) investors - $16,206,317.65;

  b.  Total estimated liquidation value of automobile loans/titles - $1,000,000.00;

  c.  Car Loans Securitized and Pledged to Agora Data and collected by Westlake Financial – Principal Balance $2,909,000. Residual Loan balance - $800,000.00;

  d.  Available Cash and Bank Accounts - $23,105.28;

  e.  Other than the $1,000,000.00 in repossessed automobiles, there is no evidence of a Car Loan portfolio, and much less, a designated portfolio of Car Loans in securing De Julio's investment.

376.     De Julio had no knowledge of the scheme perpetrated by Defendants until the ABCs were filed. Prior to the filing of the ABCs, De Julio  and the investors believed themselves to be secured creditors, with their investments secured by lien rights in certain vehicles. It was not until the ABCs were filed that they discovered the Defendants scheme and came to know that they in fact were unsecured creditors, without lien rights to any of the vehicles.

---

[18] Capital Force F1 ABC Petition refers to loan balances and financial through 8/31/22. The corresponding financials and Car Loan ledgers contain data through late 2021. There is no data provided for 2022.

## COUNT 1

**VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5**
**(By Ernesto Thomas Lalor and Josefina Maria Ruiz Luque Against Capital Force, Capital Force F1, Costantini, Talia-Brown, and Culley)**

377.    The Lalor Family restates and incorporates by reference the allegations set forth generally in paragraphs 1-79 and specifically in paragraphs 80-137 of the Complaint, as though fully set forth herein.

378.    This is a claim for multiple violations against Defendants Capital Force, Capital Force F1, Costantini, Talia-Brown, and Culley under Section 10(b) of the Exchange Act and Rule 10b-(5) promulgated thereunder.

379.    The Investment Agreements, which included the Promissory Note, Security Agreement, and Special Power of Attorney constitute "investment contracts" for purposes of the FSIPA, in that The Lalor Family invested their money in a common enterprise, the purchase of Car Loans, and was led to expect profits derived solely from the efforts of Defendants Capital Force, Capital Force F1, Costantini, Talia-Brown, and Culley. Defendants also failed to file Form D with the Securities Exchange Commission.

380.    Defendants Capital Force, Capital Force F1, Costantini, Talia-Brown, and Culley directly and/or indirectly, by the use, means or instrumentality of interstate commerce or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly, made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices, and courses of business which operate or would operate as fraud or deceit.

381.    Defendants Capital Force, Capital Force F1, Costantini, Talia-Brown, and Culley

were each a direct, necessary, and substantial participant in the common course of conduct alleged herein.

382.     As detailed herein, Defendants Capital Force, Capital Force F1, Costantini, Talia-Brown, and Culley each knowingly or with deliberate recklessness committed manipulative or deceptive acts in furtherance of their fraudulent scheme including, *inter alia*, (a) causing and/or permitting the dissemination of false and misleading Capital Force Group marketing material and other information delivered to The Lalor Family; (b) providing The Lalor Family with false information concerning Capital Force Group's profitability; (c) failing to disclose that Capital Force and Capital Force F1 were grossly undercapitalized and that The Lalor Family's investment was at no time secured by Car Loans exceeding 125% of The Lalor Family investment, and (d) falsely stating that Capital Force Group had a strict Car Loan underwriting policy and effective risk management systems.

383.     At the time of said misrepresentations and omissions, The Lalor Family was ignorant of their falsity and had no reason to believe that Defendants Capital Force, Capital Force F1, Costantini, Talia-Brown, and Culley's statements were not true. Had The Lalor Family known of the true operating and financial of Capital Force Group (including Capital Force and Capital Force F1) and of its other problems *inter alia*, Car Loan deficiencies, undercapitalization, that The Lalor Family investment was not secured by adequate collateral, that they were not a "secured party" – they would not have invested and/or otherwise wired funds for the benefit of Capital Force and Capital Force F1.

384.     The truth about the extent and severity of the deterioration of Capital Force Group's financial and operating condition, and the inadequacy of its internal controls, became apparent to a few investors within the Costantini circle by June 2020 (including the Chilean Fund and

Costantini family members).[19] These investors within Costantini's inner sanctum realized that Capital Force Group was sinking and sinking fast. Investors including the Chilean Fund and Costantini family members quietly and expeditiously demanded return of their investments. As a result, and to maintain the status quo within Costantini's inner sanctum - Capital Force Group, Costantini, Culley, and Talia-Brown undertook a plan during the course of late 2020 to liquidate Capital Force F1 and Capital Force Car Loans to repay those investors, further diluting the Car Loan collateral and severely crippling the already foundering situation. Information with respect to the preferential payments and further dilution of the already undercapitalized investment was not disclosed to The Lalor Family at the time of providing The Lalor Family money during the Investment Period.

385.    Had those facts been disclosed to The Lalor Family, The Lalor Family would have discovered that their existing investment was undercapitalized, and in turn would not have proceeded with being induced to make their investment.

386.    As a direct and proximate result of Defendants Capital Force, Capital Force F1, Costantini, Talia-Brown and Culley's fraudulent scheme to raise over $35,000,000.00 with excessive leverage, inexperienced management and poor and/or nonexistent underwriting and risk management, Defendants finally caused Capital Force Group (including Capital Force and Capital Force F1) to collapse and file Assignments for Benefit of Creditors on October 24, 2022.

387.    As a result of Costantini's lies on how The Lalor Family's funds would be and were invested and how successful and safe they would be (i.e., secured by 125% investment to collateral

---

[19] Unbeknownst to The Lalor Family at the time, Costantini had foreshadowed Capital Force Group's eventual demise by telling certain investors within Costantini's inner sanctum that Capital Force Group was having liquidity issues in part because VSC and Alberto San Miguel were failing to deliver Car Loans on a timely basis to collateralize the investors' money.

ratio) – lies documented by Costantini and others in hundreds if not thousands of emails, WhatsApp messages and false account documents to other investors – The Lalor Family has lost the totality of the outstanding sum of their investment which now exceeds $1,625,980.00.

388.    Prior to Duane Morris's Insolvency Letter of April 2022, The Lalor Family reasonably believed and relied upon Costantini, Talia-Brown, and Culley's representations, that their investment was safe since it was adequately secured by valuable Car Loans. Shortly after receipt of the Insolvency Letter, The Lalor Family was once again falsely assured by Costantini, Talia-Brown, and Culley, that Capital Force Group was experiencing some difficulties, but that they continued to have performing Car Loans (and repossessed cars) to recover their investment.

389.    By virtue of the foregoing, Defendants Capital Force, Capital Force F1, Costantini, Talia-Brown, and Culley have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

WHEREFORE, Plaintiffs The Lalor Family demands judgment against Defendants Capital Force, Capital Force F1, Costantini, Talia-Brown, and Culley jointly and severally for damages, interest, and costs of this action and such further relief as this Court deems just and proper pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT 2

### Violations of Section 20(a) of the Exchange Act
### (By The Lalor Family Against Costantini, Talia-Brown and Culley)

390.    Plaintiff The Lalor Family restates and incorporates by reference the allegations set forth generally in paragraphs 1-79 and specifically in paragraphs 80-137 of the Complaint, as though fully set forth herein.

391.    The Defendants Costantini, Talia-Brown and Culley acted as controlling persons of Capital Force and Capital Force F1 within the meaning of § 20(a) of the Exchange Act. By

reason of their high-level positions with Capital Force and Capital Force F1, their ownership of equity in Capital Force and Capital Force F1, their participation in the drafting, approving and executing of investor security agreements, Capital Force Group's promotional material, financial reports to investors, drafting electronic communications to The Lalor Family and other deceptive documents provided to The Lalor Family, dissemination of other false and inaccurate statements to the investing public, and their participation in the fraudulent schemes and acts described herein, Defendants Costantini, Talia-Brown, and Culley had the power and authority to control and cause the Capital Force Group of companies, including, but not limited, to Capital Force and Capital Force F1 to engage in the wrongful conduct complained of herein.

392.    By reason of such conduct, the Defendants named herein are liable to The Lalor Family pursuant to §20(a) of the Exchange Act.

393.    Each of the Defendants knew or were deliberately reckless in not knowing of the adverse material facts which rendered the statements alleged herein false and misleading.

394.    Despite personal knowledge of the fundamentally deteriorated condition of Capital Force Group throughout the Investment Period, and the solicitation of investment funds through false and deceptive statements (*inter alia* – that the investments were safe, secure and collateralized with Car Loans valued 125% in excess of the investment amount), Costantini, Talia-Brown, and Culley were motivated to conceal such circumstances from The Lalor Family and the investing public, while they concurrently were seeking infusion of critically-needed capital.

395.    Because of their positions, their ability to exercise actual operational control, power and influence with respect to the Capital Force Group of companies, including Capital Force and Capital Force F1's course of conduct, including the fraudulent schemes and acts described herein, Costantini, Talia-Brown, and Culley were, during the course of the Investment Period, and at the

time of wrongs alleged herein, controlling persons of the Capital Force Group of companies, including Capital Force, and Capital Force F1 within the meaning of Section 20(a) of the Exchange Act.

396.    As set forth above, Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons of the Capital Force Group of companies, Capital Force, and Capital Force F1, Defendants are liable to The Lalor Family's damages pursuant to Section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff The Lalor Family demands judgment against Defendants Costantini, Talia-Brown, and Culley, jointly and severally for damages, interest, and costs of this action and such further relief as this Court deems just and proper pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT 3

### VIOLATION OF THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT
**(By The Lalor Family Against Capital Force, Capital Force F1, Costantini, Talia-Brown, and Culley)**

397.    Plaintiff The Lalor Family restates and incorporates by reference the allegations set forth generally in paragraphs 1-79 and specifically in paragraphs 80-137 of the Complaint, as though fully set forth herein.

398.    This is a claim for multiple violations against Defendants Capital Force, Capital Force F1, Costantini, Talia-Brown, and Culley under Florida Securities and Investor Protection Act ("FSIPA"), Section 517.011 et. seq.

399.    The Promissory Notes constitute a "security" pursuant to Section 517.021(21)(a) Florida Statutes, because it is a note, evidence of indebtedness, and/or an investment contract.

400.    The Investment Agreements, which included the Promissory Note, Security

Agreement, and Special Power of Attorney constitute "investment contracts" for purposes of the FSIPA, in that The Lalor Family invested their money in a common enterprise, the purchase of Car Loans, and was led to expect profits derived solely from the efforts of Defendants Capital Force, Capital Force F1, Costantini, Talia-Brown, and Culley.

401.    As set forth herein, the Defendants implemented a plan and undertook unlawful acts to defraud investors, such as The Lalor Family, in connection with the sale securities.

402.    The Lalor Family was in fact defrauded, upon investing and delivering funds to Snyder Law, relying upon information communicated through Capital Force Group's representatives, who used false and misleading statements and omissions of fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

403.    Further, Florida Statutes 517.301 declares that it is unlawful for a person to knowingly and willfully falsify, conceal, or cover up, by any trick, scheme, or device, a material fact, make any false, fictitious, or fraudulent statement or representation.

404.    As a result, the Bad Actors orchestrated an investment scheme with the intent to deceive and defraud Plaintiff, by among other acts, misrepresenting the Bad Actors' business model and projected profits to Plaintiff, which Defendants knew to be fraudulent.

405.    As a direct and proximate result of Defendants' untrue statements and material omissions and their reasonable reliance thereupon, The Lalor Family has suffered consequential damages, including the loss of use of the funds invested, the loss of interest thereupon, the loss of the principal amount invested.

WHEREFORE, Plaintiff The Lalor Family demands judgment against Capital Force, Capital Force F1, Costantini, Talia-Brown, and Culley, jointly and severally, for compensatory

damages, attorneys' fees pursuant to Fla. Stat. §517.211(6), and costs, interest, and such further relief as this Court deems just and proper.

### COUNT 4

### SALE OF UNREGISTERED SECURITIES
**(By The Lalor Family Against Capital Force, Capital Force F1, Costantini, Talia-Brown, and Culley)**

406.    Plaintiff The Lalor Family restates and incorporates by reference the allegations set forth generally in paragraphs 1-79 and specifically in paragraphs 80-137 of the Complaint, as though fully set forth herein.

407.    This is a claim against Defendants Capital Force, Capital Force F1, Costantini, Talia-Brown, and Culley for violations of Chapter 517 of the Florida Securities and Investor Protection Act arising from the sale of unregistered securities in the state of Florida. The offers of investing in Capital Force and Capital Force F1 through the Car Loan scheme, violated section 517.211, Florida Statutes, which provides a private right of action for violations of section 517.07, Florida Statutes.

408.    Section 517.07 provides that "[i]t is unlawful and a violation of this chapter for any person to sell or offer to sell a security within this state" unless the security or transaction is "exempt" under Chapter 517, or unless the security is "registered pursuant to this chapter."

409.    The Promissory Notes are securities as defined in Section 517.021(21), Florida Statutes.

410.    The Promissory Notes are not exempt from registration under the Act.

411.    Section 517.211 renders jointly and severally liable each person making the sale "and every director, officer, partner or agent of or for the seller if the director, officer, partner or agent has personally participated or aided in making the sale."

412.     Defendants Costantini and Talia-Brown were managers, and through affiliated entities, equity owners of Capital Force Group and Capital Force F1, and personally participated in and/or aided in the sale of the Promissory Note investments with knowledge that the offer was not exempt from Florida and federal registration requirements.

413.     Pursuant to section 517.211, Florida Statutes, Plaintiff The Lalor Family is entitled to rescission and actual damages together with interest therein.

WHEREFORE, Plaintiff The Lalor Family demands judgment against Capital Force, Capital Force F1, Vehicle Solutions CF, Costantini, Talia-Brown, and Culley for compensatory damages, punitive damages, costs, attorney's fees, prejudgment interest, post-judgment interest, and such further relief as this Court deems just and proper.

## COUNT 5

### FRAUDULENT MISREPRESENTATION IN CONNECTION WITH OFFERING THE PROMISSORY NOTE
### (By The Lalor Family Against Costantini, Talia Brown, and Culley)

414.     Plaintiff The Lalor Family restates and incorporates by reference the allegations set forth generally in paragraphs 1-79 and specifically in paragraphs 80-137 of the Complaint, as though fully set forth herein.

415.     This is a claim for fraudulent misrepresentation pursuant to Florida common law.

416.     As fully detailed in the allegations incorporated herein, Costantini, Talia Brown, and Culley made untrue statements of fact to Plaintiff The Lalor Family and omitted other material facts necessary to make their affirmative statements not misleading.

417.     In so doing, Costantini, Talia Brown, and Culley acted deliberately and with the intent to deceive, manipulate and defraud Plaintiff The Lalor Family, and made the subject misrepresentations and material omissions with the intent that Plaintiff The Lalor Family rely on said representations and material omissions.

418.    The untrue statements of fact and material misrepresentations in question are set forth herein.

419.    Plaintiffs The Lalor Family reasonably relied to their detriment on the representations and omissions, but for which Plaintiff The Lalor Family would never have invested in Capital Force F1 and Capital Force or agreed to enter into the respective Promissory Notes.

420.    Defendant Costantini, Talia Brown, and Culley's actions were intentional, wanton, malicious, and made with the intent to injure Plaintiffs The Lalor Family or with reckless disregard for The Lalor Family's lawful rights.

421.    As a direct and proximate result of Costantini, Talia Brown, and Culley's untrue statements and material omissions and Plaintiff The Lalor Family's reasonable reliance thereupon, Plaintiff The Lalor Family suffered consequential damages, including the loss of use of the funds invested, the loss of interest thereupon, the loss of the principal amount invested.

WHEREFORE, Plaintiff The Lalor Family demands judgment against Defendant Costantini, Talia Brown, and Culley for compensatory damages, punitive damages, costs, attorney's fees, prejudgment interest, post-judgment interest, and such further relief as this Court deems just and proper.

## COUNT 6

### BREACH OF THE PROMISSORY NOTES
### AND SECURITY AGREEMENTS
### (In the Alternative)
### (By The Lalor Family Against Capital Force F1 LLC)

422.    Plaintiff The Lalor Family restates and incorporates by reference the allegations set forth generally in paragraphs 1-79 and specifically in paragraphs 80-137 of the Complaint, as though fully set forth herein.

423.    This is an action for breach of contract against Capital Force F1 for violating its

obligations under the Promissory Notes and Security Agreements.

424.    The Promissory Notes and Security Agreements constitute binding contracts pursuant to Florida law, in that there was an offer, an acceptance, and consideration given by both sides, and a definitive agreement as to all essential terms of the underlying bargain.

425.    The Promissory Notes obligate Capital Force F1 to pay interest bearing a rate of 10-12% per annum, payable monthly.

426.    On the dates applicable to due date for payment of interest, Capital Force F1 was contractually obligated to repay said interest.

427.    Despite the fact that Plaintiff The Lalor Family has fully complied with The Lalor Family obligations under the Promissory Notes by loaning Capital Force F1 the monies corresponding to Plaintiff The Lalor Family, Capital Force F1 has materially breached its corresponding obligations by failing to the pay the interest payments as required by the Promissory Notes.

428.    Capital Force F1 has further breached its corresponding obligations by commencing the action for liquidation of assets which is an "Event of Default" under the terms of the Promissory Notes – arising from Capital Force F1's Petition for Assignment for the Benefit of Creditors on October 24, 2022.

429.    Capital Force F1 has breached its corresponding obligations under the terms of the Security Agreements by disposing of The Lalor Family's Collateral and not replacing the Collateral with Collateral of equal value.

430.    As a result of Capital Force F1's breaches of the Promissory Notes and Security Agreements, Plaintiff The Lalor Family has suffered pecuniary damages.

431.    Pursuant to the terms of Promissory Notes and Security Agreements, Plaintiff is

entitled to an award of attorneys' fees and costs incurred as a result of Capital Force F1's breaches of the Promissory Notes.

WHEREFORE, Plaintiff The Lalor Family demands judgment against Defendant Capital Force F1 for compensatory damages, attorneys' fees, costs, prejudgment interest, post-judgment interest, and for such further relief as this Court deems just and proper.

### COUNT 7

**BREACH OF THE PROMISSORY NOTE
AND SECURITY AGREEMENT
(In the Alternative)
(Against Capital Force LLC)**

432.    Plaintiff The Lalor Family restates and incorporates by reference the allegations set forth generally in paragraphs 1-79 and specifically in paragraphs 80-137 of the Complaint, as though fully set forth herein.

433.    This is an action for breach of contract against Capital Force for violating its obligations under the Promissory Note and Security Agreement.

434.    The Promissory Note and Security Agreement constitute binding contracts pursuant to Florida law, in that there was an offer, an acceptance, and consideration given by both sides, and a definitive agreement as to all essential terms of the underlying bargain.

435.    The Promissory Notes obligate Capital Force to pay interest bearing a rate of 10-12% per annum, payable monthly.

436.    On the dates applicable to due date for payment of interest, Capital Force was contractually obligated to repay said interest.

437.    Despite the fact that Plaintiff The Lalor Family has fully complied with The Lalor Family obligations under the Promissory Notes by loaning Capital Force the monies corresponding to Plaintiff The Lalor Family, Capital Force has materially breached its corresponding obligations

by failing to the pay the interest payments as required by the Promissory Notes.

438.    Capital Force has further breached its corresponding obligations by commencing the action for liquidation of assets which is an "Event of Default" under the terms of the Promissory Note – arising from Capital Force's Petition for Assignment for the Benefit of Creditors on October 24, 2022.

439.    Capital Force has breached its corresponding obligations under the terms of the Security Agreement by disposing of The Lalor Family's Collateral and not replacing the Collateral with Collateral of equal value.

440.    As a result of Capital Force breaches of the Promissory Note and Security Agreement, Plaintiffs The Lalor Family has suffered pecuniary damages.

441.    Pursuant to the terms of Promissory Note and Security Agreement, Plaintiff The Lalor Family is entitled to an award of attorneys' fees and costs incurred as a result of Capital Force breaches of the Promissory Note and Security Agreement.

WHEREFORE, Plaintiff The Lalor Family demands judgment against Defendant Capital Force for compensatory damages, attorneys' fees, costs, prejudgment interest, post-judgment interest, and for such further relief as this Court deems just and proper.

## COUNT 8

### VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5
### (By Martin Melhem Against Capital Force, Capital Force F1, Vehicle Solutions CF, San Miguel, Costantini, Talia-Brown, and Culley)

442.    Plaintiff Melhem restates and incorporates by reference the allegations set forth in generally in paragraphs 1-79 and specifically in paragraphs 138-206 of the Complaint, as though fully set forth herein.

443.    This is a claim for multiple violations against Defendants Vehicle Solutions CF,

Capital Force, Capital Force F1, San Miguel, Costantini, Talia-Brown, and Culley under Section 10(b) of the Exchange Act and Rule 10b-(5) promulgated thereunder.

444.   The Investment Agreements, which included the Promissory Note, Security Agreement, and Special Power of Attorney constitute "investment contracts" for purposes of the FSIPA, in that Plaintiff Melhem invested Melhem money in a common enterprise, the purchase of Car Loans, and was led to expect profits derived solely from the efforts of Defendants Vehicle Solutions CF, Capital Force, Capital Force F1, San Miguel, Costantini, Talia-Brown, and Culley. Defendants also failed to file Form D with the Securities Exchange Commission.

445.   Defendants Vehicle Solutions CF, Capital Force, Capital Force F1, San Miguel, Costantini, Talia-Brown, and Culley, directly and/or indirectly, by the use, means or instrumentality of interstate commerce or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly, made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices, and courses of business which operate or would operate as fraud or deceit.

446.   Defendants Vehicle Solutions CF, Capital Force, Capital Force F1, San Miguel, Costantini, Talia-Brown, and Culley, were each a direct, necessary and substantial participant in the common course of conduct alleged herein.

447.   As detailed herein, Defendants Vehicle Solutions CF, Capital Force, Capital Force F1, San Miguel, Costantini, Talia-Brown, and Culley, each knowingly or with deliberate recklessness committed manipulative or deceptive acts in furtherance of their fraudulent scheme including, *inter alia*, (a) causing and/or permitting the dissemination of false and misleading Capital Force Group marketing material and other information delivered to Melhem; (b) providing

Melhem with false information concerning Capital Force Group's profitability; (c) failing to disclose that Vehicle Solutions CF, Capital Force and Capital Force F1 were grossly undercapitalized and that Melhem's investment was at no time secured by Car Loans exceeding 125% of Melhem's investment, and (d) falsely stating that Capital Force Group had a strict Car Loan underwriting policy and effective risk management systems.

448.    At the time of said misrepresentations and omissions, Melhem was ignorant of their falsity and had no reason to believe that Defendants Vehicle Solutions CF, Capital Force, Capital Force F1, San Miguel, Costantini, Talia-Brown, and Culley's statements were not true. Had Melhem known of the true operating and financial of Capital Force Group (including Vehicle Solutions CF, Capital Force and Capital Force F1) and of its other problems *inter alia*, Car Loan deficiencies, undercapitalization, that Melhem's investment was not secured by adequate collateral, that they were not a "secured party" – he would not have invested and/or otherwise wired funds for the benefit of Capital Force, Capital Force F1, and Vehicle Solutions CF.

449.    The truth about the extent and severity of the deterioration of Capital Force Group's financial and operating condition, and the inadequacy of its internal controls, became apparent to a few investors within the Costantini circle by June 2020 (including the Chilean Fund and Costantini family members).[20] These investors within Costantini's inner sanctum realized that Capital Force Group was sinking and sinking fast. Investors including the Chilean Fund and Costantini family members quietly and expeditiously demanded return of their investments. As a result, and to maintain the status quo within Costantini's inner sanctum - Capital Force Group,

---

[20] Unbeknownst to Melhem at the time, Costantini had foreshadowed Capital Force Group's eventual demise by telling certain investors within Costantini's inner sanctum that Capital Force Group was having liquidity issues in part because VSC and Alberto San Miguel were failing to deliver Car Loans on a timely basis to collateralize the investors' money.

Costantini, Culley, Talia-Brown and San Miguel undertook a plan during the course of late 2020 to liquidate Vehicle Solution CF, Capital Force F1 and Capital Force Car Loans to repay those investors, further diluting the Car Loan collateral and severely crippling the already foundering situation. Information with respect to the preferential payments and further dilution of the already undercapitalized investment was not disclosed to Melhem during the Investment Period.

450.    Had those facts been disclosed to Melhem, Melhem would have discovered that his existing investment was undercapitalized, and in turn would not have proceeded with being induced to make the investments.

451.    As a direct and proximate result of Defendants Vehicle Solutions CF, Capital Force, Capital Force F1, San Miguel, Costantini, Talia-Brown and Culley's fraudulent scheme to raise over $35,000,000.00 with excessive leverage, inexperienced management and poor and/or nonexistent underwriting and risk management, Defendants finally caused Capital Force Group (including Vehicle Solutions CF, Capital Force and Capital Force F1) to collapse and file Assignments for Benefit of Creditors on October 24, 2022.

452.    As a result of Costantini's lies on how Melhem's funds would be and were invested and how successful and safe they would be (i.e., secured by 125% investment to collateral ratio) – lies documented by Costantini and others in hundreds if not thousands of emails, WhatsApp messages and false account documents to other investors – Melhem has lost the totality of the outstanding sum of his investment which now exceeds $3,400,000.00.

453.    Prior to Duane Morris's Insolvency Letter of April 2022, Melhem reasonably believed and relied upon Costantini, Talia-Brown, and Culley's representations, that his investment was safe since it was adequately secured by valuable Car Loans. Shortly after receipt of the Insolvency Letter, Melhem was once again falsely assured by Costantini, Talia-Brown,

Culley and San Miguel, that Capital Force Group was experiencing some difficulties, but that they continued to have performing Car Loans (and repossessed cars) to recover Melhem investment.

454.    By virtue of the foregoing, Defendants Vehicle Solutions CF, Capital Force, Capital Force F1, San Miguel, Costantini, Talia-Brown, and Culley have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

WHEREFORE, Plaintiff Melhem demands judgment against Defendants Vehicle Solutions CF, Capital Force, Capital Force F1, San Miguel, Costantini, Talia-Brown, and Culley jointly and severally for damages, interest, and costs of this action and such further relief as this Court deems just and proper pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT 9

### Violations of Section 20(a) of the Exchange Act
### (By Melhem Against San Miguel, Costantini, Talia-Brown and Culley)

455.    Plaintiff Melhem restates and incorporates by reference the allegations set forth in generally in paragraphs 1-79 and specifically in paragraphs 138-206 of the Complaint, as though fully set forth herein.

456.    The Defendants San Miguel, Costantini, Talia-Brown and Culley acted as controlling persons of Vehicle Solutions CF, Capital Force and Capital Force F1 within the meaning of § 20(a) of the Exchange Act. By reason of their high-level positions with Vehicle Solutions CF, Capital Force and Capital Force F1, their ownership of equity in Vehicle Solutions CF, Capital Force and Capital Force F1, their participation in the drafting, approving and executing of investor security agreements, Capital Force Group's promotional material, financial reports to investors, drafting electronic communications to Melhem and other deceptive documents provided to Melhem, dissemination of other false and inaccurate statements to the investing public, and their

participation in the fraudulent schemes and acts described herein, Defendants San Miguel, Costantini, Talia-Brown, and Culley had the power and authority to control and cause the Capital Force Group of companies, including, but not limited, to Vehicle Solutions CF, Capital Force and Capital Force F1 to engage in the wrongful conduct complained of herein.

457.    By reason of such conduct, the Defendants named herein are liable to Melhem pursuant to §20(a) of the Exchange Act.

458.    Each of the Defendants knew or were deliberately reckless in not knowing of the adverse material facts which rendered the statements alleged herein false and misleading.

459.    Despite personal knowledge of the fundamentally deteriorated condition of Capital Force Group throughout the Investment Period, and the solicitation of investment funds through false and deceptive statements (*inter alia* – that the investments were safe, secure and collateralized with Car Loans valued 125% in excess of the investment amount), San Miguel, Costantini, Talia-Brown, and Culley were motivated to conceal such circumstances from Melhem and the investing public, while they concurrently were seeking infusion of critically-needed capital.

460.    Because of their positions, their ability to exercise actual operational control, power and influence with respect to the Capital Force Group of companies, including Vehicle Solutions CF, Capital Force and Capital Force F1's course of conduct, including the fraudulent schemes and acts described herein, San Miguel, Costantini, Talia-Brown, and Culley were, during the course of the Investment Period, and at the time of wrongs alleged herein, controlling persons of the Capital Force Group of companies, including Vehicle Solutions CF, Capital Force, and Capital Force F1 within the meaning of Section 20(a) of the Exchange Act.

461.    As set forth above, Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons

of the Capital Force Group of companies, Vehicle Solutions CF, Capital Force, and Capital Force F1, Defendants are liable to Melhem for damages pursuant to Section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff Melhem demands judgment against Defendants San Miguel, Costantini, Talia-Brown, and Culley, jointly and severally for damages, interest, and costs of this action and such further relief as this Court deems just and proper pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT 10

### VIOLATION OF THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT
### (By Melhem Against Capital Force, Capital Force F1, Vehicle Solutions CF, San Miguel, Costantini, Talia-Brown, and Culley)

462.    Plaintiff Melhem restates and incorporates by reference the allegations set forth generally in paragraphs 1-79 and specifically in paragraphs 138-206 of the Complaint, as though fully set forth herein.

463.    This is a claim for multiple violations against all Defendants under Florida Securities and Investor Protection Act ("FSIPA"), Section 517.011 et. seq.

464.    The Promissory Notes constitute a "security" pursuant to Section 517.021(21)(a) Florida Statutes, because it is a note, evidence of indebtedness, and/or an investment contract.

465.    The Investment Agreements, which included the Promissory Note, Security Agreement, and Special Power of Attorney constitute "investment contracts" for purposes of the FSIPA, in that Plaintiff Melhem invested his money in a common enterprise, the purchase of Car Loans, and was led to expect profits derived solely from the efforts of Defendants Vehicle Solutions CF, Capital Force, Capital Force F1, Costantini, Talia-Brown, and Culley.

466.    As set forth herein, the Defendants implemented a plan and undertook unlawful acts to defraud investors, such as Plaintiff Melhem, in connection with the sale securities.

467.    Plaintiff Melhem was in fact defrauded, upon investing and delivering funds to Snyder Law, relying upon information communicated through Capital Force Group's representatives, who used false and misleading statements and omissions of fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

468.    Further, Florida Statutes 517.301 declares that it is unlawful for a person to knowingly and willfully falsify, conceal, or cover up, by any trick, scheme, or device, a material fact, make any false, fictitious, or fraudulent statement or representation.

469.    As a result, the Bad Actors orchestrated an investment scheme with the intent to deceive and defraud Plaintiff Melhem, by among other acts, misrepresenting the Bad Actors' business model and projected profits to Melhem, which Defendants knew to be fraudulent.

470.    As a direct and proximate result of Defendants' untrue statements and material omissions and their reasonable reliance thereupon, Plaintiff Melhem has suffered consequential damages, including the loss of use of the funds invested, the loss of interest thereupon, the loss of the principal amount invested.

WHEREFORE, Plaintiff Melhem demands judgment against Capital Force, Capital Force F1, Vehicle Solutions CF, San Miguel, Costantini, Talia-Brown, and Culley, jointly and severally, for compensatory damages, attorneys' fees pursuant to Fla. Stat. §517.211(6), and costs, interest, and such further relief as this Court deems just and proper.

## COUNT 11

**SALE OF UNREGISTERED SECURITIES**
**(By Melhem Against Capital Force, Capital Force F1, Vehicle Solutions CF, San Miguel, Costantini, Talia-Brown, and Culley)**

471.     Plaintiff Melhem restates and incorporates by reference the allegations set forth generally in paragraphs 1-79 and specifically in paragraphs 138-206 of the Complaint, as though fully set forth herein.

472.     This is a claim against all Defendants for violations of Chapter 517 of the Florida Securities and Investor Protection Act arising from the sale of unregistered securities in the state of Florida. The offers of investing in Capital Force and Capital Force F1 through the Car Loan scheme, violated section 517.211, Florida Statutes, which provides a private right of action for violations of section 517.07, Florida Statutes.

473.     Section 517.07 provides that "[i]t is unlawful and a violation of this chapter for any person to sell or offer to sell a security within this state" unless the security or transaction is "exempt" under Chapter 517, or unless the security is "registered pursuant to this chapter."

474.     The Promissory Notes are securities as defined in Section 517.021(21), Florida Statutes.

475.     The Promissory Notes are not exempt from registration under the Act.

476.     Section 517.211 renders jointly and severally liable each person making the sale "and every director, officer, partner or agent of or for the seller if the director, officer, partner or agent has personally participated or aided in making the sale."

477.     Defendants Costantini and Talia-Brown were managers, and through affiliated entities, equity owners of Capital Force Group and Capital Force F1, and personally participated in and/or aided in the sale of the Promissory Note investments with knowledge that the offer was not exempt from Florida and federal registration requirements.

478.     Pursuant to section 517.211, Florida Statutes, Plaintiff Melhem is entitled to rescission and actual damages together with interest therein.

WHEREFORE, Plaintiff Melhem demands judgment against Capital Force, Capital Force F1, Vehicle Solutions CF, San Miguel, Costantini, Talia-Brown, and Culley for compensatory damages, punitive damages, costs, attorney's fees, prejudgment interest, post-judgment interest, and such further relief as this Court deems just and proper.

## COUNT 12

**FRAUDULENT MISREPRESENTATION IN CONNECTION WITH
OFFERING THE PROMISSORY NOTE
(By Melhem Against Costantini)**

479.    Plaintiff Melhem restates and incorporates by reference the allegations set forth generally in paragraphs 1-79 and specifically in paragraphs 138-206 of the Complaint, as though fully set forth herein.

480.    This is a claim for fraudulent misrepresentation pursuant to Florida common law.

481.    As fully detailed in the allegations incorporated herein, Costantini made untrue statements of fact to Plaintiff Melhem and omitted other material facts necessary to make their affirmative statements not misleading.

482.    In so doing, Costantini acted deliberately and with the intent to deceive, manipulate and defraud Plaintiff Melhem, and made the subject misrepresentations and material omissions with the intent that Plaintiff Melhem rely on said representations and material omissions.

483.    The untrue statements of fact and material misrepresentations in question are set forth herein.

484.    Plaintiff Melhem reasonably relied to his detriment on Costantini's representations and omissions, but for which Plaintiff Melhem would never have invested in Capital Force F1 and Capital Force or agreed to enter into the respective Promissory Notes.

485.    Defendant Costantini's actions were intentional, wanton, malicious, and made with the intent to injure Plaintiff Melhem or with reckless disregard for Melhem's lawful rights.

486.     As a direct and proximate result of Costantini's untrue statements and material omissions and Plaintiff Melhem's reasonable reliance thereupon, Plaintiff Melhem suffered consequential damages, including the loss of use of the funds invested, the loss of interest thereupon, the loss of the principal amount invested.

WHEREFORE, Plaintiff Melhem demands judgment against Defendant Costantini for compensatory damages, punitive damages, costs, attorney's fees, prejudgment interest, post-judgment interest, and such further relief as this Court deems just and proper.

## COUNT 13

**BREACH OF THE PROMISSORY NOTES
AND SECURITY AGREEMENTS
(In the Alternative)
(By Melhem Against Capital Force F1 LLC)**

487.     Plaintiff Melhem restates and incorporates by reference the allegations set forth generally in paragraphs 1-79 and specifically in paragraphs 138-206 of the Complaint, as though fully set forth herein.

488.     This is an action for breach of contract against Capital Force F1 for violating its obligations under the Promissory Notes and Security Agreements.

489.     The Promissory Notes and Security Agreements constitute binding contracts pursuant to Florida law, in that there was an offer, an acceptance, and consideration given by both sides, and a definitive agreement as to all essential terms of the underlying bargain.

490.     The Promissory Notes obligate Capital Force F1 to pay interest bearing a rate of 10-12% per annum, payable monthly.

491.     On the dates applicable to due date for payment of interest, Capital Force F1 was contractually obligated to repay said interest.

492.     Despite the fact that Plaintiff Melhem has fully complied with his obligations under

the Promissory Notes by loaning Capital Force F1 the monies corresponding to Plaintiff Melhem, Capital Force F1 has materially breached its corresponding obligations by failing to the pay the interest payments as required by the Promissory Notes.

493.    Capital Force F1 has further breached its corresponding obligations by commencing the action for liquidation of assets which is an "Event of Default" under the terms of the Promissory Notes – arising from Capital Force F1's Petition for Assignment for the Benefit of Creditors on October 24, 2022.

494.    Capital Force F1 has breached its corresponding obligations under the terms of the Security Agreements by disposing of Melhem's Collateral and not replacing the Collateral with Collateral of equal value.

495.    As a result of Capital Force F1's breaches of the Promissory Notes and Security Agreements, Plaintiff Melhem has suffered pecuniary damages.

496.    Pursuant to the terms of Promissory Notes and Security Agreements, Plaintiff is entitled to an award of attorneys' fees and costs incurred as a result of Capital Force F1's breaches of the Promissory Notes.

WHEREFORE, Plaintiff Melhem demands judgment against Defendant Capital Force F1 for compensatory damages, attorneys' fees, costs, prejudgment interest, post-judgment interest, and for such further relief as this Court deems just and proper.

## COUNT 14

**BREACH OF THE PROMISSORY NOTE**
**AND SECURITY AGREEMENT**
**(In the Alternative)**
**(Against Capital Force LLC)**

497.    Plaintiff Melhem restates and incorporates by reference the allegations set forth generally in paragraphs 1-79 and specifically in paragraphs 138-206 of the Complaint, as though fully set forth herein.

498.    This is an action for breach of contract against Capital Force for violating its obligations under the Promissory Note and Security Agreement.

499.    The Promissory Note and Security Agreement constitute binding contracts pursuant to Florida law, in that there was an offer, an acceptance, and consideration given by both sides, and a definitive agreement as to all essential terms of the underlying bargain.

500.    The Promissory Notes obligate Capital Force to pay interest bearing a rate of 10-12% per annum, payable monthly.

501.    On the dates applicable to due date for payment of interest, Capital Force was contractually obligated to repay said interest.

502.    Despite the fact that Plaintiff Melhem has fully complied with his obligations under the Promissory Notes by loaning Capital Force the monies corresponding to Plaintiff Melhem, Capital Force has materially breached its corresponding obligations by failing to the pay the interest payments as required by the Promissory Notes.

503.    Capital Force has further breached its corresponding obligations by commencing the action for liquidation of assets which is an "Event of Default" under the terms of the Promissory Note – arising from Capital Force's Petition for Assignment for the Benefit of Creditors on October 24, 2022.

504.    Capital Force has breached its corresponding obligations under the terms of the Security Agreement by disposing of Melhem's Collateral and not replacing the Collateral with Collateral of equal value.

505.     As a result of Capital Force's breaches of the Promissory Note and Security Agreement, Plaintiff Melhem has suffered pecuniary damages.

506.     Pursuant to the terms of Promissory Note and Security Agreement, Plaintiff Melhem is entitled to an award of attorneys' fees and costs incurred as a result of Capital Force's breaches of the Promissory Note and Security Agreement.

WHEREFORE, Plaintiff Melhem demands judgment against Defendant Capital Force for compensatory damages, attorneys' fees, costs, prejudgment interest, post-judgment interest, and for such further relief as this Court deems just and proper.

## COUNT 15

### BREACH OF THE PROMISSORY NOTE
### AND SECURITY AGREEMENT
### (In the Alternative)
### (Against Vehicle Solutions CF)

507.     Plaintiff Melhem restates and incorporates by reference the allegations set forth generally in paragraphs 1-79 and specifically in paragraphs 138-206 of the Complaint, as though fully set forth herein.

508.     This is an action for breach of contract against Vehicle Solutions CF for violating its obligations under the Promissory Note and Security Agreement.

509.     The Promissory Note and Security Agreement constitute binding contracts pursuant to Florida law, in that there was an offer, an acceptance, and consideration given by both sides, and a definitive agreement as to all essential terms of the underlying bargain.

510.     The Promissory Notes obligate Vehicle Solutions CF to pay interest bearing a rate of 10-12% per annum, payable monthly.

511.     On the dates applicable to due date for payment of interest, Vehicle Solutions CF was contractually obligated to repay said interest.

512.     Despite the fact that Plaintiff Melhem has fully complied with his obligations under the Promissory Notes by loaning Vehicle Solutions CF the monies corresponding to Plaintiff Melhem, Vehicle Solutions CF has materially breached its corresponding obligations by failing to the pay the interest payments as required by the Promissory Notes.

513.     Vehicle Solutions CF has further breached its corresponding obligations by commencing the action for liquidation of assets which is an "Event of Default" under the terms of the Promissory Note – arising from Capital Force's Petition for Assignment for the Benefit of Creditors on October 24, 2022.

514.     Vehicle Solutions CF has breached its corresponding obligations under the terms of the Security Agreement by disposing of Melhem's Collateral and not replacing the Collateral with Collateral of equal value.

515.     As a result of Vehicle Solutions CF's breaches of the Promissory Note and Security Agreement, Plaintiff Melhem has suffered pecuniary damages.

516.     Pursuant to the terms of Promissory Note and Security Agreement, Plaintiff Melhem is entitled to an award of attorneys' fees and costs incurred as a result of Vehicle Solutions CF's breaches of the Promissory Note and Security Agreement.

WHEREFORE, Plaintiff Melhem demands judgment against Defendant Vehicle Solutions CF for compensatory damages, attorneys' fees, costs, prejudgment interest, post-judgment interest, and for such further relief as this Court deems just and proper.

## COUNT 16

### VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5
**(By Plaintiff Gustavo Archain Against Capital Force, Costantini, Talia-Brown, and Culley)**

517.     Plaintiff G. Archain restates and incorporates by reference the allegations set forth generally in paragraphs 1-79 and specifically in paragraphs 207-262 of the Complaint, as though

fully set forth herein.

518.    This is a claim for multiple violations against Defendants Capital Force, Costantini, Talia-Brown, and Culley under Section 10(b) of the Exchange Act and Rule 10b-(5) promulgated thereunder.

519.    The Investment Agreements, which included the Promissory Note, Security Agreement, and Special Power of Attorney constitute "investment contracts" for purposes of the FSIPA, in that Plaintiff G. Archain invested his money in a common enterprise, the purchase of Car Loans, and was led to expect profits derived solely from the efforts of Defendants Capital Force,  Costantini, Talia-Brown, and Culley. Defendants also failed to file Form D with the Securities Exchange Commission.

520.    Defendants Capital Force, Costantini, Talia-Brown, and Culley, directly and/or indirectly, by the use, means or instrumentality of interstate commerce or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly, made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices, and courses of business which operate or would operate as fraud or deceit.

521.    Defendants  Capital Force, Costantini, Talia-Brown, and Culley, were each a direct, necessary and substantial participant in the common course of conduct alleged herein.

522.    As detailed herein, Defendants  Capital Force, Costantini, Talia-Brown, and Culley, each knowingly or with deliberate recklessness committed manipulative or deceptive acts in furtherance of their fraudulent scheme including, *inter alia*, (a) causing and/or permitting the dissemination of false and misleading Capital Force Group marketing material and other information delivered to G. Archain; (b) providing G. Archain with false information concerning

Capital Force Group's profitability; (c) failing to disclose that  Capital Force  were grossly undercapitalized and that G. Archain's investment was at no time secured by Car Loans exceeding 125% of his investment, and (d) falsely stating that Capital Force Group had a strict Car Loan underwriting policy and effective risk management systems.

523.    At the time of said misrepresentations and omissions, G. Archain was ignorant of their falsity and had no reason to believe that Defendants  Capital Force,  Costantini, Talia-Brown, and Culley's statements were not true. Had G. Archain known of the true operating and financial of Capital Force Group (including  Capital Force ) and of its other problems *inter alia*, Car Loan deficiencies, undercapitalization, that his investment was not secured by adequate collateral, that he was not a "secured party" – he would not have invested and/or otherwise wired funds for the benefit of Capital Force .

524.    The truth about the extent and severity of the deterioration of Capital Force Group's financial and operating condition, and the inadequacy of its internal controls, became apparent to a few investors within the Costantini circle by June 2020 (including the Chilean Fund and Costantini family members).[21] These investors within Costantini's inner sanctum realized that Capital Force Group was sinking and sinking fast. Investors including the Chilean Fund and Costantini family members quietly and expeditiously demanded return of their investments. As a result, and to maintain the status quo within Costantini's inner sanctum - Capital Force Group, Costantini, Culley, and Talia-Brown undertook a plan during the course of late 2020 to liquidate Capital Force F1 and Capital Force Car Loans to repay those investors, further diluting the Car

---

[21] Unbeknownst to Archain at the time, Costantini had foreshadowed Capital Force Group's eventual demise by telling certain investors within Costantini's inner sanctum that Capital Force Group was having liquidity issues in part because VSC and Alberto San Miguel were failing to deliver Car Loans on a timely basis to collateralize the investors' money.

Loan collateral and severely crippling the already foundering situation. Information with respect to the preferential payments and further dilution of the already undercapitalized investment was not disclosed to G. Archain at the time of providing his money during the Investment Period.

525.    Had those facts been disclosed to G. Archain, G. Archain would have discovered that his existing investment was undercapitalized, and in turn would not have proceeded with being induced to make his investment.

526.    As a direct and proximate result of Defendants Capital Force,  Costantini, Talia-Brown and Culley's fraudulent scheme to raise over $35,000,000.00 with excessive leverage, inexperienced management and poor and/or nonexistent underwriting and risk management, Defendants finally caused Capital Force Group (including Capital Force ) to collapse and file Assignments for Benefit of Creditors on October 24, 2022.

527.    As a result of Costantini's lies on how G. Archain's funds would be and were invested and how successful and safe they would be (i.e., secured by 125% investment to collateral ratio) – lies documented by Costantini and others in hundreds if not thousands of emails, WhatsApp messages and false account documents to other investors – G. Archain has lost the totality of the outstanding sum of his investment which now exceeds $50,000.00.

528.    Prior to Duane Morris's Insolvency Letter of April 2022, G. Archain reasonably believed and relied upon Costantini, Talia-Brown, and Culley's representations, that his investment was safe since it was adequately secured by valuable Car Loans. Shortly after receipt of the Insolvency Letter, G. Archain was once again falsely assured by Costantini, Talia-Brown, and Culley that Capital Force Group was experiencing some difficulties, but that he continued to have performing Car Loans (and repossessed cars) to recover his investment.

529.    By virtue of the foregoing, Defendants  Capital Force,  Costantini, Talia-Brown,

and Culley have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

WHEREFORE, Plaintiff G. Archain demands judgment against Defendants Capital Force, Costantini, Talia-Brown, and Culley jointly and severally for damages, interest, and costs of this action and such further relief as this Court deems just and proper pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT 17

### Violations of Section 20(a) of the Exchange Act
### (By Gustavo Archain Against Costantini, Talia-Brown and Culley)

530.    Plaintiff G. Archain restates and incorporates by reference the allegations set forth generally in paragraphs 1-79 and specifically in paragraphs 207-262 of the Complaint, as though fully set forth herein.

531.    The Defendants Costantini, Talia-Brown and Culley acted as controlling persons of Capital Force within the meaning of § 20(a) of the Exchange Act. By reason of their high-level positions with Capital Force , their ownership of equity in Capital Force, their participation in the drafting, approving and executing of investor security agreements, Capital Force Group's promotional material, financial reports to investors, drafting electronic communications to G. Archain and other deceptive documents provided to G. Archain, dissemination of other false and inaccurate statements to the investing public, and their participation in the fraudulent schemes and acts described herein, Defendants Costantini, Talia-Brown, and Culley had the power and authority to control and cause the Capital Force Group of companies, including, but not limited, to Capital Force to engage in the wrongful conduct complained of herein.

532.    By reason of such conduct, the Defendants named herein are liable to G. Archain pursuant to §20(a) of the Exchange Act.

533.     Each of the Defendants knew or were deliberately reckless in not knowing of the adverse material facts which rendered the statements alleged herein false and misleading.

534.     Despite personal knowledge of the fundamentally deteriorated condition of Capital Force Group throughout the Investment Period, and the solicitation of investment funds through false and deceptive statements (*inter alia* – that the investments were safe, secure and collateralized with Car Loans valued 125% in excess of the investment amount), Costantini, Talia-Brown, and Culley were motivated to conceal such circumstances from Mr. G. Archain and the investing public, while they concurrently were seeking infusion of critically-needed capital.

535.     Because of their positions, their ability to exercise actual operational control, power and influence with respect to the Capital Force Group of companies, including  Capital Force 's course of conduct, including the fraudulent schemes and acts described herein, Costantini, Talia-Brown, and Culley were, during the course of the Investment Period, and at the time of wrongs alleged herein, controlling persons of the Capital Force Group of companies, including  Capital Force,  within the meaning of Section 20(a) of the Exchange Act.

536.     As set forth above, Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons of the Capital Force Group of companies,  Capital Force, , Defendants are liable to Mr. G. Archain for his damages pursuant to Section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff G. Archain demands judgment against Defendants Costantini, Talia-Brown, and Culley, jointly and severally for damages, interest, and costs of this action and such further relief as this Court deems just and proper pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**COUNT 18**

**VIOLATION OF THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT**
**(By Gustavo Archain Against Capital Force,  Costantini, Talia-Brown, and Culley)**

537.    Plaintiff G. Archain restates and incorporates by reference the allegations set forth generally in paragraphs 1-79 and specifically in paragraphs 207-262 of the Complaint, as though fully set forth herein.

538.    This is a claim for multiple violations against Defendants Capital Force, Costantini, Talia-Brown, and Culley under Florida Securities and Investor Protection Act ("FSIPA"), Section 517.011 et. seq.

539.    The Promissory Notes constitute a "security" pursuant to Section 517.021(21)(a) Florida Statutes, because it is a note, evidence of indebtedness, and/or an investment contract.

540.    The Investment Agreements, which included the Promissory Note, Security Agreement, and Special Power of Attorney constitute "investment contracts" for purposes of the FSIPA, in that Plaintiff G. Archain invested his money in a common enterprise, the purchase of Car Loans, and was led to expect profits derived solely from the efforts of Defendants  Capital Force,  Costantini, Talia-Brown, and Culley.

541.    As set forth herein, the Defendants implemented a plan and undertook unlawful acts to defraud investors, such as Plaintiff G. Archain, in connection with the sale of securities.

542.    Plaintiff G. Archain was in fact defrauded, upon investing and delivering funds to Snyder Law, relying upon information communicated through Capital Force Group's representatives, who used false and misleading statements and omissions of fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

543.    Further, Florida Statutes 517.301 declares that it is unlawful for a person to

knowingly and willfully falsify, conceal, or cover up, by any trick, scheme, or device, a material fact, make any false, fictitious, or fraudulent statement or representation.

544.    As a result, the Bad Actors orchestrated an investment scheme with the intent to deceive and defraud Plaintiff, by among other acts, misrepresenting the Bad Actors' business model and projected profits to Plaintiff, which Defendants knew to be fraudulent.

545.    As a direct and proximate result of Defendants' untrue statements and material omissions and their reasonable reliance thereupon, Plaintiff has suffered consequential damages, including the loss of use of the funds invested, the loss of interest thereupon, the loss of the principal amount invested.

546.    WHEREFORE, Plaintiff G. Archain demands judgment against Capital Force, Costantini, Talia-Brown, and Culley, jointly and severally, for compensatory damages, attorneys' fees pursuant to Fla. Stat. §517.211(6), and costs, interest, and such further relief as this Court deems just and proper.

## COUNT 19

### SALE OF UNREGISTERED SECURITIES
### (By Gustavo Archain Against Capital Force, Costantini, Talia-Brown, and Culley)

547.    Plaintiff G. Archain restates and incorporates by reference the allegations set forth generally in paragraphs 1-79 and specifically in paragraphs 207-262 of the Complaint, as though fully set forth herein.

548.    This is a claim against all Defendants for violations of Chapter 517 of the Florida Securities and Investor Protection Act arising from the sale of unregistered securities in the state of Florida. The offers of investing in Capital Force through the Car Loan scheme, violated section 517.211, Florida Statutes, which provides a private right of action for violations of section 517.07, Florida Statutes.

549.     Section 517.07 provides that "[i]t is unlawful and a violation of this chapter for any person to sell or offer to sell a security within this state" unless the security or transaction is "exempt" under Chapter 517, or unless the security is "registered pursuant to this chapter."

550.     The Promissory Notes are securities as defined in Section 517.021(21), Florida Statutes.

551.     The Promissory Notes are not exempt from registration under the Act.

552.     Section 517.211 renders jointly and severally liable each person making the sale "and every director, officer, partner or agent of or for the seller if the director, officer, partner or agent has personally participated or aided in making the sale."

553.     Defendants Costantini and Talia-Brown were managers, and through affiliated entities, equity owners of Capital Force Group, and personally participated in and/or aided in the sale of the Promissory Note investments with knowledge that the offer was not exempt from Florida and federal registration requirements.

554.     Pursuant to section 517.211, Florida Statutes, Plaintiff G. Archain is entitled to rescission and actual damages together with interest therein.

WHEREFORE, Plaintiff G. Archain demands judgment against Capital Force, Costantini, Talia-Brown, and Culley for compensatory damages, punitive damages, costs, attorney's fees, prejudgment interest, post-judgment interest, and such further relief as this Court deems just and proper.

## COUNT 20

### FRAUDULENT MISREPRESENTATION IN CONNECTION WITH OFFERING THE PROMISSORY NOTE
### (By Gustavo Archain Against Costantini)

555.     Plaintiff G. Archain restates and incorporates by reference the allegations set forth generally in paragraphs 1-79 and specifically in paragraphs 207-262 of the Complaint, as though

fully set forth herein.

556. This is a claim for fraudulent misrepresentation pursuant to Florida common law.

557. As fully detailed in the allegations incorporated herein, Costantini made untrue statements of fact to Plaintiff G. Archain and omitted other material facts necessary to make their affirmative statements not misleading.

558. In so doing, Costantini acted deliberately and with the intent to deceive, manipulate and defraud Plaintiff G. Archain, and made the subject misrepresentations and material omissions with the intent that Plaintiff G. Archain rely on said representations and material omissions.

559. The untrue statements of fact and material misrepresentations in question are set forth herein.

560. Plaintiff G. Archain reasonably relied to his detriment on the representations and omissions, but for which Plaintiff G. Archain would never have invested in  and Capital Force or agreed to enter into the respective Promissory Notes.

561. Defendant Costantini's actions were intentional, wanton, malicious, and made with the intent to injure Plaintiff G. Archain or with reckless disregard for G. Archain's lawful rights.

562. As a direct and proximate result of Costantini's untrue statements and material omissions and Plaintiff G. Archain's reasonable reliance thereupon, Plaintiff G. Archain suffered consequential damages, including the loss of use of the funds invested, the loss of interest thereupon, the loss of the principal amount invested.

WHEREFORE, Plaintiff G. Archain demands judgment against Defendant Costantini for compensatory damages, punitive damages, costs, attorney's fees, prejudgment interest, post-judgment interest, and such further relief as this Court deems just and proper.

**COUNT 21**

**BREACH OF THE PROMISSORY NOTE**
**AND SECURITY AGREEMENT**
**(In the Alternative)**
**(Against Capital Force LLC)**

563.     Plaintiff G. Archain restates and incorporates by reference the allegations set forth generally in paragraphs 1-79 and specifically in paragraphs 207-262 of the Complaint, as though fully set forth herein.

564.     This is an action for breach of contract against Capital Force for violating its obligations under the Promissory Note and Security Agreement.

565.     The Promissory Note and Security Agreement constitute binding contracts pursuant to Florida law, in that there was an offer, an acceptance, and consideration given by both sides, and a definitive agreement as to all essential terms of the underlying bargain.

566.     The Promissory Notes obligate Capital Force to pay interest bearing a rate of 10-12% per annum, payable monthly.

567.     On the dates applicable to due date for payment of interest, Capital Force was contractually obligated to repay said interest.

568.     Despite the fact that Plaintiff G. Archain has fully complied with his obligations under the Promissory Notes by loaning Capital Force the monies corresponding to Plaintiff G. Archain, Capital Force has materially breached its corresponding obligations by failing to the pay the interest payments as required by the Promissory Notes.

569.     Capital Force has further breached its corresponding obligations by commencing the action for liquidation of assets which is an "Event of Default" under the terms of the Promissory Note – arising from Capital Force's Petition for Assignment for the Benefit of Creditors on October 24, 2022.

570.     Capital Force has breached its corresponding obligations under the terms of the

Security Agreement by disposing of G. Archain's Collateral and not replacing the Collateral with Collateral of equal value.

571.    As a result of Capital Force breaches of the Promissory Note and Security Agreement, Plaintiff G. Archain has suffered pecuniary damages.

572.    Pursuant to the terms of Promissory Note and Security Agreement, Plaintiff G. Archain is entitled to an award of attorneys' fees and costs incurred as a result of Capital Force breaches of the Promissory Note and Security Agreement.

WHEREFORE, Plaintiff G. Archain demands judgment against Defendant Capital Force for compensatory damages, attorneys' fees, costs, prejudgment interest, post-judgment interest, and for such further relief as this Court deems just and proper

## COUNT 22

### VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5
**(By Plaintiff Ignacio Archain Against Capital Force, Costantini, Talia-Brown, and Culley)**

573.    Plaintiff I. Archain restates and incorporates by reference the allegations set forth generally in paragraphs 1-79 and specifically in paragraphs 263-317 of the Complaint, as though fully set forth herein.

574.    This is a claim for multiple violations against Defendants Capital Force, Costantini, Talia-Brown, and Culley under Section 10(b) of the Exchange Act and Rule 10b-(5) promulgated thereunder.

575.    The Investment Agreements, which included the Promissory Note, Security Agreement, and Special Power of Attorney constitute "investment contracts" for purposes of the FSIPA, in that Plaintiff I. Archain invested his money in a common enterprise, the purchase of Car Loans, and was led to expect profits derived solely from the efforts of Defendants Capital Force, Costantini, Talia-Brown, and Culley. Defendants also failed to file Form D with the Securities

Exchange Commission.

576.     Defendants Capital Force, Costantini, Talia-Brown, and Culley, directly and/or indirectly, by the use, means or instrumentality of interstate commerce or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly, made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices, and courses of business which operate or would operate as fraud or deceit.

577.     Defendants Capital Force, Costantini, Talia-Brown, and Culley, were each a direct, necessary and substantial participant in the common course of conduct alleged herein.

578.     As detailed herein, Defendants Capital Force, Costantini, Talia-Brown, and Culley, each knowingly or with deliberate recklessness committed manipulative or deceptive acts in furtherance of their fraudulent scheme including, *inter alia*, (a) causing and/or permitting the dissemination of false and misleading Capital Force Group marketing material and other information delivered to I. Archain; (b) providing I. Archain with false information concerning Capital Force Group's profitability; (c) failing to disclose that Capital Force were grossly undercapitalized and that I. Archain's investment was at no time secured by Car Loans exceeding 125% of his investment, and (d) falsely stating that Capital Force Group had a strict Car Loan underwriting policy and effective risk management systems.

579.     At the time of said misrepresentations and omissions, I. Archain was ignorant of their falsity and had no reason to believe that Defendants Capital Force, Costantini, Talia-Brown, and Culley's statements were not true. Had I. Archain known of the true operating and financial of Capital Force Group (including Capital Force ) and of its other problems *inter alia*, Car Loan deficiencies, undercapitalization, that his investment was not secured by adequate collateral, that

he was not a "secured party" – he would not have invested and/or otherwise wired funds for the benefit of Capital Force .

580.    The truth about the extent and severity of the deterioration of Capital Force Group's financial and operating condition, and the inadequacy of its internal controls, became apparent to a few investors within the Costantini circle by June 2020 (including the Chilean Fund and Costantini family members).[22] These investors within Costantini's inner sanctum realized that Capital Force Group was sinking and sinking fast. Investors including the Chilean Fund and Costantini family members quietly and expeditiously demanded return of their investments. As a result, and to maintain the status quo within Costantini's inner sanctum - Capital Force Group, Costantini, Culley, and Talia-Brown undertook a plan during the course of late 2020 to liquidate Capital Force F1 and Capital Force Car Loans to repay those investors, further diluting the Car Loan collateral and severely crippling the already foundering situation. Information with respect to the preferential payments and further dilution of the already undercapitalized investment was not disclosed to I. Archain at the time of providing his money during the Investment Period.

581.    Had those facts been disclosed to I. Archain, I. Archain would have discovered that his existing investment was undercapitalized, and in turn would not have proceeded with being induced to make his investment.

582.    As a direct and proximate result of Defendants  Capital Force,  Costantini, Talia-Brown and Culley's fraudulent scheme to raise over $35,000,000.00 with excessive leverage, inexperienced management and poor and/or nonexistent underwriting and risk management,

---

[22] Unbeknownst to Archain at the time, Costantini had foreshadowed Capital Force Group's eventual demise by telling certain investors within Costantini's inner sanctum that Capital Force Group was having liquidity issues in part because VSC and Alberto San Miguel were failing to deliver Car Loans on a timely basis to collateralize the investors' money.

Defendants finally caused Capital Force Group (including Capital Force ) to collapse and file Assignments for Benefit of Creditors on October 24, 2022.

583.    As a result of Costantini's lies on how I. Archain's funds would be and were invested and how successful and safe they would be (i.e., secured by 125% investment to collateral ratio) – lies documented by Costantini and others in hundreds if not thousands of emails, WhatsApp messages and false account documents to other investors – I. Archain has lost the totality of the outstanding sum of his investment which now exceeds $100,000.00.

584.    Prior to Duane Morris's Insolvency Letter of April 2022, I. Archain reasonably believed and relied upon Costantini, Talia-Brown, and Culley's representations, that his investment was safe since it was adequately secured by valuable Car Loans. Shortly after receipt of the Insolvency Letter, I. Archain was once again falsely assured by Costantini, Talia-Brown, and Culley that Capital Force Group was experiencing some difficulties, but that he continued to have performing Car Loans (and repossessed cars) to recover his investment.

585.    By virtue of the foregoing, Defendants  Capital Force,  Costantini, Talia-Brown, and Culley have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

WHEREFORE, Plaintiff I. Archain demands judgment against Defendants  Capital Force, Costantini, Talia-Brown, and Culley jointly and severally for damages, interest, and costs of this action and such further relief as this Court deems just and proper pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT 23

**Violations of Section 20(a) of the Exchange Act**
**(By Ignacio Archain Against Costantini, Talia-Brown and Culley)**

586.    Plaintiff I. Archain restates and incorporates by reference the allegations set forth

generally in paragraphs 1-79 and specifically in paragraphs 263-317 of the Complaint, as though fully set forth herein.

587.    The Defendants Costantini, Talia-Brown and Culley acted as controlling persons of Capital Force within the meaning of § 20(a) of the Exchange Act. By reason of their high-level positions with Capital Force , their ownership of equity in Capital Force, their participation in the drafting, approving and executing of investor security agreements, Capital Force Group's promotional material, financial reports to investors, drafting electronic communications to Archain and other deceptive documents provided to Archain, dissemination of other false and inaccurate statements to the investing public, and their participation in the fraudulent schemes and acts described herein, Defendants Costantini, Talia-Brown, and Culley had the power and authority to control and cause the Capital Force Group of companies, including, but not limited, to  Capital Force  to engage in the wrongful conduct complained of herein.

588.    By reason of such conduct, the Defendants named herein are liable to Archain pursuant to §20(a) of the Exchange Act.

589.    Each of the Defendants knew or were deliberately reckless in not knowing of the adverse material facts which rendered the statements alleged herein false and misleading.

590.    Despite personal knowledge of the fundamentally deteriorated condition of Capital Force Group throughout the Investment Period, and the solicitation of investment funds through false and deceptive statements (*inter alia* – that the investments were safe, secure and collateralized with Car Loans valued 125% in excess of the investment amount), Costantini, Talia-Brown, and Culley were motivated to conceal such circumstances from Mr. Archain and the investing public, while they concurrently were seeking infusion of critically-needed capital.

591.    Because of their positions, their ability to exercise actual operational control, power and influence with respect to the Capital Force Group of companies, including  Capital Force 's course of conduct, including the fraudulent schemes and acts described herein, Costantini, Talia-Brown, and Culley were, during the course of the Investment Period, and at the time of wrongs alleged herein, controlling persons of the Capital Force Group companies, including  Capital Force,  within the meaning of Section 20(a) of the Exchange Act.

592.    As set forth above, Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons of the Capital Force Group companies, Defendants are liable to I. Archain for his damages pursuant to Section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff I. Archain demands judgment against Defendants Costantini, Talia-Brown, and Culley, jointly and severally for damages, interest, and costs of this action and such further relief as this Court deems just and proper pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT 24

### VIOLATION OF THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT
**(By Ignacio Archain Against Capital Force,  Costantini, Talia-Brown, and Culley)**

593.    Plaintiff I. Archain restates and incorporates by reference the allegations set forth generally in paragraphs 1-79 and specifically in paragraphs 263-317 of the Complaint, as though fully set forth herein.

594.    This is a claim for multiple violations against Defendants Capital Force, Costantini, Talia-Brown, and Culley under Florida Securities and Investor Protection Act ("FSIPA"), Section 517.011 et. seq.

595.     The Promissory Notes constitute a "security" pursuant to Section 517.021(21)(a) Florida Statutes, because it is a note, evidence of indebtedness, and/or an investment contract.

596.     The Investment Agreements, which included the Promissory Note, Security Agreement, and Special Power of Attorney constitute "investment contracts" for purposes of the FSIPA, in that Plaintiff Archain invested his money in a common enterprise, the purchase of Car Loans, and was led to expect profits derived solely from the efforts of Defendants  Capital Force, Costantini, Talia-Brown, and Culley.

597.     As set forth herein, the Defendants implemented a plan and undertook unlawful acts to defraud investors, such as Plaintiff Archain, in connection with the sale of securities.

598.     Plaintiff Archain was in fact defrauded, upon investing and delivering funds to Snyder Law, relying upon information communicated through Capital Force Group's representatives, who used false and misleading statements and omissions of fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

599.     Further, Florida Statutes 517.301 declares that it is unlawful for a person to knowingly and willfully falsify, conceal, or cover up, by any trick, scheme, or device, a material fact, make any false, fictitious, or fraudulent statement or representation.

600.     As a result, the Bad Actors orchestrated an investment scheme with the intent to deceive and defraud Plaintiff, by among other acts, misrepresenting the Bad Actors' business model and projected profits to Plaintiff, which Defendants knew to be fraudulent.

601.     As a direct and proximate result of Defendants' untrue statements and material omissions and their reasonable reliance thereupon, Plaintiff has suffered consequential damages, including the loss of use of the funds invested, the loss of interest thereupon, the loss of the

principal amount invested.

WHEREFORE, Plaintiff I. Archain demands judgment against Capital Force, Costantini, Talia-Brown, and Culley, jointly and severally, for compensatory damages, attorneys' fees pursuant to Fla. Stat. §517.211(6), and costs, interest, and such further relief as this Court deems just and proper.

**COUNT 25**

**SALE OF UNREGISTERED SECURITIES**
**(By Ignacio Archain Against Capital Force, Costantini, Talia-Brown, and Culley)**

602.    Plaintiff I. Archain restates and incorporates by reference the allegations set forth generally in paragraphs 1-79 and specifically in paragraphs 263-317 of the Complaint, as though fully set forth herein.

603.    This is a claim against Defendants Capital Force, Costantini, Talia-Brown, and Culley for violations of Chapter 517 of the Florida Securities and Investor Protection Act arising from the sale of unregistered securities in the state of Florida. The offers of investing in Capital Force through the Car Loan scheme, violated section 517.211, Florida Statutes, which provides a private right of action for violations of section 517.07, Florida Statutes.

604.    Section 517.07 provides that "[i]t is unlawful and a violation of this chapter for any person to sell or offer to sell a security within this state" unless the security or transaction is "exempt" under Chapter 517, or unless the security is "registered pursuant to this chapter."

605.    The Promissory Notes are securities as defined in Section 517.021(21), Florida Statutes.

606.    The Promissory Notes are not exempt from registration under the Act.

607.     Section 517.211 renders jointly and severally liable each person making the sale "and every director, officer, partner or agent of or for the seller if the director, officer, partner or agent has personally participated or aided in making the sale."

608.     Defendants Costantini and Talia-Brown were managers, and through affiliated entities, equity owners of Capital Force Group, and personally participated in and/or aided in the sale of the Promissory Note investments with knowledge that the offer was not exempt from Florida and federal registration requirements.

609.     Pursuant to section 517.211, Florida Statutes, Plaintiff I. Archain is entitled to rescission and actual damages together with interest therein.

WHEREFORE, Plaintiff Archain demands judgment against Capital Force, Costantini, Talia-Brown, and Culley for compensatory damages, punitive damages, costs, attorney's fees, prejudgment interest, post-judgment interest, and such further relief as this Court deems just and proper.

## COUNT 26

**FRAUDULENT MISREPRESENTATION IN CONNECTION WITH OFFERING THE PROMISSORY NOTE**
**(By Ignacio Archain Against Costantini)**

610.     Plaintiff I. Archain restates and incorporates by reference the allegations set forth i generally in paragraphs 1-79 and specifically in paragraphs 263-317 of the Complaint, as though fully set forth herein.

611.     This is a claim for fraudulent misrepresentation pursuant to Florida common law.

612.     As fully detailed in the allegations incorporated herein, Costantini made untrue statements of fact to Plaintiff I. Archain and omitted other material facts necessary to make their affirmative statements not misleading.

613.     In so doing, Costantini acted deliberately and with the intent to deceive, manipulate

and defraud Plaintiff I. Archain, and made the subject misrepresentations and material omissions with the intent that Plaintiff Archain rely on said representations and material omissions.

614.    The untrue statements of fact and material misrepresentations in question are set forth herein.

615.    Plaintiff Archain reasonably relied to his detriment on the representations and omissions, but for which Plaintiff I. Archain would never have invested in  and Capital Force or agreed to enter into the respective Promissory Notes.

616.    Defendant Costantini's actions were intentional, wanton, malicious, and made with the intent to injure Plaintiff Archain or with reckless disregard for I. Archain's lawful rights.

617.    As a direct and proximate result of Costantini's untrue statements and material omissions and Plaintiff I. Archain's reasonable reliance thereupon, Plaintiff I. Archain suffered consequential damages, including the loss of use of the funds invested, the loss of interest thereupon, the loss of the principal amount invested.

WHEREFORE, Plaintiff I. Archain demands judgment against Defendant Costantini for compensatory damages, punitive damages, costs, attorney's fees, prejudgment interest, post-judgment interest, and such further relief as this Court deems just and proper.

## COUNT 27

### BREACH OF THE PROMISSORY NOTE
### AND SECURITY AGREEMENT
### (In the Alternative)
### (Against Capital Force LLC)

618.    Plaintiff I. Archain restates and incorporates by reference the allegations set forth generally in paragraphs 1-79 and specifically in paragraphs 263-317of the Complaint, as though fully set forth herein.

619.    This is an action for breach of contract against Capital Force for violating its

obligations under the Promissory Note and Security Agreement.

620.     The Promissory Note and Security Agreement constitute binding contracts pursuant to Florida law, in that there was an offer, an acceptance, and consideration given by both sides, and a definitive agreement as to all essential terms of the underlying bargain.

621.     The Promissory Notes obligate Capital Force to pay interest bearing a rate of 10-12% per annum, payable monthly.

622.     On the dates applicable to due date for payment of interest, Capital Force was contractually obligated to repay said interest.

623.     Despite the fact that Plaintiff I. Archain has fully complied with his obligations under the Promissory Notes by loaning Capital Force the monies corresponding to Plaintiff Archain, Capital Force has materially breached its corresponding obligations by failing to the pay the interest payments as required by the Promissory Notes.

624.     Capital Force has further breached its corresponding obligations by commencing the action for liquidation of assets which is an "Event of Default" under the terms of the Promissory Note – arising from Capital Force's Petition for Assignment for the Benefit of Creditors on October 24, 2022.

625.     Capital Force has breached its corresponding obligations under the terms of the Security Agreement by disposing of I. Archain's Collateral and not replacing the Collateral with Collateral of equal value.

626.     As a result of Capital Force breaches of the Promissory Note and Security Agreement, Plaintiff I. Archain has suffered pecuniary damages.

627.     Pursuant to the terms of Promissory Note and Security Agreement, Plaintiff I. Archain is entitled to an award of attorneys' fees and costs incurred as a result of Capital Force

breaches of the Promissory Note and Security Agreement.

WHEREFORE, Plaintiff I. Archain demands judgment against Defendant Capital Force for compensatory damages, attorneys' fees, costs, prejudgment interest, post-judgment interest, and for such further relief as this Court deems just and proper

## COUNT 28

### VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5
**(By Guillermo De Julio Against Capital Force F1, Costantini, Talia-Brown, and Culley)**

628.    Plaintiff De Julio restates and incorporates by reference the allegations set forth generally in paragraphs 1-79 and specifically in paragraphs 318-376 of the Complaint, as though fully set forth herein.

629.    This is a claim for multiple violations against Defendants Capital Force F1, Costantini, Talia-Brown, and Culley under Section 10(b) of the Exchange Act and Rule 10b-(5) promulgated thereunder.

630.    The Investment Agreements, which included the Promissory Note, Security Agreement, and Special Power of Attorney constitute "investment contracts" for purposes of the FSIPA, in that Plaintiff De Julio invested his money in a common enterprise, the purchase of Car Loans, and was led to expect profits derived solely from the efforts of Defendants Capital Force F1, Costantini, Talia-Brown, and Culley. Defendants also failed to file Form D with the Securities Exchange Commission.

631.    Defendants Capital Force F1, Costantini, Talia-Brown, and Culley, directly and/or indirectly, by the use, means or instrumentality of interstate commerce or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly, made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts,

practices, and courses of business which operate or would operate as fraud or deceit.

632.    Defendants Capital Force F1, Costantini, Talia-Brown, and Culley, were each a direct, necessary and substantial participant in the common course of conduct alleged herein.

633.    As detailed herein, Defendants Capital Force F1, Costantini, Talia-Brown, and Culley, each knowingly or with deliberate recklessness committed manipulative or deceptive acts in furtherance of their fraudulent scheme including, *inter alia*, (a) causing and/or permitting the dissemination of false and misleading   Capital Force Group marketing material and other information delivered to De Julio; (b) providing De Julio with false information concerning Capital Force Group's profitability; (c) failing to disclose that and Capital Force F1 were grossly undercapitalized and that De Julio's investment was at no time secured by Car Loans exceeding 125% of his investment, and (d) falsely stating that  Capital Force Group had a strict Car Loan underwriting policy and effective risk management systems.

634.    At the time of said misrepresentations and omissions, De Julio was ignorant of their falsity and had no reason to believe that Defendants Capital Force F1, Costantini, Talia-Brown, and Culley's statements were not true. Had De Julio known of the true operating and financial of Capital Force Group (including Capital Force F1) and of its other problems *inter alia*, Car Loan deficiencies, undercapitalization, that his investment was not secured by adequate collateral, that he was not a "secured party" – he would not have invested and/or otherwise wired funds for the benefit of  and  Capital Force F1.

635.    The truth about the extent and severity of the deterioration of Capital Force Group's financial and operating condition, and the inadequacy of its internal controls, became apparent to a few investors within the Costantini circle by June 2020 (including the Chilean Fund and

Costantini family members).[23] These investors within Costantini's inner sanctum realized that Capital Force Group was sinking and sinking fast. Investors including the Chilean Fund and Costantini family members quietly and expeditiously demanded return of their investments. As a result, and to maintain the status quo within Costantini's inner sanctum - Capital Force Group Costantini, Culley, Talia-Brown and  undertook a plan during the course of late 2020 to liquidate Capital Force F1 and Capital Force Car Loans to repay those investors, further diluting the Car Loan collateral and severely crippling the already foundering situation. Information with respect to the preferential payments and further dilution of the already undercapitalized investment was not disclosed to De Julio at the time of providing his money during the Investment Period.

636.    Had those facts been disclosed to De Julio, De Julio would have discovered that his existing investment was undercapitalized, and in turn would not have proceeded with being induced to make his investment.

637.    As a direct and proximate result of Defendants Capital Force F1, Costantini, Talia-Brown and Culley's fraudulent scheme to raise over $35,000,000.00 with excessive leverage, inexperienced management and poor and/or nonexistent underwriting and risk management, Defendants finally caused  Capital Force Group (including Capital Force F1) to collapse and file Assignments for Benefit of Creditors on October 24, 2022.

638.    As a result of Costantini's lies on how De Julio's funds would be and were invested and how successful and safe they would be (i.e., secured by 125% investment to collateral ratio) – lies documented by Costantini and others in hundreds if not thousands of emails, WhatsApp

---

[23] Unbeknownst to De Julio at the time, Costantini had foreshadowed  Capital Force Group's eventual demise by telling certain investors within Costantini's inner sanctum that  Capital Force Group was having liquidity issues in part because VSC and Alberto San Miguel were failing to deliver Car Loans on a timely basis to collateralize the investors' money.

messages and false account documents to other investors – De Julio has lost the totality of the outstanding sum of his investment which now exceeds $100,000.00.

639.    Prior to Duane Morris's Insolvency Letter of April 2022, De Julio reasonably believed and relied upon Costantini, Talia-Brown, and Culley's representations, that his investment was safe since it was adequately secured by valuable Car Loans. Shortly after receipt of the Insolvency Letter, De Julio was once again falsely assured by Costantini, Talia-Brown, and Culley that Capital Force Group was experiencing some difficulties, but that he continued to have performing Car Loans (and repossessed cars) to recover his investment.

640.    By virtue of the foregoing, Defendants Capital Force F1, Costantini, Talia-Brown, and Culley have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

WHEREFORE, Plaintiff De Julio demands judgment against Capital Force F1, Costantini, Talia-Brown, and Culley jointly and severally for damages, interest, and costs of this action and such further relief as this Court deems just and proper pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**<u>COUNT 29</u>**
**Violations of Section 20(a) of the Exchange Act**
**(By Guillermo De Julio Against  Costantini, Talia-Brown and Culley)**

641.    Plaintiff De Julio restates and incorporates by reference the allegations set forth generally in paragraphs 1-79 and specifically in paragraphs 318-376 of the Complaint, as though fully set forth herein.

642.    The Defendants Costantini, Talia-Brown and Culley acted as controlling persons of  and,  Capital Force F1 within the meaning of § 20(a) of the Exchange Act. By reason of their high-level positions with and  Capital Force F1, their ownership of equity in   and  Capital Force

F1, their participation in the drafting, approving and executing of investor security agreements, Capital Force Capital Force Group's promotional material, financial reports to investors, drafting electronic communications to De Julio and other deceptive documents provided to De Julio, dissemination of other false and inaccurate statements to the investing public, and their participation in the fraudulent schemes and acts described herein, Defendants Costantini, Talia-Brown, and Culley had the power and authority to control and cause the Capital Force Group of companies, including, but not limited, and Capital Force F1 to engage in the wrongful conduct complained of herein.

643.     By reason of such conduct, the Defendants named herein are liable to De Julio pursuant to §20(a) of the Exchange Act.

644.     Each of the Defendants knew or were deliberately reckless in not knowing of the adverse material facts which rendered the statements alleged herein false and misleading.

645.     Despite personal knowledge of the fundamentally deteriorated condition of Capital Force Group throughout the Investment Period, and the solicitation of investment funds through false and deceptive statements (*inter alia* – that the investments were safe, secure and collateralized with Car Loans valued 125% in excess of the investment amount), Costantini, Talia-Brown, and Culley were motivated to conceal such circumstances from Mrs. De Julio and the investing public, while they concurrently were seeking infusion of critically-needed capital.

646.     Because of their positions, their ability to exercise actual operational control, power and influence with respect to the Capital Force Group of companies, including Capital Force F1's course of conduct, including the fraudulent schemes and acts described herein, Costantini, Talia-Brown, and Culley were, during the course of the Investment Period, and at the time of wrongs

alleged herein, controlling persons of the Capital Force Group of companies, including Capital Force F1 within the meaning of Section 20(a) of the Exchange Act.

647.    As set forth above, Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons of the Capital Force Group of companies, and Capital Force F1, Defendants are liable to De Julio for his damages pursuant to Section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff De Julio demands judgment against Defendants Costantini, Talia-Brown, and Culley, jointly and severally for damages, interest, and costs of this action and such further relief as this Court deems just and proper pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT 30

### VIOLATION OF THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT
### (By Guillermo De Julio Against Capital Force F1, Costantini, Talia-Brown, and Culley)

648.    Plaintiff De Julio restates and incorporates by reference the allegations set forth generally in paragraphs 1-79 and specifically in paragraphs 318-376 of the Complaint, as though fully set forth herein.

649.    This is a claim for multiple violations against Defendants Capital Force F1, Costantini, Talia-Brown, and Culley under Florida Securities and Investor Protection Act ("FSIPA"), Section 517.011 et. seq.

650.    The Promissory Notes constitute a "security" pursuant to Section 517.021(21)(a) Florida Statutes, because it is a note, evidence of indebtedness, and/or an investment contract.

651.    The Investment Agreements, which included the Promissory Note, Security Agreement, and Special Power of Attorney constitute "investment contracts" for purposes of the

FSIPA, in that Plaintiff De Julio invested his money in a common enterprise, the purchase of Car Loans, and was led to expect profits derived solely from the efforts of Defendants Capital Force F1, Costantini, Talia-Brown, and Culley.

652.    As set forth herein, the Defendants implemented a plan and undertook unlawful acts to defraud investors, such as Plaintiff De Julio, in connection with the sale securities.

653.    Plaintiff De Julio was in fact defrauded, upon investing and delivering funds to Snyder Law, relying upon information communicated through Capital Force Group's representatives, who used false and misleading statements and omissions of fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

654.    Further, Florida Statutes 517.301 declares that it is unlawful for a person to knowingly and willfully falsify, conceal, or cover up, by any trick, scheme, or device, a material fact, make any false, fictitious, or fraudulent statement or representation.

655.    As a result, the Bad Actors orchestrated an investment scheme with the intent to deceive and defraud Plaintiff, by among other acts, misrepresenting the Bad Actors' business model and projected profits to Plaintiff, which Defendants knew to be fraudulent.

656.    As a direct and proximate result of Defendants' untrue statements and material omissions and their reasonable reliance thereupon, Plaintiff has suffered consequential damages, including the loss of use of the funds invested, the loss of interest thereupon, the loss of the principal amount invested.

WHEREFORE, Plaintiff De Julio demands judgment against Capital Force F1, Costantini, Talia-Brown, and Culley, jointly and severally, for compensatory damages, attorneys' fees

pursuant to Fla. Stat. §517.211(6), and costs, interest, and such further relief as this Court deems just and proper.

## COUNT 31

### SALE OF UNREGISTERED SECURITIES
### (By Guillermo De Julio Against Capital Force F1,  Costantini, Talia-Brown, and Culley)

657.    Plaintiff De Julio restates and incorporates by reference the allegations set forth generally in paragraphs 1-79 and specifically in paragraphs 318-376  of the Complaint, as though fully set forth herein.

658.    This is a claim against Defendants Capital Force F1, Costantini, Talia-Brown, and Culley for violations of Chapter 517 of the Florida Securities and Investor Protection Act arising from the sale of unregistered securities in the state of Florida. The offers of investing in  and Capital Force F1 through the Car Loan scheme, violated section 517.211, Florida Statutes, which provides a private right of action for violations of section 517.07, Florida Statutes.

659.    Section 517.07 provides that "[i]t is unlawful and a violation of this chapter for any person to sell or offer to sell a security within this state" unless the security or transaction is "exempt" under Chapter 517, or unless the security is "registered pursuant to this chapter."

660.    The Promissory Notes are securities as defined in Section 517.021(21), Florida Statutes.

661.    The Promissory Notes are not exempt from registration under the Act.

662.    Section 517.211 renders jointly and severally liable each person making the sale "and every director, officer, partner or agent of or for the seller if the director, officer, partner or agent has personally participated or aided in making the sale."

663.    Defendants Costantini and Talia-Brown were managers, and through affiliated entities, equity owners of Capital Force Group and Capital Force F1, and personally participated in and/or aided in the sale of the Promissory Note investments with knowledge that the offer was not exempt from Florida and federal registration requirements.

664.    Pursuant to section 517.211, Florida Statutes, Plaintiff De Julio is entitled to rescission and actual damages together with interest therein.

WHEREFORE, Plaintiff De Julio demands judgment against Capital Force F1, Costantini, Talia-Brown, and Culley for compensatory damages, punitive damages, costs, attorney's fees, prejudgment interest, post-judgment interest, and such further relief as this Court deems just and proper.

## COUNT 32

### FRAUDULENT MISREPRESENTATION IN CONNECTION WITH
### OFFERING THE PROMISSORY NOTE
### (By Guillermo De Julio Against Costantini)

665.    Plaintiff De Julio restates and incorporates by reference the allegations set forth generally in paragraphs 1-79 and specifically in paragraphs 318-376 of the Complaint, as though fully set forth herein.

666.    This is a claim for fraudulent misrepresentation pursuant to Florida common law.

667.    As fully detailed in the allegations incorporated herein, Costantini made untrue statements of fact to Plaintiff De Julio and omitted other material facts necessary to make their affirmative statements not misleading.

668.    In so doing, Costantini acted deliberately and with the intent to deceive, manipulate and defraud Plaintiff De Julio, and made the subject misrepresentations and material omissions with the intent that Plaintiff De Julio rely on said representations and material omissions.

669.    The untrue statements of fact and material misrepresentations in question are set

forth herein.

670.    Plaintiff De Julio reasonably relied to his detriment on the representations and omissions, but for which Plaintiff De Julio would never have invested in  Capital Force F1 and  or agreed to enter into the respective Promissory Notes.

671.    Defendant Costantini's actions were intentional, wanton, malicious, and made with the intent to injure Plaintiff De Julio or with reckless disregard for De Julio's lawful rights.

672.    As a direct and proximate result of Costantini's untrue statements and material omissions and Plaintiff De Julio's reasonable reliance thereupon, Plaintiff De Julio suffered consequential damages, including the loss of use of the funds invested, the loss of interest thereupon, the loss of the principal amount invested.

WHEREFORE, Plaintiff De Julio demands judgment against Defendant Costantini for compensatory damages, punitive damages, costs, attorney's fees, prejudgment interest, post-judgment interest, and such further relief as this Court deems just and proper.

## COUNT 33

**BREACH OF THE PROMISSORY NOTES
AND SECURITY AGREEMENTS
(In the Alternative)
(By Guillermo De Julio Against Capital Force F1 LLC)**

673.    Plaintiff De Julio restates and incorporates by reference the allegations set forth generally in paragraphs 1-79 and specifically in paragraphs 318-376 of the Complaint, as though fully set forth herein.

674.    This is an action for breach of contract against  Capital Force F1 for violating its obligations under the Promissory Notes and Security Agreements.

675.    The Promissory Notes and Security Agreements constitute binding contracts pursuant to Florida law, in that there was an offer, an acceptance, and consideration given by both

sides, and a definitive agreement as to all essential terms of the underlying bargain.

676.    The Promissory Notes obligate Capital Force F1 to pay interest bearing a rate of 10-12% per annum, payable monthly.

677.    On the dates applicable to due date for payment of interest,  Capital Force F1 was contractually obligated to repay said interest.

678.    Despite the fact that Plaintiff De Julio has fully complied with his obligations under the Promissory Notes by loaning  Capital Force F1 the monies corresponding to Plaintiff De Julio, Capital Force F1 has materially breached its corresponding obligations by failing to the pay the interest payments as required by the Promissory Notes.

679.    Capital Force F1 has further breached its corresponding obligations by commencing the action for liquidation of assets which is an "Event of Default" under the terms of the Promissory Notes – arising from  Capital Force F1's Petition for Assignment for the Benefit of Creditors on October 24, 2022.

680.    Capital Force F1 has breached its corresponding obligations under the terms of the Security Agreements by disposing of De Julio's Collateral and not replacing the Collateral with Collateral of equal value.

681.    As a result of  Capital Force F1's breaches of the Promissory Notes and Security Agreements, Plaintiff De Julio has suffered pecuniary damages.

682.    Pursuant to the terms of Promissory Notes and Security Agreements, Plaintiff is entitled to an award of attorneys' fees and costs incurred as a result of  Capital Force F1's breaches of the Promissory Notes.

WHEREFORE, Plaintiff De Julio demands judgment against Defendant  Capital Force F1 for compensatory damages, attorneys' fees, costs, prejudgment interest, post-judgment interest,

and for such further relief as this Court deems just and proper.

DATED: December 15, 2023

> **VAZQUEZ & ASSOCIATES**
> *Counsel for Plaintiff*
> 1111 Brickell Avenue
> Suite 1550
> Miami, Florida 33131
> Telephone: (305) 371.8064
> Facsimile: (305) 371.4967
> By: Gerardo A. Vazquez
> Gerardo A. Vazquez, Esq.
> Florida Bar No. 0006904
> E-Mail: gv@gvazquez.com
> Ralph Longo IV, Esq.
> Florida Bar No. 124169
> E-Mail: rl@gvazquez.com
> Safa Chowdhury, Esq.
> Florida Bar No. 1033004
> E-Mail: sc@gvazquez.com
> Steven Herzberg, Esq.
> Florida Bar No. 111541
> E-Mail: sh@gvazquez.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of December 2023, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF.

> By: Gerardo A. Vazquez
> Gerardo A. Vazquez, Esq.
> Florida Bar No. 0006904
> E-Mail: gv@gvazquez.com